752 So.2d 1113 (1999)
Della F. EUBANKS et al.
v.
Mike HALE.
1980596.
Supreme Court of Alabama.
July 2, 1999.
Opinion on Return to Remand August 20, 1999.
Opinion on Return to Second Remand November 5, 1999.
*1119 Albert L. Jordan, Michael L. Jackson, and Shara L. Gray of Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham; and Algert S. Agricola, Jr., of Wallace, Jordan, Ratliff & Brandt, L.L.C., Montgomery, for appellants Della F. Eubanks, Daniel J. Nichols, and Jim Woodward.
Russell Jackson Drake of Whatley Drake, L.L.C., Birmingham; Fournier J. Gale III of Maynard, Cooper & Gale, P.C., Birmingham, and C.C. Torbert, Jr., of Maynard, Cooper & Gale, P.C., Montgomery, for appellee.
PER CURIAM.
This appeal involves the contest of an election for the office of sheriff of Jefferson County. Many of the facts relating to the contest are undisputed. Nonetheless, we set out the pertinent facts to show the nature of the controversy and the legal issues presented.
On November 3, 1998, an election was held in Jefferson County for the office of sheriff of Jefferson County. Jim Woodward and Mike Hale were candidates for this office. On November 6, 1998, the Board of Supervisors/Canvassing Board for Jefferson County declared the results of the election. The declaration was based on a canvass of election returns provided by the returning officers of the various precincts, including a canvass of the returns of the absentee box made by the absentee-election manager. The canvass showed that Hale had received 106,269 votes and that Jim Woodward had received 106,232 votesthe difference was 37 votes. The Board declared Mike Hale the winner.
After several proceedings related to the election had occurred, Della F. Eubanks, Daniel J. Nichols, and Jim Woodward (hereinafter together referred to as "the contestants") filed a statement of election contest in the Jefferson Circuit Court. When they filed the contest, they also filed a "motion for random assignment of judge by the presiding judge." After seven of the circuit judges recused themselves, Judge William Wynn was chosen by a random drawing to preside over the election contest.
Judge Wynn ordered the contestants to file, in camera, a list of the names and addresses of persons who the contestants believed had cast illegal votes. The contestants complied with the order, presenting two lists containing the names and addresses of 274 voters suspected of having cast illegal or invalid ballots. On December 9, 1998, the contestants served notice to the adverse party of the number of alleged illegal votes and certain information regarding those votes, as required by § 17-15-21, Ala.Code 1975. This notice listed 64 voters in the Bessemer Division of Jefferson County as having cast illegal absentee ballots for Mike Hale; the notice also stated that the contestants intended to introduce evidence tending to show that between 100 and 200 on-site absentee ballots from the Birmingham Division had not been counted because on those ballots the box indicating the reason for voting absentee was not marked. The contestants contend that those ballots should have been counted.
The trial court set the trial for January 6, 1999, and scheduled a pretrial conference for December 29, 1998. At the December 29, 1998, conference, Judge Wynn asked the contestants to "show with particularity what they expect to prove at the *1120 trial of this case." The contestants described two general categories of evidence they intended to offer: (1) the on-site absentee ballots in the Birmingham Division that they claim were not counted, but should have been, and (2) the 64 absentee ballots from the Bessemer Division that they claim were illegally cast.
Before the December 29, 1998, conference, Judge Wynn allowed the contestants access to the absentee-ballot applications and affidavits of the 64 voters in the Bessemer Division that the contestants had identified as having cast illegal votes for Mike Hale. The record indicates that the contestants could locate the affidavits of only 48 of those 64 voters, and that of those 48 only 46 might have cast illegal ballots.
On January 4, 1999, Judge Wynn entered an order dismissing the election contest and certifying Mike Hale as having been elected sheriff of Jefferson County.
The contestants appealed, arguing, among other things, that the trial court had erred in not considering the disputed on-site absentee ballots cast in the Birmingham Division and in not allowing the contestants to observe his in camera examination of those absentee ballots.
In dismissing the contest, Judge Wynn stated:
"The [contestants'] first argument was that votes not counted because of failure of voters to mark the blockshould have been counted. I counted every single uncounted ballot and added the totals to Woodward and Hale. Hale still received the majority of votes."
(Emphasis added.)
The contestants argue that they were not permitted to observe all of the examination proceedings conducted by the court. They claim that under § 17-15-7(2), Ala. Code 1975, they should have been permitted to observe those proceedings. That statute provides, in part, that "[e]xamination procedures shall be within the discretion of the court," but it also states that "[t]he court must, when so requested by any party or candidate involved in the contest, allow such party or candidate, and his agents, to observe all of the examination proceedings." (Emphasis added.)
From the record before us, we cannot determine whether the parties were allowed to observe all of the examination proceedings and we cannot determine what election materials the trial judge examined in camera. Consequently, we remand this case with instructions for the trial judge to conduct a hearing at which he specifies the election materials he examined in camera and allows the parties to examine those materials and to file such exceptions and objections to the January 4, 1999, dismissal order as they deem proper. The trial court is directed to make a return to this Court within 14 days, and, consistent with the need to preserve the integrity of the ballots, voting machines, and voting-machine computations and printouts, as provided by § 17-15-7(2), Ala.Code 1975, to keep and transmit to this Court, under seal, any and all materials it reviews or has reviewed in this case, so that this Court can view the same evidence the trial judge considered in making his decision in this case, together with any objections and exceptions made by the parties.
REMANDED WITH DIRECTIONS.
HOOPER, C.J., and MADDOX, HOUSTON, COOK, SEE, LYONS, and JOHNSTONE, JJ., concur.
BROWN, J., recuses herself.

On Return to Remand
PER CURIAM.
On July 2, 1999, this Court remanded this election-contest case with instructions for the trial judge "to conduct a hearing at which he specifies the election materials he examined in camera [and to allow] the parties to examine those materials and to file such exceptions and objections to the January 4, 1999, dismissal order as they deem[ed] proper." 752 So.2d at 1120. This Court further directed the trial court *1121 "to make a return to this Court within 14 days, and, consistent with the need to preserve the integrity of the ballots, voting machines, and voting-machine computations and printouts, as provided by § 17-15-7(2), Ala.Code 1975, to keep and transmit to this Court, under seal, any and all materials it ... reviewed in this case, so that this Court [could] view the same evidence the trial judge considered in making his decision in this case, together with any objections and exceptions made by the parties." 752 So.2d at 1120.
In conformity with this Court's remand order, the trial court held a hearing on July 7-8, 1999, and allowed the parties and their attorneys to review the contents of several boxes of evidence that the trial judge stated he had reviewed in camera in making his decision to dismiss the election contest. At the close of those proceedings, the trial court, as directed by this Court, ordered that the evidence be placed under seal and transferred to this Court. The records of this Court show that, on the evening of July 8, 1999, the clerk of this Court accepted the evidence that had been placed under seal. That evidence remained in the custody of the clerk of this Court, under seal, until August 10, 1999, when this Court, in conference, using a method consistent with the need to preserve the integrity of the ballots, as required by § 17-15-7(2), Ala.Code 1975, examined the evidence for the purpose of deciding the legal issues presented to this Court.[1] For a better understanding of this case, this Court directed that the parties appear before this Court on July 29, 1999, and present their respective arguments on the propriety of the trial court's order dismissing this case.
All absentee ballots must "be accompanied by an envelope upon which shall be printed an affidavit." § 17-10-7(a), Ala. Code 1975. Throughout this opinion, we will refer to ballots authorized by § 17-10-3(c), the form of whose associated affidavits is governed by § 17-10-7(c), as "on-site" absentee ballots. We will refer to ballots authorized by § 17-10-3(a), the form of whose associated affidavits is governed by § 17-10-7(b), as "regular" absentee ballots. We attach as Appendix A to this opinion a copy of the "on-site" absentee-ballot affidavit used in this election, and we attach as Appendix B a copy of the "regular" absentee-ballot affidavit used in this election.
The question presented in this case is: Which candidate for sheriff of Jefferson County received the largest number of legal votes in the 1998 General Election? That, and that alone, is what this Court seeks to ascertain. A determination of this issue has been delayed by the failure of the trial judge to follow a statutory mandate in election contests. See Ala. Code 1975, § 17-15-7(2): "The court must, when so requested by any party or candidate involved in the contest, allow such party or candidate, and his agents, to observe all of the examination proceedings." (Emphasis added.) Instead, the trial judge conducted a private examination of the documents at his home and then, without permitting the parties to review the documents, entered an order stating:
"The contestants' first argument was that votes not counted because of failure of voters to mark the blockshould have been counted. I counted every single uncounted ballot and added the *1122 totals to Woodward and Hale. Hale still received the majority of votes."
We remanded to permit the parties to exercise their statutory right to examine these documents. § 17-15-7(2). After this examination was conducted, we were informed that the paragraph quoted above from the trial court's January 4, 1999, order was wrong. After hearing oral arguments and examining these documents, we are persuaded that that paragraph in the trial court's order is wrong and that, at this stage of the proceeding, the contestant, Jim Woodward, not the contestee, Mike Hale, appears to have the majority of legal votes cast for sheriff of Jefferson County in the November 1998 General Election.

I. Our Standard of Review
Before we begin our discussion, we first consider the standard of review applicable. At oral argument, the contestee Hale argued that the ore tenus standard of review should apply and that applying that standard would support the dismissal. This Court has stated:
"In reviewing the trial court's findings of fact in [an] election contest, we apply the same standard used by appellate courts when the trial court in a nonjury case has taken a material part of the evidence through ore tenus testimony; that is, we will not disturb the trial court's findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence."
Williams v. Lide, 628 So.2d 531, 534 (Ala. 1993), citing Mitchell v. Kinney, 242 Ala. 196, 200, 5 So.2d 788, 797 (1942). That same principle of law is also stated in such cases as Gaston v. Ames, 514 So.2d 877 (Ala.1987), and Cougar Mining Co. v. Mineral Land & Mining Consultants, Inc., 392 So.2d 1177 (Ala.1981).
Should we apply the ore tenus standard to this case, in which there was no evidence presented ore tenus that was relevant to the main legal issues before this Court and in which, as to the number of votes cast for the two candidates, the case was decided based upon deposition testimony and a review of documentary evidence, consisting mostly of absentee affidavits and ballots? We think not. Our appellate courts have held on several occasions that, where no testimony is presented ore tenus, a reviewing court will not apply the presumption of correctness to a trial court's findings of fact and that the reviewing court will review the evidence de novo. See Hospital Corp. of America v. Springhill Hospitals, Inc., 472 So.2d 1059, 1060-61 (Ala.Civ.App.1985), where the Court of Civil Appeals stated:
"The rationale behind the ore tenus rule has historically been that the trial court deserves a presumption of correctness when it is in a position to actually see [the witnesses] and hear the testimony, observing firsthand the demeanor of the witnesses. Christian v. Reed, 265 Ala. 533, 92 So.2d 881 (1957); Steed v. Bailey, 247 Ala. 407, 24 So.2d 765 (1946); Barran v. Barran, 431 So.2d 1278 (Ala. Civ.App.1983). Considering that the trial court heard only part of the testimony of one witness, including only a partial direct examination and no cross examination, and that the case was otherwise tried exclusively on the basis of numerous depositions and exhibits, we hold that the ore tenus rule does not apply. Consequently, no presumption of correctness will be accorded the trial court's findings on the evidence, and this court will sit in judgment on the evidence as if it had been presented de novo. Smith v. Dalrymple, 275 Ala. 529, 156 So.2d 622 (1963); Lepeska Leasing Corp. v. State Department of Revenue, 395 So.2d 82 (Ala.Civ.App.), writ denied, 395 So.2d 85 (Ala.1981)."
See also, Muscogee Constr. Co. v. Peoples Bank & Trust Co., 286 Ala. 258, 238 So.2d 883 (1970), and Continental Elec. Co. v. City of Leeds, 473 So.2d 1056 (Ala.Civ.App. 1984).
Based on the standard of review we have decided applies in this case, and after considering the oral arguments, the briefs of the parties on the original submission, *1123 and the objections and exceptions filed on return to remand, and after examining the same evidence the trial court examined in camera, we conclude that the order of the trial court dismissing this case is due to be reversed and the cause remanded with directions. We will state in some detail the reasons we reach this conclusion, and, in doing so, we will consider three distinct groups of ballots that have been discussed by the parties.

II. The 25 Bessemer Division affidavit envelopes with ballots enclosed
The parties represent to this Court, and our review of the evidence confirms, that 25 absentee-ballot envelopes from the Bessemer Division of Jefferson County, which had been opened at some point before July 7-8, are included in the box labelled "Court's exhibit 2." The ballots, however, were still in envelopes inside the affidavit envelopes. The parties do not dispute that these ballots were not counted by election officials.
The presence of these 25 absentee envelopes and ballots in Exhibit 2 is consistent with the testimony of Diane Grubbs, the absentee-ballot manager for the Bessemer Division, who testified, by deposition, that 25 absentee ballots were set aside on election night and were not counted because the voters had failed to fill out their affidavit forms properly. The presence of these 25 absentee ballots is also consistent with what the parties found when they examined the evidence during the July 7-8 hearing, because the transcript reveals that they also found that there were 25 of these affidavit envelopes and that they had previously been opened.
This Court examined the affidavit envelopes one-by-one, and we conclude that election officials were correct with regard to all but two of the 25 ballots when they concluded that the ballots' affidavits did not comply with statutory requirements and that the ballots were therefore not due to be counted. Section 17-10-10, Ala.Code 1975, provides:
"No poll worker or other election official shall open an affidavit envelope if the affidavit printed thereon is unsigned by the voter (and unmarked), and no ballot envelope or ballot therein may be removed or counted. No poll worker or other election official shall open an affidavit envelope if the voter's affidavit signature (or mark) is not witnessed by the signatures of two witnesses or a notary public (or other officer authorized to acknowledge oaths) and no ballot envelope or ballot therein may be removed or counted."
With regard to 23 of the 25 affidavit envelopes and ballots, as mentioned above, we conclude that election officials complied with the requirements of § 17-10-10. We conclude that 2 of the 25 affidavit envelopes, however, complied with all applicable provisions of law. Accordingly, the ballots contained within those two affidavit envelopes should have been counted. Those ballots showed votes for Hale.
Although the parties have not made these 25 ballots an issue on this appeal, we elected to examine them, in an effort to try to determine how the trial judge concluded that Hale was the winner of the election. At the July 8, 1999, remand hearing, there was a question as to whether 25 opened affidavit envelopes, from the Bessemer Division, with ballots in them, should be examined. The contestee demanded that they be examined; the contestants objected. The trial judge stated that he had "examined that stack" and added "I don't recall opening these ballots, but I don't recall rejecting anything. If it was there, I felt like I had a duty to look at it. And, as far as me having a specific recollection about opening these and looking at them, I don't. But I didn't cull anything else, I looked at everything." Therefore, this Court has looked at these 25 ballots, and we have determined that 23 of them should not have been counted, because they failed to comply with statutory requirements for witnessing or notarization.
All 25 of these ballots contained votes for sheriff. Adding these 25 ballots to the 108 votes for sheriff out of 115 on-site *1124 Birmingham Division absentee ballots, see section IV, infra, yields a total of 133 votes for sheriff, which is the total that the trial judge stated at the remand hearing he had determined when he counted the ballots in his review of the evidence.[2] Based on the evidence before us, and in light of the trial judge's statement that he "counted every single uncounted ballot and added the totals to Woodward and Hale," we can conclude only that the trial judge opened these affidavit envelopes and that he included these ballots in his calculations. However, as noted above, 23 of those ballots were not due to be counted. Two were due to be counted as votes for Hale. That conclusion, coupled with the conclusions we reach below, supports our conclusion that the trial judge's statement that "Hale still received the majority of votes" is not supported by the evidence.

III. The 23 absentee-affidavit envelopes that contained no ballots
We next consider an issue raised by the parties relating to 23 "on-site" absentee affidavit envelopes from the Bessemer Division that contained no ballots when the parties examined them on July 7-8 and which, the parties represent to this Court, the parties discovered mixed together with the affidavit envelopes for absentee ballots that had been counted by election officials on election day. Counsel for the contestee, at oral argument, raised the question whether those ballots might perhaps have been lost.[3] Counsel for the contestants, however, argued that an assumption that the ballots have been lost would be inconsistent with the evidence.
At oral argument, on this return to remand, the contestant argued that the trial judge had simply miscalculated the votes. The trial judge acknowledged that possibility: "And it could just be a miscount on my part." At oral argument, the contestee contended that it was equally plausible that the trial judge "looked at something that's not here in these boxes." (A reference to seven boxes and one envelope that were forwarded to this Court by the trial court.) The trial judge stated at one point during the remand hearing, "[T]hat could have happened."
Counsel for the contestants represented to this Court that the 23 affidavit envelopes in question had been mixed together with the affidavit envelopes for absentee ballots that had been counted by election officials on election day. Counsel for the contestee has not contradicted that statement, although he suggested, nonetheless, that these ballots were not counted on election day, even though the envelopes were opened in the same way that all of the other Bessemer on-site envelopes were opened and that they were mixed in the box with all other Bessemer on-site envelopes. We find that argument implausible. If these 23 were added to the 108 Birmingham on-site votes for sheriff, see section IV, infra, this would be a total of only 131 instead of 133 votes, which the trial judge said he counted. Likewise, if we accepted the contestee's contention, then we would have to ignore the 25 ballots the trial judge said he considered. It is much more plausible that the trial court counted the 25 opened envelopes with ballots still in them, than that he counted some ballots that are now mysteriously missing, and that the 23 absentee envelopes that were opened but without a ballot in them were counted in the election-night totals.
Counsel for the contestants argued that the only reasonable inference to be drawn was that those ballots were counted by election officials. Counsel for the contestee has not satisfactorily explained what evidence would show that the ballots in the affidavit envelopes were not counted.
Our finding that the 23 "on-site" ballots were, in fact, counted, is consistent with statutory requirements for the handling of *1125 such ballots. Under the provisions of § 17-10-10, Ala.Code 1975, election officials are directed to examine absentee-ballot affidavits before counting absentee ballots. In her deposition, Diane Grubbs testified that it was the practice of Bessemer Division election officials to place absentee-ballot affidavit envelopes that did not conform to their understanding of the requirements of the law in a pile (with the ballots still sealed inside) separate from those that appeared to be in order and that were, thus, to be counted.
Ms. Grubbs testified that it was her understanding that "on-site" absentee ballots with the box unchecked were not to be counted. During her deposition, however, counsel for the contestants presented to her two such affidavit envelopes that had been opened and from which the ballots had been removed. She testified that it was her conclusion that those ballots had been counted, a conclusion that is consistent with a statement made by Mr. Drake, counsel for the contestee, during the deposition hearing of Earl Carter, Jr., the deputy circuit clerk for the Bessemer Division of the Tenth Judicial Circuit.[4]
Based on the foregoing, we think it sufficient to say that no evidence in the record indicates that the 23 envelopes in question had contained ballots that were not counted. No evidence in this record would allow a fact-finder to conclude other than that these 23 absentee ballots were, in fact, counted on election day.

IV. The 115 uncounted "on-site" absentee ballots from the Birmingham Division
One of the central issues involved in this case is whether 115 "on-site" absentee ballots from voters of the Birmingham Division of Jefferson County that were not counted by election officials because the voters did not check a box on their absentee-ballot affidavit forms should, in fact, have been counted. The contestants argue that they should have been, and they argue that adding those votes to the votes certified by election officials would yield a margin of victory for Woodward of 17 votes. Accordingly, they argue that this Court should reverse the trial judge's order of dismissal and render a judgment for Woodward. The contestee argues, on the other hand, that none of the 115 ballots should be counted because, he argues, they did not comply with the requirements of the law that the voter specify the reason why he or she was authorized to vote absentee.
In resolving the issue whether these ballots should or should not have been counted, we are not without legislative guidance. Sections 17-10-3 through 17-10-26, Ala. Code 1975, specify what persons may vote absentee and detail the procedures for casting and counting absentee ballots. Section 17-10-7 specifically prescribes the form of the absentee voter's affidavit that is required to be printed on the envelope accompanying each absentee ballot. Subsection (b) of § 17-10-7 specifies the form *1126 of the affidavit for what we refer to in this opinion as "regular" absentee ballots, and subsection (c) of § 17-10-7 specifies the form for "on-site" absentee ballots.
For "regular" absentee ballots, that is, those that are mailed in or that are hand delivered, § 17-10-7(b) provides that paragraph (5) of the affidavit shall read as follows:
"`(5) I am entitled to vote an absentee ballot because:
Check only one:
"____ I will be out of the county or the state on all of the following days: election day, Saturday ten (10) days prior to election day, and Tuesday of the week immediately preceding election day.
"____ I am physically incapacitated and will not be able to vote in person on election day.
"____ I work a required workplace shift which has at least ten hours which coincide with the polling hours at my regular polling place.
"____ I am a student at an educational institution located outside the county of my permanent residence and am therefore unable to vote at my usual polling place on election day.
"____ I am a member of or a spouse/dependent of a member of the armed forces of the United States.
"____ I have been appointed as an election officer at a polling place which is not my regular polling place."
For "on-site" absentee voters' affidavits, Subsection 17-10-7(c) provides that paragraph (5) of the affidavit shall read as follows:
"(5) I am entitled to vote an absentee ballot because I will be out of the county or state on election day."
It is apparent from the words used by the Legislature in this statute that the Legislature required that the voter check the appropriate reason for voting a "regular" absentee ballot, but made no provision for the inclusion of a box or space after the "(5)" because there is only one reason listed in the statute and on the form, viz.: "I am entitled to vote an absentee ballot because I will be out of the county or state on election day."[5] Stated differently, a comparison of the language the Legislature used in subsection (b) of § 17-10-7 for "regular" absentee affidavits with the language the Legislature prescribed for "on-site" absentee affidavits in subsection (c) reveals that the Legislature specified spaces in front of the reasons for voting absentee for "regular" absentee affidavits, with instructions to "Check only one," but that the Legislature did not require that there be a space or a box on the "on-site" absentee form and that there are no instructions to check any such box on that form.
It is readily apparent why the Legislature wrote the statute as it did. Subparagraph (5) in § 17-10-7(b) lists the six different reasons for authorizing a person to vote absentee, but in § 17-10-7(c) there is only one reason for voting absentee permitted; thus, there are no alternatives to mark when a voter is voting absentee "on site." The signature of the affiant is sufficient to identify the reason for voting absenteethat the voter states that he or she will be "out of the county or state on election day." By contrast, for "regular" absentee ballots, there are six possible reasons for casting an absentee ballot by mail or by hand delivery, only one of which includes the reason that the voter will be out of the county or state on election day. Thus, there is a need for the absentee *1127 voter to identify which reason is being claimed. Compare Ala.Code 1975, § 17-10-3(a), with Ala.Code 1975, § 17-10-3(c).
The last sentence of the affidavitin both forms of the affidavitreads as follows:
"Moreover, I further swear (or affirm) that all of the information given above is true and correct to the best of my knowledge and that I understand that by knowingly giving false information so as to vote illegally by absentee ballot that I shall be guilty of a misdemeanor which is punishable by a fine not to exceed one thousand dollars ($1,000) or confinement in the county jail for not more than six months, or both."
Thus, in the case of an absentee ballot cast by mail or by hand delivery, the voter, by checking one of the six possible reasons for casting an absentee ballot and then signing the affidavit, is swearing or affirming that the indicated reason is true and correct. In the case of an absentee ballot cast on site, however, there is only one reason entitling the voter to vote an absentee ballot; therefore, there is no need to indicate which reason the voter has for voting absentee. Simply by signing the affidavit, the voter is swearing or affirming that the single reason stated in paragraph (5) is true and correct, and the voter could be prosecuted for falsely swearing or affirming false information.
Based on the foregoing, we conclude that not only is there no statutory requirement that the "on-site" absentee voter mark paragraph (5) of the affidavit, but an examination of the "on-site" absentee ballot affidavit (Appendix A) shows that the form comports with the Legislature's direction, by not having any instructions to "Check only one," because it is the only one listed. Consequently, we hold that the "on-site" absentee ballots should not be excluded simply because the voter did not place a check mark in the box beside paragraph (5), and that the contestants were entitled to have these ballots that complied with statutory requirements counted. Consequently, we cannot accept Hale's argument, in which he states:
"Woodward does not even cite Roe v. Alabama, 43 F.3d 574 (11th Cir.1995), where the Eleventh Circuit held:
"`We agree that failing to exclude the contested absentee ballots will constitute a post-election departure from previous practice in Alabama.'
"Roe v. Alabama at 581. In effect the Eleventh Circuit found that despite this Court's holding in Williams v. Lide, 628 So.2d 531 (Ala.1993). [Sic.] The actual practice in Alabama had been not to count ballots which did not meet the statutory requirements of § 17-10-7[, Ala.Code 1975]. It is now an established fact by way of the Eleventh Circuit's finding, that the practice in Alabama in 1994 and in previous years had been to follow a practice of strict compliance in the counting or excluding of absentee ballots."
(Corrected brief of appellee at 5-6; emphasis added.)
We cannot accept this argument that the law, either before or after Roe, required poll workers or election officials to set aside and not count "on-site" absentee ballots that did not have the box checked, because in § 17-10-10, the Legislature specified the procedures for counting absentee ballots. In that Code section, as we have already pointed out, the Legislature provided:
"No poll worker or other election official shall open an affidavit envelope if the affidavit printed thereon is unsigned by the voter (and unmarked), and no ballot envelope or ballot therein may be removed or counted. No poll worker or other election official shall open an affidavit envelope if the voter's affidavit signature (or mark) is not witnessed by the signatures of two witnesses or a notary public (or other officer authorized to acknowledge oaths) and no ballot envelope or ballot therein may be removed or counted."
*1128 The Legislature further stated what had been the law prior to Roe, and subsequent thereto, when it provided that "[t]he provision for witnessing of the voter's affidavit signature (or mark) in Section 17-10-7 goes to the integrity and sanctity of the ballot and election." § 17-10-10, Ala.Code 1975 (emphasis added).
Contrary to Hale's argument, the requirement that there be substantial compliance with the election laws, as articulated in Williams v. Lide, 628 So.2d 531 (Ala.1993), was not rejected in the aftermath of Roe v. Alabama, 43 F.3d 574 (11th Cir.1995), cert. denied, Davis v. Alabama, 516 U.S. 908, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995). In fact, it is clear that when the Legislature amended the law relating to absentee voting laws in 1996,[6] in response to the dispute resolved in Roe, the Legislature did not intend that poll workers and election officials would be able to set aside "on-site" absentee ballots just because the voter did not check a box on an "on-site" affidavit envelope when it did not require the checking of a space or box. Instead, the Legislature's intent, when it amended the election laws after Roe, was to address the standard that poll workers and election officials should apply in determining whether to count or not to count a particular absentee ballot. It seems clear to us that, so long as any irregularities in the voting process do not "adversely affect the sanctity of the ballot and the integrity of the election," substantial compliance "with the essential requirements of the absentee voting law" is sufficient. Williams, supra, at 536.[7]
Based on the foregoing, we conclude that election officials in the Birmingham Division were not at liberty to exclude "on-site" absentee ballots included in affidavit envelopes that did not have the box checked. The failure of the voters casting those ballots to check the box beside the only reason for casting an "on-site" absentee ballot did not conflict with the statute and did not "adversely affect the sanctity of the ballot and the integrity of the election." Indeed, as we have discussed above, there is no requirement in the law that the box be checked. Those ballots should have been counted.[8]
In support of their argument that Woodward won the election, the contestants also argue that on at least two of these Birmingham Division ballots the voter marked the "straight-ticket" box on the ballot, but then marked a vote for the sheriff candidate of the opposing party. In their objections/exceptions, the contestants argue:
"Judge Wynn stated before the on-site ballots were counted that he did not count `five or six' votes for Hale where the voter voted `straight ticket' Republican while also voting for Hale. July 7 Hearing at 37. The examination of the on-site absentee ballots revealed only 2 ballots in which the vote for Sheriff contradicted a straight party vote. One of these votes was for Woodward and one was for Hale. In any event, these votes should have been counted because [§ 17-8-16, Ala.Code 1975,] allows a voter to vote for a candidate not on his party ticket."
Objections/Exceptions of Contestants at 4, n. 4. Section 17-8-16, Ala.Code 1975, provides:
"Where only one candidate is to be elected to any office and the elector desires to vote for a candidate not on his party ticket, he may make a cross mark

*1129 (x) before the name of the candidate for whom he desires to vote on the other ticket."
In light of the provisions of § 17-8-16, we conclude that the contestants are correct in arguing that a ballot upon which a voter indicated he or she was voting a "straight ticket," but also indicated that he or she was voting for the other party's candidate for sheriff, are due to be counted as votes for the candidates beside whose name the voter made his or her mark. Stated differently, where a voter marked a "straight-ticket" ballot for party A, but also made a mark beside the name of the candidate for sheriff of party B, that ballot is due to be counted as a vote for the candidate of party B. We have applied this principle of law in reaching the conclusion we do in this case.

V. Evaluation of the evidence and the trial court's dismissal order
Determining that the 115 "on-site" ballots in the Birmingham Division should have been counted, except two that did not comply with the affidavit portion, does not end our inquiry, however. As we noted in our opinion of July 2, 1999, the trial judge stated, after his in camera examination of the ballots, that he had counted "every single uncounted ballot" and that those ballots would not have made a difference in the outcome of the election if they had been counted. 752 So.2d at 1120. If the trial judge was referring only to the 115 "on-site" absentee ballots cast in the Birmingham Division, then his statement that Hale was still the winner is clearly erroneous. Our examination of the 115 Birmingham Division ballots shows that 81 of the votes were cast for Woodward; that 27 were cast for Hale; and that 7 of the absentee voters did not cast a vote for sheriff. Two of the 81 votes for Woodward were not due to be counted, however, because of defects in their affidavits. Consequently, adding 79 (81 minus 2) votes to Woodward's total certified by the Board of Canvassers, and adding 29 votes to the total certified for Hale (27 in the Birmingham Division and 2 not counted in the Bessemer Division, see section II, supra) yields a 13-vote margin of victory for Woodward.
In reviewing this case, including the sealed evidence that we have delineated, we cannot determine what evidence the trial judge considered in reaching the conclusion that Hale was the winner and that the contestants' claims were due to be dismissed. Statements made by the trial judge included in the record after our remand do not help us in determining what evidence the trial judge used to reach his conclusion that "Hale still received the majority of votes." See 752 So.2d at 1120. We have searched the record in an attempt to determine what evidence he based his calculations on. We find no help in the following exchange, which took place during the hearing that the trial judge conducted after our remand and in which he attempts to explain how he reached the result he did:
"THE COURT: ... When I did my count, I came up with a different set of numbers from what y'all did. I don't know if it would help anything for me to give you the totals that I came up with or if it would just confuse you. And I've hesitated to mention it, but, you know, both sides agreed that it might help something or that maybe it won't have any effect at all, but I have a total as to the votes I counted, the ones that were indon't agree with the numbers that all of y'all came up with. And I don't understand it and maybe it's best that it just stay right here in my notes. I don't know.
"MR. DRAKE [counsel for contestee]: We'd like to know.
"MR. AGRICOLA [counsel for contestants]:
We would, too, Judge.
"THE COURT: All right. I came up with 83 votes for Woodward and 50 votes for Hale. The difference being 33 votes, being within the 37[-vote margin of Hale's victory as declared *1130 by the Board of Supervisors/Canvassing Board for Jefferson County on November 6, 1998], and that's the reason that I maintained that Hale was still the winner.
"MR. JORDAN [counsel for contestants]:
Judge, that's 133 votes.
"THE COURT: I know.
"MR. JORDAN: And the inventory in the record and what's in the box says it was 115.
"MR. LANGNER [counsel for contestee]:
Well, that clearly indicates that there may be some of those Bessemer on-site ballots that were marked that we are talking about right here.
"MR. JORDAN: I don't thinkI actually don't think they were requested to be delivered on December 29th.
"THE COURT: Well, I will say this: These votesI mean these numbers I came up with reflected one or two convicted felons that I took a vote away from Hale, I believe. And reflected six non-registered voters, as per the registrar's office, and beyond that I can't say. I've looked at my notes and it doesn't help.
"And it could be just a miscount on my part. But I don't know why I would have [come] up with that. And I know of the 115 I recall thatall of the 115 were not due to be counted; some had nobody marked at all.
"MR. JORDAN: That's correct.
"THE COURT: Something like 101, I think, that were.
"MR. JORDAN: Well, I think our count was about 7, 5 to 7, something like that.
"THE COURT: I had about 14 that I think I found that were not due to be counted. Well, I don't know what that does. I just apologize that I didn't make more specific notes. All right, anything else y'all want to put on record?
"MR. JORDAN: The only reason I asked you to come out, Judge, was to get clarification about these boxes that were brought by the deputies and I think we have more materials to continue to go through.
"THE COURT: All right, gentlemen. Well, I'll let you get back to your work."
(3d Supp. R. at 20-23.)
Based upon this excerpt from the record, we find it apparent that the trial judge could not explain how he arrived at the conclusion that he did, and our examination of the evidence shows that he made a grievous error in his calculations. If the 115 "on-site" absentee ballots represented "every single uncounted ballot" that the judge referred to in his dismissal order, then he was clearly wrong. If "every uncounted ballot," the phrase used by the trial judge in his dismissal order, included the 25 Bessemer Division ballots, Hale would not be the winner.[9] Hale does not *1131 attempt to justify the finding of the trial judge on these 25 Bessemer Division votes, but he argues that there were 23 absentee affidavits in the Bessemer Division where the voter did not mark the box in the "on-site" affidavit and that those 23 ballots could explain how the judge reached his conclusion that Hale won.[10] At oral argument, members of this Court questioned the attorneys about these ballots.[11]
*1132 We have carefully searched through each of the exhibits, and we have carefully read the depositions and the transcript of the hearings. The only conclusion we can draw from our review is that the trial judge's statements that he added "every *1133 single uncounted ballot and added the totals to Woodward and Hale" and that doing so supported his finding that "Hale still received the majority of votes" are without supporting evidence.

VI. Security for costs
The contestee argued, even before our remand, that the trial court lacked jurisdiction because the contestants failed to file security for the election contest as required by law, that is, security that was approved by the circuit clerk. See § 17-15-29, Ala.Code 1975. The contestee's argument is that the statute requires the clerk to approve the security and that the contestants never posted the $25,000 security that the clerk required.
The record shows that the trial judge recognized the dispute relating to filing the proper security for costs; however, he refused to dismiss the election contest on these grounds, and our review of the record, convinces us that the trial judge did not err in refusing to grant the contestee's motion to dismiss that was based on these grounds.

VII. The contestants' argument that this Court should render a judgment
As mentioned above, the contestants argue that this Court, based on the record before us, should render a judgment in their favor. It would be improper for us to do so at this time. As the contestee points out, this matter was dismissed by the trial judge at a relatively early procedural stage. Our review of the record shows that after the contestants filed their notice of election contest, the trial judge held hearings on December 14, 16, and 29, 1998, at which various preliminary and procedural matters were raised by the parties and considered by the judge. At the December 29 hearing, the judge asked the attorneys for the contestants to specify the evidence they would need to move forward with their case. They gave the judge a description of the evidence that they believed was necessary, and he subsequently ordered that that evidence be delivered to him.
The trial judge, in consultation with the parties, set a trial date of January 6, 1999. The court reconvened before that trial date, however, on January 4, and on that date the judge entered his order dismissing this case, stating as his grounds that he had "counted every single uncounted ballot and added the totals to Woodward and Hale" and that "Hale still received the majority of votes." As we have shown, this finding is not supported by the record. Because of that erroneous finding, we could reverse the judgment of dismissal and render a judgment, except for the request filed by the contestee Hale that he be allowed to show that illegal votes for Woodward were counted and that they should not have been counted, and that this issue is still a viable one.
We note from the record in support of this claim by Hale that, on December 22, 1998, he did file a "Notice of Nature of Evidence," consistent with § 17-15-21, Ala.Code 1975, listing 23 voters who he alleged had illegally cast votes for Woodward. That document stated:
"Comes now, Mike Hale, the Contestee in the above-styled cause and files this his notice of nature of evidence pursuant to § 17-15-21[, Ala.Code 1975]. At the trial of this election contest which is scheduled to begin January 6, 1999, the Contestee will present evidence to show that the following persons voted illegally for Jim Woodward at the Bailey Criminal Justice Center on site voting center."
There follows a list of 21 names. The document also stated: "Additionally, the Contestee intends to prove that the following persons voted for Jim Woodward illegally at the on site center in Homewood." There follows a list of 2 names. Because the trial court dismissed this case before the trial of this election contest began, the contestee did not have an opportunity to present evidence relating to the alleged 23 voters he claimed illegally voted for Woodward.
*1134 Likewise, the contestants, because of the dismissal of the case, never had the opportunity to present evidence concerning votes that they had previously alleged were illegally cast for Hale.
The contestants now argue that the contestee is not entitled to present any evidence because he did not file a cross-contest, but the contestee correctly points out that the statutes do not require that he file an independent "cross-contest." Section 17-15-1, Ala.Code 1975, provides:
"The election of any person declared elected to ... any office which is filled by the vote of a single county ... may be contested...."
(Emphasis added.) Under the language of the statute, then, only the election of a "person declared elected" may be contested. Because Woodward had not been declared the winner of the sheriff's race, the statute did not authorize Hale to file an election contest. Section 17-15-32, Ala. Code 1975, provides:
"If, on the trial of the contest of any election, ... it shall appear that any person other than the one whose election is contested, received or would have received, had the ballots intended for him and illegally rejected been received, the highest number of legal votes, judgment must be given declaring such person duly elected...."
In light of these statutes, we conclude that the contestee is not prohibited from introducing such evidence of votes cast illegally for Woodward. Neither are the contestants foreclosed from offering any other evidence of illegal votes that they claimed were cast for Hale.
This question remains: In view of the state of this record at this time, what action should this Court take? We note the principle that where a motion to dismiss is supported by matters outside the pleadings, the motion to dismiss may be considered by the trial court as a motion for summary judgment. Graveman v. Wind Drift Owners' Association, Inc., 607 So.2d 199 (Ala.1992). We could, accordingly, upon our conclusion that the judgment of the trial court is due to be reversed, proceed to render a judgment in Woodward's favor and declare him the winner of the election, as the contestants request and as the law permits, it being well settled that this Court has the authority to render a judgment contrary to a judgment entered by the trial court, provided that all the facts bearing on the issue in question are before this Court and establish that the party is entitled to a judgment as a matter of law. Indeed, § 12-22-70, Ala.Code 1975, provides:
"The appellate court may, upon the reversal of any judgment or decree, remand the same for further proceedings or enter such judgment or decree as the court below should have entered or rendered, when the record enables it to do so."
Although we have held that § 12-22-70 is simply a codification of an appellate court's inherent powers, Barnes v. Dale, 530 So.2d 770 (Ala.1988); see also Jefferson County v. Busby, 25 Ala.App. 449, 148 So. 415 (1933), it is nonetheless an accurate statement of the law. Further, we note that this Court has, in the past, rendered judgments in cases that were before this Court on appeal from summary judgments. See, e.g., Nationwide Ins. Co. v. Nilsen, 745 So.2d 264 (Ala.1998); and Jefferson County v. Alabama Criminal Justice Information Center Comm'n, 620 So.2d 651 (Ala. 1993).
There are restrictions on the power of this Court to render a judgment, however. For example, for an appellate court to render a judgment, the record must demonstrate that all facts on the issue in question are before the appellate court, and those facts must establish that the party is entitled to a judgment as a matter of law. With regard to the question of the issues now before us involving the absentee ballots and materials before us, we believe that we can render a final judgment, and we find support for that position.
*1135 In Fabric v. Provident Life & Accident Insurance Co., 115 F.3d 908 (11th Cir. 1997), the United States Court of Appeals for the Eleventh Circuit discussed the federal appellate courts' practice of entering a summary judgment, which is similar to our practice of rendering a judgment. Although the terminology used by the federal appellate courts is different from the terminology historically employed by the appellate courts of this state, the practice is essentially the same. The court wrote:
"The power of an appellate court to order summary judgment for a party who did not move for it in the district court has been widely recognized by circuit courts and other authorities, including our predecessor, the Fifth Circuit, in a decision binding on us. Black Warrior Elec. Membership Corp. v. [Mississippi] Power Co., 413 F.2d 1221, 1226 (5th Cir.1969); see, e.g., Dickeson v. Quarberg, 844 F.2d 1435, 1444, n. 8 (10th Cir.1988); Martinez v. [United States], 669 F.2d 568, 570 (9th Cir.1981); Morgan Guar. Trust Co. v. Martin, 466 F.2d 593, 600 (7th Cir.1972); Garner v. Memphis Police Dept., 8 F.3d 358, 366 (6th Cir.1993); In re Continental Airlines, 981 F.2d 1450, 1458-59 (5th Cir.1993); Uzzell v. Friday, 547 F.2d 801, 805 (4th Cir.1977), vacated on other grounds, 438 U.S. 912, 98 S.Ct. 3139, 57 L.Ed.2d 1158 (1978); Viger v. Commercial Ins. Co., 707 F.2d 769, 774 (3rd Cir.1983); Procter & Gamble Indep. Union v. Procter & Gamble [Mfg. Co.], 312 F.2d 181 (2nd Cir.1962), cert. denied, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963); First Nat'l Bank v. Maryland Cas. Co., 290 F.2d 246, 251 (2nd Cir.1961); Mullen v. St. Paul Fire & Marine Ins. Co., 972 F.2d 446 (1st Cir.1992).
"Summary judgment in favor of a non-moving party has become an accepted method for an appellate court to expedite litigation. Morgan Guar. Trust Co., 466 F.2d at 600. There the court found that its grant of summary judgment to a non-movant was `just under the circumstances' in light of a fully developed factual record and was consistent with 28 U.S.C. § 2106. That section provides:
"`The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.'
"Professor Moore explains that an appellate court may properly grant summary judgment for the non-moving party as long as all facts bearing on the issue in question are before the court and establish that the non-movant is entitled to judgment as a matter of law. 6 James Wm. Moore et al., Moore's Federal Practice ¶ 56.12; see also 10 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice & Procedure § 2716 (2d ed.1983)."
115 F.3d at 914-15. In Fabric, the court carefully pointed out that the entry of a summary judgment in that case would not result in procedural prejudice to the opposing party, and it noted a principle of law that also governs our consideration of whether to render a judgment:
"If a party did not have an opportunity to present his side of a dispute, granting summary judgment for a non-moving party would be improper. E.g., Fountain v. Filson, 336 U.S. 681, 69 S.Ct. 754, 93 L.Ed. 971 (1949) (the circuit court improperly ordered summary judgment on a new issue for the nonmoving plaintiff where his opponent was deprived of an opportunity to dispute facts relevant to the issue)."
115 F.3d at 915.

VIII. Conclusion
We conclude that the ultimate question of fact the trial court must determine is which candidate received "the highest number of legal votes" in the sheriff's election. *1136 In the present posture of the case, we cannot render a judgment, as the contestants ask us to do, because we cannot be certain that our doing so would not be procedurally prejudicial to the contestee. Nevertheless, we are convinced that the trial court's January 4, 1999, order of dismissal is due to be reversed and the cause remanded for further proceedings. We are also convinced that this Court should retain jurisdiction of this cause to render such further orders as might be necessary to make sure that the ultimate issue in this case is justly reached and decided.
Because of the strong public policy that the rightful winner of an election should occupy the office to which he was elected, the trial court is directed to conduct, within 14 days after the date on which this opinion is released, such further proceedings as are necessary to allow the parties to introduce any evidence they may have concerning votes they allege were illegally cast in the election for sheriff of Jefferson County. When those proceedings are concluded, the trial court is instructed to enter a judgment, as required under § 17-15-32, which shall include a calculation of the total number of votes legally cast for the contestant and the total number of votes legally cast for the contestee, and the trial court is further instructed to enter a detailed statement of findings of fact that it considers in reaching its judgment. Any judgment rendered shall be forwarded forthwith to this Court, together with any record of the proceedings conducted on remand. Further, the trial court shall stay the enforcement of its judgment pending this Court's review. This Court specifically retains jurisdiction of this case for the purposes set out. The parties are directed to file any additional briefs they deem necessary within seven days from the date on which the trial court enters its judgment as herein directed.
REVERSED AND REMANDED WITH DIRECTIONS.
HOOPER, C.J., and MADDOX, HOUSTON, SEE, and LYONS, JJ., concur.
JOHNSTONE, J., concurs specially.
COOK, J., concurs in the result.
BROWN, J., recuses herself.
JOHNSTONE, Justice (concurring specially).
In deciding a case, no Justice on this Court can defer to any party allegiance and still preserve a Supreme Court for the people of Alabama. Rather, our duty is to obey and to apply the constitutional and statutory law with absolute impartiality.
We have studied the statute at issue meticulously. We have received and comprehended the arguments of each side with the purpose of recognizing and accepting any and every valid and true assertion by whomever advanced. We have applied traditional and tested rules of statutory construction and have heeded the letter and spirit of the United States Constitution as the paramount law.
So considered, the statute at issue did not and does not authorize any requirement that a person applying to cast an "on-site" absentee ballot place a checkmark in a box alongside the statement, "I am entitled to vote an absentee ballot because I will be out of the county or state on election day," in the affidavit for the "on-site" ballot. Neither by language, implication, analogy, nor any other source or means is any such requirement authorized.
We cannot allow an unauthorized requirement to infringe any voter's right to vote. Thus, every "on-site" ballot supported by an affidavit completed in accordance with the provisions of the statute but without a checkmark in the unauthorized box should be counted. This conclusion is both strict compliance and substantial compliance with the statutory and constitutional law governing this election.
COOK, Justice (concurring in the result).
I agree with the majority in the conclusion that Ala.Code 1975, § 17-10-7(c), does not require a person casting an "on-site" absentee ballot to place a "check" by the reason he or she is voting absentee. However, *1137 I cannot agree with all of the conclusions expressed in the majority opinion; therefore I concur only in the result. I do agree with the sentiments Justice Johnstone expresses in his special writing.
At the outset, it must be remembered that the affidavit envelopes accompanying these ballots are new. In 1996, the Legislature amended various absentee-voting provisions, including Ala.Code 1975, §§ 17-10-3 and -7, necessitating the printing of new affidavit forms for on-site absentee voting. See Act No. 96-885, 1996 Ala. Acts 1699. Although some evidence in the record suggests that these affidavits have been used in municipal or primary elections, the November 3, 1998, election is the first general election in which ballots were cast pursuant to these revisions.
Before 1996, the statutory scheme contained no provisions devoted exclusively to "on-site" absentee voting. These statutory changes necessitated the printing of new affidavit forms, including forms specifically designed for the on-site absentee ballots. The project was undertaken by two or three different printing companies. Throughout this litigation, it was been asserted, although not proven at this point, that the on-site affidavit forms in use in over 60 Alabama counties contain a "box" for the voter to "check."
The widespread practice of including a place for the voter to check, assuming it exists, can be understood in the context of the historical experience of voters in Alabama.
In this connection, the contestants presented the testimony of Charles Grainger, general counsel for the secretary of state. He testified that, "historically," voting absentee in Alabama "has meant ... `check[ing a] box.'" In fact, the 1998 general election was the first election in decades in which on-site absentee voters were not confronted with multiple reasons for voting absentee.[12]
As for those "23 `on-site' absentee affidavit envelopes from the Bessemer Division that contained no ballots when the parties examined them on July 7-8," 752 So.2d at 1124, there is a factual issue regarding the disposition of the ballots those envelopes once contained. I do not deem it prudent, given the posture of this case, i.e., an appeal from an order granting a motion to dismiss, to infer that these 23 on-site ballots were counted, when it may be possible during the trial of this contest to establish from the evidentiary materials whether the ballots have been counted.
Likewise, given the posture of this case, as previously stated, and the other pending issues that are acknowledged by the majority and that have not been resolved, I cannot agree that it is possible for this Court to render a judgment in this case. I concur in the judgment reversing the trial court's January 4, 1999, order of dismissal and remanding for the trial of the election contest, which will include a calculation of the legal votes cast for the contestant and of those cast for the contestee.
*1138
 Appendix A (to the per curiam opinion
 of August 20, 1999)
 ON-SITE ABSENTEE VOTING ENVELOPE
 AFFIDAVIT OF ABSENTEE VOTER
"State of Alabama
"County of____________________________________________________________________________________________________
"I, the undersigned, do swear (or affirm) that:
"(1) I am a resident of ______________________________________________________ County in the State of Alabama.
"(2) My place of residence in Alabama is: ____________________________________________________________________
 (street)
___________________________________________________________________________, AL_______________________________
 (city or town) (zip code)
"(3) My voting precinct (or place where I vote) is:
______________________________________________________________________________________________________________
"(4) My date of birth is: ____________________________________________________________________________________
 (month day year)
"(5) [] I am entitled to vote an absentee ballot because I will be out of the county or state on election day.
 "I further swear (or affirm) that I have not voted nor will I vote in person in the election to which this ballot pertains.
 "I have marked the enclosed absentee ballot voluntarily and I have read or had read to me and understand the instructions
accompanying this ballot and I have carefully complied with such instructions.
"Moreover. I further swear (or affirm) that all of the information given above is true and correct to the best of my knowledge and
that I understand that by knowingly giving false information so as to vote illegally by absentee ballot that I shall be guilty of a
misdemeanor which is punishable by a fine not to exceed one thousand dollars ($1.000) or confinement in the county jail for not more
than six months, or both.
 _________________________________________________________________________
 (Signature or mark of voter.)
 _________________________________________________________________________
 (Printed name of voter.)
"IF YOUR AFFIDAVIT IS NOT SIGNED (OR MARKED), OR IF YOUR AFFIDAVIT IS NOT WITNESSED BY TWO
WITNESSES 18 YEARS OF AGE OR OLDER OR A NOTARY PUBLIC OR OTHER OFFICER AUTHORIZED TO
ACKNOWLEDGE OATHS, PRIOR TO BEING DELIVERED OR MAILED TO THE ABSENTEE ELECTION
MANAGER, YOUR BALLOT WILL NOT BE COUNTED.
 | | 1st
 Sworn to and subscribed before me this ___________________________| | Witness __________________________________________
 | | (Signature)
day of ____________________________________________. 19 ____________| | __________________________________________________
I certify that the affiant is known (or wade known) to me to be the | | (Pnnt name)
identical party he or she claims to be. | |___________________________________________________
 | OR | (Address)
____________________________________________________________________| |___________________________________________________
 (Signature of official) | | (City) (Zip Code)
 | | 2nd
____________________________________________________________________| | Witness __________________________________________
 (Title of Official) | | (Signature)
 | |___________________________________________________
____________________________________________________________________| | (Pnnt name)
 (Address of official) | |___________________________________________________
 | | (Address)
____________________________________________________________________| |___________________________________________________
 (City) (Zip Code) | | (City) (Zip Code)
 | |
*1139
 Appendix B (to the per curiam opinion
 of August 20, 1999)
 AFFIDAVIT OF ABSENTEE VOTER
"State of Alabama
"County of__________________________________________________________________________________________
"I, the undersigned, do swear (or affirm) that:
"(1) I am a resident of _______________________________________________County in the State of Alabama.
"(2) My place of residence in Alabama is: __________________________________________________________
 (street)
_______________________________________________________________________________ AL _________________
 (city or town) (zip code)
"(3) My voting precinct (or place where I vote) is:
____________________________________________________________________________________________________
"(4) My date of birth is: __________________________________________________________________________
 (month day year)
"(5) I am entitled to vote an absentee ballot because:
 "Check only one:
[] I will be out of the county or the state on all of the following days: election day, Saturday ten (10) days prior to election
 day, and Tuesday of the week Immediately preceding election day.
[] I am physically Incapacitated and will not be able to vote in person on election day.
[] I work a required workplace shift which has at least ten hours which coincide with the polling hours at my regular polling
 place.
[] I am a student at an educational Institution located outside the county of my permanent residence and am therefore
unable to vote at my usual polling place on election day.
[] I am a member of or a spouse/dependent of a member of the armed forces of the United States.
[] I have been appointed as an election officer at a polling place which is not my regular polling place.
 "I further swear (or affirm) that I have not voted nor will I vote in person in the election to which this ballot pertains.
 "I have marked the enclosed absentee ballot voluntarily and I have read or had read to me and understand the instructions
accompanying this ballot and I have carefully complied with such instructions.
 "Moreover,1 further swear (or affirm) that all of the information given above is true and correct to the best of my knowledge and that
I understand that by knowingly giving false information so as to vote illegally by absentee ballot that I shall be guilty of a misdemeanor
which Is punishable by a fine not to exceed one thousand dollars (51.000) or confinement in the county jail for riot more than six
months, or both."
 ____________________________________________________________
 (Signature or mark of voter.)
 ____________________________________________________________
 (Printed name of voter.)
"IF YOUR AFFIDAVIT IS NOT SIGNED (OR MARKED), OR IF YOUR AFFIDAVIT IS NOT WITNESSED BY TWO
WITNESSES 18 YEARS OF AGE OR OLDER OR A NOTARY PUBLIC OR OTHER OFFICER AUTHORIZED TO
ACKNOWLEDGE OATHS, PRIOR TO BEING DELIVERED OR MAILED TO THE ABSENTEE ELECTION
MANAGER, YOUR BALLOT WILL NOT BE COUNTED.
 | | 1st
Sworn to and subscribed before me this _____________________________| | Witness __________________________________________
 | | (Signature)
day of ________________________________________. 19 ________________| | __________________________________________________
I certify that the affiant is known (or wade known) to me to be the | | (Pnnt name)
identical party he or she claims to be. | |___________________________________________________
 | OR | (Address)
____________________________________________________________________| |___________________________________________________
 (Signature of official) | | (City) (Zip Code)
 | | 2nd
____________________________________________________________________| | Witness __________________________________________
 (Title of Official) | | (Signature)
 | |___________________________________________________
____________________________________________________________________| | (Pnnt name)
 (Address of official) | |___________________________________________________
 | | (Address)
____________________________________________________________________| |___________________________________________________
 (City) (Zip Code) | | (City) (Zip Code)
 | |

On Return to Second Remand
MADDOX, Justice.
On August 20, 1999, this Court reversed the trial judge's dismissal of this election-contest case and remanded the cause with instructions for the trial judge to "conduct, within 14 days ..., such further proceedings as are necessary to allow the parties to introduce any evidence they may have concerning votes they allege were illegally cast in the election for sheriff of Jefferson County." 752 So.2d at 1136. This Court further "instructed [the trial judge] to enter a judgment, as required under § 17-15-32, which [includes] a calculation of the total number of votes legally cast for the *1140 contestant and the total number of votes legally cast for the contestee." 752 So.2d at 1136. This Court also instructed the trial judge to include with his calculations "a detailed statement of findings of fact that [he] consider[ed] in reaching [his] judgment." 752 So.2d at 1136.
On remand, the trial judge conducted proceedings at which the parties introduced evidence tending to prove that certain votes were either legally cast or were illegally cast. On September 3, the 14th day following the release of this Court's August 20 remand order, and the date by which all proceedings below were to have been completed and the trial court's judgment entered, the trial court filed with this Court a request for an extension of time, which this Court granted.
On Friday, September 10, 1999, this Court received from the trial court a copy the trial court's order, along with several boxes of evidence.[1] In his order, a copy of which is attached to this opinion as Appendix A,[2] the trial judge found that Jim Woodward, the contestant, had received a total of 106,276 legal votes and that Mike Hale, the contestee, had received a total of 106,282 votes, giving Hale a 6-vote margin of victory. Although the trial judge's order contains a lengthy discussion of whether certain challenged votes were due to be excluded, his order does not contain a clear explanation of the calculations by which he got those totals.
Despite the trial judge's finding that Hale had received the most legal votes, he declared both Woodward and Hale "[i]neligible to be sheriff insofar as the November 3, 1998, election only" [sic], and he ordered the Governor to call a new election. See Appendix A, 752 So.2d at 1185. We have reviewed the record, the trial court's order, and the briefs of the parties. For the reasons discussed below, we reverse, and we render a judgment in the contestants' favor and declare Woodward the winner of the November 3, 1998, election.

I.
We first consider whether the trial court was authorized to declare both candidates ineligible and to order that a new election be held. We conclude that he was not, and that, in purporting to do so, he exceeded the scope of his authority.
In his order, the trial judge stated:
"Despite the apparent majority attributable to Mike Hale, in light of all the evidence and the well-intentioned but conflicting or irreconcilable occurrence of statutory and constitutional law as cited hereinabove, a judgment under § 17-15-2 and § 17-15-32, [Ala.Code 1975], are the only proper statutes which can be followed in order to attain the legality necessary to state of the law and evidence as adduced. [Sic.] Thus, each candidate is declared ineligible to be sheriff insofar as the November 3, 1998, election only. [Sic.]
"The election of November 3, 1998, insofar as the election of Sheriff of Jefferson County is hereby annulled. [Sic.]"
Appendix A, 752 So.2d at 1185.
Our reading of the trial judge's order suggests to us that he thought Alabama's laws pertaining to the contests of elections for sheriff were inconsistent and that this Court should clear up that inconsistency by declaring that contests of elections for sheriff should be decided by the Legislature.[3] We refuse to make such a declaration.
*1141 We note that neither the contestants nor the contestee agree with the trial judge's stated belief that the Legislature is the proper venue for contests of the election of sheriffs. The parties agree that the trial judge's belief is without basis in the law. Although we do not disagree with the trial court's conclusion that sheriffs are executive officers of the state,[4] we point out that the Legislature has specifically provided in §§ 17-15-20 through 17-15-35 for the contests of elections for sheriff.[5]
*1142 Based on the foregoing, we decline the trial judge's invitation to "mandate" that contests of elections for sheriff be governed by Code sections other than those that the Legislature clearly provided would apply. Despite the trial court's apparent conclusion that §§ 17-15-50 through 17-15-63 ought to govern contests of the election of sheriffs, he appears to have concluded that he was nonetheless bound to apply the provisions of §§ 17-15-20 through 17-15-35. Because we find that conclusion to be correct, we now consider whether those Code sections, or other applicable sections, authorized him to declare both candidates ineligible and to order the Governor to call a new election.
The trial judge cites §§ 17-15-2 and 17-15-32, Ala.Code 1975, as authority for his order that "each candidate is declared ineligible to be sheriff insofar as the November 3, 1998, election only," and, presumably, for his decision to call upon the Governor to schedule a new election. Although the trial judge does not explain why he believed these Code sections, or any others, authorized him to do so, we have examined the two Code sections he mentioned, and we conclude that neither of them authorized him to declare both candidates ineligible and to order a new election.
Section 17-15-2 provides:
"No malconduct, fraud or corruption on the part of the inspector, clerk, marker, returning officer, board of supervisors or other person, nor any offers to bribe, bribery, intimidation or other malconduct which prevented a fair, free and full exercise of the elective franchise can annul or set aside any election unless thereby the person declared elected and whose election is contested is shown not to have received the highest number of legal votes, nor must any election contested under the provisions of this title be annulled or set aside because of illegal votes given to the person whose election is contested, unless it appears that the number of illegal votes given to such person, if taken from him, would reduce the number of votes given to him below the number of legal votes given to some other person for the same office. No election shall be annulled or set aside because of the rejection of legal votes unless it appears that such legal votes, if given to the person intended, would increase the number of his legal votes to or above the number of legal votes received by any other person for the same office."
Did this Code section authorize the trial judge to declare both candidates ineligible and to call upon the Governor to schedule a new election for sheriff of Jefferson County? A careful reading of § 17-15-2 reveals that it does not contemplate the action the trial judge took. In fact, that Code section actually speaks more in terms of when a trial judge should not enter a judgment altering the result of an election as previously certified by election officials. It provides that malfeasance or misfeasance by election officials, among others, is insufficient to cause a previously certified winner to be ousted from his or her office, in the absence of certain evidence. Specifically, a contestant must prove that he or she would have the highest number of legal votes once illegal votes previously counted are subtracted and legal votes previously excluded are counted.
When this Code section speaks of annulling an election, it refers to the declaration that the candidate previously certified as the winner is not, actually, the winner of the election. It does not refer to declaring the entire election void and calling for a new election. The language of the Code section does not, therefore, authorize the trial court's action, and we cannot, in the absence of a clearer statement that it intended to do so, conclude that the Legislature intended to grant such broad authority. Our conclusion is further strengthened by considering § 17-15-2 in pari materia with § 17-15-32, as we must because the two statutes relate to the same general subject matter. See Opinion of the Justices No. 334, 599 So.2d 1166 (Ala.1992).
Section 17-15-32 provides:

*1143 "If, on the trial of the contest of any election, either before the judge of probate or the circuit court, it shall appear that any person other than the one whose election is contested, received or would have received, had the ballots intended for him and illegally rejected been received, the highest number of legal votes, judgment must be given declaring such person duly elected, and such judgment shall have the force and effect of investing the person thereby declared elected, with full right and title to have and to hold the office to which he is declared elected. If it appears that two or more persons have, or would have had, if the ballots intended for them and illegally rejected had been received, the highest and equal number of votes for such office, judgment must be entered declaring the fact, and such fact must be certified to the officer having authority to fill vacancies in the office the election to which was contested. If the person whose election is contested is found to be ineligible to the office, judgment must be entered declaring the election void and the fact certified to the appointing power. If the party whose election is contested is found to have been duly and legally elected, judgment must be entered declaring him entitled to have and to hold the office to which he was so elected."
Did this Code section authorize the trial judge to take the action he did? Again, the answer is no. Under this Code section, a trial judge is under an obligation, after receiving evidence of previously uncounted legal votes and previously counted illegal votes, to declare one of the two candidates as the winner, except in two circumstances. The first of those two circumstances occurs when, after receiving the above-described evidence, the trial judge finds that both candidates received the same number of legal votes. That is not the case here. The second circumstance occurs when the trial judge finds that the winning candidate is "ineligible to the office." That circumstance is also not present here, because there has been no evidence introduced to indicate that either candidate is "ineligible to the office."[6]
Although this admittedly is a complex case, we cannot sanction a result that the law does not authorize, even in light of the contestee's willingness to have another election held.[7] We are required to apply the law to the facts and to enter a judgment as the law demands. We find no support in the law for the trial court's conclusion that a new election should be called. Election contests are statutory actions, and courts may not exceed the provisions of applicable statutes in resolving them. See § 17-15-6, Ala.Code 1975; Ex parte Vines, 456 So.2d 26 (Ala.1984); Black v. Pate, 130 Ala. 514, 30 So. 434 (1901). As we stated in our August 20, 1999, remand order, "The question presented in this case is: Which candidate for sheriff of Jefferson County received the largest number of legal votes in the 1998 General Election?" 752 So.2d at 1121. That question is still the main question with which this Court is concerned.

II.
Before we examine the evidence, we must first determine whether the proceedings below exceeded the scope of this Court's remand mandate. When we remanded *1144 this case on August 20, 1999, we did so because the trial judge had previously entered an order dismissing this election contest at an early stage in the proceedings and because the parties had been given no opportunity to introduce evidence regarding the votes they believed had been illegally cast. Before the trial court entered its January 4, 1999, order of dismissal, the contestants had submitted a list of 64 names of people they alleged had voted illegally for Hale. In response, Hale had submitted a list of 23 names of people he alleged had voted illegally for Woodward.
The contestants claim that the trial judge improperly permitted the contestee to present evidence relating to voters other than the 23 previously named. The contestee argues that Wilkerson v. Lee, 236 Ala. 104, 181 So. 296 (1938), which construes § 551, Ala.Code of 1923, the statutory predecessor of the present § 17-15-21, stands for the proposition that enforcement of the requirements of that Code section relating to notice of evidence is within a trial judge's discretion. Although we cannot conclude that Wilkerson in fact stands for that proposition, we note that the contestee filed a motion to amend his pleadings after the close of the proceedings, in which he purported to modify his previous notice of the nature of the evidence. The trial court granted that motion, and the contestants have presented no argument that convinces us that the trial judge exceeded his authority in doing so.
Even if the law would not authorize the contestee to modify his notice of the nature of the evidence in this manner, we would nonetheless conclude that the contestee was entitled to present the evidence he did, because this Court's remand order did not foreclose the introduction of evidence of allegedly illegal votes by persons that had not been previously named. We specifically stated, on August 20, 1999, that the parties could introduce "any evidence they may have concerning votes they allege were illegally cast in the election for sheriff of Jefferson County." 752 So.2d at 1136.
Further, even if our remand had been more limited, we believe the federal and state constitutions' protections of a party's right to due process would require us to consider all of the evidence presented below.[8]

III.
In our remand order of August 20, 1999, we discussed the standard of review applicable. 752 So.2d at 1122-23. At that point, we held that the ore tenus standard of review was not applicable because the trial judge had not heard oral testimony bearing on the legal issues presented. On remand, however, a great deal of oral testimony was presented, and the trial court made findings of fact based upon that oral testimony and other evidence. Accordingly, we are constrained to apply the ore tenus standard in our review on this return to remand. Therefore, "we will not disturb the trial court's findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence." Williams v. Lide, 628 So.2d 531, 534 (Ala.1993), citing Mitchell v. Kinney, 242 Ala. 196, 200, 5 So.2d 788, 797 (1942). However, the ore tenus rule does not extend to cloak a trial judge's conclusions of law, or incorrect application of law to the facts, with a presumption of correctness. *1145 As this Court has held, "when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment." Griggs v. Driftwood Landing, Inc., 620 So.2d 582, 586 (Ala.1993).

IV.
We now consider the central question: Which of the two candidates for sheriff of Jefferson County in the November 3, 1998, election received the most legal votes? The trial court concluded that the contestee, Mike Hale, did. For the reasons discussed below, however, we conclude that the trial court erred. Jim Woodward received the most legal votes for sheriff, and, as a result, he must be declared the winner of the election.
Before beginning our discussion of the evidence, we believe it would be helpful to state some of the basic facts and to explain the point from which we begin our analysis. Following the November 3 election, the Board of Canvassers certified that Mike Hale received 106,269 votes and that Jim Woodward received 106,232 votes; that certification represented a 37-vote margin of victory for Hale. However, this Court, in its August 20, 1999, remand order, held that election officials had improperly refused to count the votes of numerous persons who voted by on-site absentee ballots in the Birmingham Division of Jefferson County. There were 115 ballots that election officials did not count. We examined those ballots and their associated affidavits, and we concluded that 79 of the ballots were due to be counted that showed votes for Woodward, and 27 were due to be counted that showed votes for Hale. (Seven of the 115 ballots did not show a vote for sheriff, and 2 were not due to be counted because of defects in their affidavits.) Further, based upon its review of the sealed records, this Court concluded that two ballots from the Bessemer Division of Jefferson County that had not previously been counted should have been counted. Those two ballots showed votes for Hale. In light of the above, when this Court remanded this case on August 20, Woodward had 106,311 votes, and Hale had 106,298. Thus, Woodward led by 13 votes.
On remand, the parties presented evidence tending to show that various persons had voted illegally. We note that it is the responsibility of a party seeking to have a vote excluded to make a prima facie showing that that vote was illegally cast. See Shepherd v. Sartain, 185 Ala. 439, 64 So. 57 (1913); Black v. Pate, 130 Ala. 514, 30 So. 434 (1901). Where there is no prima facie showing that a vote was illegally cast, that vote cannot be excluded. We now address the evidence adduced by the parties and the legal issues associated with that evidence.[9]
We first consider the trial court's refusal to consider the testimony of Dr. Richard Roper, whom the contestants sought to have testify as a handwriting expert. The trial judge refused to qualify Dr. Roper as an expert, and he therefore refused to allow Dr. Roper to testify as to the authenticity of signatures on a number of ballots. For the reasons discussed below, we conclude that the trial judge erred in refusing to allow Dr. Roper to testify.
The admissibility of testimony concerning handwriting analysis has been addressed by the Legislature, through statutory enactment, and by this Court, through the adoption of a rule of civil procedure. In § 12-21-40, Ala.Code 1975, the Legislature provided:
"Comparison of a disputed writing with any writing admitted to be genuine or proven to the reasonable satisfaction of the court to be genuine shall be permitted *1146 to be made by witnesses who are qualified as experts or who are familiar with the handwriting of the person whose handwriting is in question, and such writings and the evidence of witnesses respecting the same may be submitted to the court or jury trying the case as evidence of the genuineness or otherwise of the writings in dispute."
(Emphasis added.) That Code section originated as Act No. 90, Ala. Acts 1915, p. 134. Subsequently, this Court adopted Rule 44(j), Ala. R. Civ. P., pursuant to its rule-making authority granted by the people in their adoption of Amendment 328 to our Constitution. That rule provides:
"(j) Proof of Handwriting. Whenever the genuineness of the handwriting of any person may be involved, any admitted or proved handwriting of such person shall be competent evidence as a basis for comparison to prove or disprove such genuineness. Comparison of a disputed writing with any writing admitted or proven to the reasonable satisfaction of the court to be genuine shall be permitted to be made by witnesses who are qualified as experts, or who are familiar with the handwriting of the person whose handwriting is in question."
(Emphasis added.) The question then, is: Who may testify as a handwriting expert? "[A] witness [may be] qualified as an expert by knowledge, skill, experience, training, or education...." Rule 702, Ala. R. Evid.[10] We apply the abuse-of-discretion standard when reviewing a trial court's decision whether to allow a witness to testify as an expert. Griffin v. Gregory, 355 So.2d 691 (Ala.1978); Roberts v. Davis, 230 Ala. 272, 160 So. 718 (1935).
The contestants submitted Dr. Roper's résumé and engaged in a lengthy colloquy with him to elicit testimony explaining his qualifications in the field of handwriting analysis. Dr. Roper testified that he had spent 16 years as a document examiner for the Alabama Department of Forensic Sciences. Further, he testified:
"Q: And have you testified as an expert witness in handwriting examination in courts in Alabama?
"A: I have.
"Q: Do you have a judgment as to how many circuit courts in Alabama ... you have testified [in] as an expert in handwriting analysis ...?
"A: InI don't have an exact count, but I have certainly testified in most of them. From one end of the state to the other.
"Q: And would that have been in your capacity as chief document examiner for the Alabama Department of Forensic Sciences?"
"A: In that capacity and privately."
(5th Supp. R. at 205-06.) He also testified that he had appeared in several federal district courts in Alabama, Georgia, Florida, and Virginia as an expert in the field of handwriting analysis. He testified that he had made presentations in this "field" to a number of scientific conferences and that he is a member of a number of professional associations, such as the Southeastern Association of Forensic Document Examiners.
The contestee introduced no evidence tending to call into question Dr. Roper's qualifications to testify as an expert witness in the field of handwriting analysis. The trial judge, nonetheless, ruled that Dr. Roper could not testify as an expert, apparently because he did not use a microscope in his examination of certain handwriting samples.[11] We have carefully reviewed the record and the applicable law, *1147 and we are convinced that the trial judge's ruling was an abuse of discretion.
In its role as the trier of facts, the trial court could have determined that Dr. Roper's testimony carried little weight and, on that basis, could have ruled against the contestants on these disputed ballots. However, the trial judge never considered Dr. Roper's testimony, because he did not allow Dr. Roper to testify. According to the contestants' proffer, Dr. Roper would have testified about the authenticity of 21 ballots, indicating that those ballots should have been excluded. We note that the trial judge correctly excluded 12 of those ballots for other reasons, as we discuss below. Further, in our discussion below, we conclude that an additional three of those 21 ballots also should have been excluded, based on the testimony of witnesses other than Dr. Roper. As a consequence, all but 6 of the ballots about which Dr. Roper would have testified were excluded, or were due to be excluded, for other reasons. With regard to those 6 ballots, Dr. Roper's proffered testimony would have been the only evidence tending to show that they should have been excluded.[12] We could remand this case for the *1148 trial judge to consider Dr. Roper's testimony. Because doing so would make no difference in the outcome of this case, however, and because of the need to prevent any further delay in the resolution of this case, we will count these six votes for Hale at this time. (We do so for the purposes of this opinion only and because time is of the essence.) This result will prevent further delay in a matter that has been delayed too long. Because we do not exclude these six votes, the vote totals stated above do not change.[13] (See note 9.) Accordingly, Hale's vote total remains 106,298; Woodward's vote total remains 106,311; and Woodward's lead remains 13 votes.
We next consider the testimony of Jessie Burrell. The trial judge found that her testimony was not credible, and he therefore discounted her testimony tending to show that certain voters cast illegal votes for Hale. Generally speaking, Burrell testified as to her knowledge that some voters who had voted absentee and had stated as their reason for doing so that they were physically incapacitated were not, in fact, incapacitated. The trial judge wrote that Burrell's testimony was not credible because:
"On the stand, she could never be `stumped.' She knew the exact, sound physical condition, the activities, location and potential of her neighbors on election day. With no medical training, she testified staunchly on the diagnosis, prognosis and progress report on each of her targets. To be concise, her testimony was unworthy of any credibility whatsoever."
Appendix A, 752 So.2d at 1183. We have carefully reviewed Ms. Burrell's testimony. Although the trial judge's description of Ms. Burrell's testimony appears to be an overstatement, we cannot conclude that he abused his discretion in finding that her testimony was not credible.
Under the ore tenus standard of review, it is an important function of a trial judge acting as a finder of fact to weigh the credibility of witnesses and to determine how much weight to assign to their testimony. See Hall v. Mazzone, 486 So.2d 408 (Ala.1986). Given that we were not present in the courtroom to see Ms. Burrell and hear her testimony, we cannot say that the trial judge's finding that her testimony was not credible is plainly and palpably wrong. Therefore, we need not engage in further consideration of her testimony or the votes about which she testified. Accordingly, Hale's vote total remains 106,298; Woodward's vote total remains 106,311; and Woodward's lead remains 13 votes.
We next consider the vote of R.C., who was shown to have been convicted of a felony before the date of the November 1998 General Election. The trial judge concluded that, because of his felony conviction, R.C.'s vote for Hale was due to be excluded, a conclusion that is consistent with Williams v. Lide, 628 So.2d 531 (Ala. 1993). In that case, a majority of this Court held that a person who is ineligible to vote, under the provisions of Ala. Const. of 1901, art. VIII, § 182, is not eligible to vote even though his name still appears on the list of registered voters. We affirm the trial court's exclusion of R.C.'s ballot. Accordingly, Hale's vote total is reduced to 106,297; Woodward's vote total remains 106,311; and Woodward's lead extends to 14 votes.
The trial judge next considered a group of voters who cast on-site absentee ballots and whom he described as "obviously in Jefferson County on election day since they were serving as poll watchers." Appendix A, 752 So.2d at 1183. The trial judge concluded that because these voters were in the county on election day, and *1149 because "the only reason a voter may vote by on-site absentee ballot is that the voter will be out of town on election day," Appendix A, 752 So.2d at 1183, the votes were due to be excluded. The trial judge identified 13 people who fell into this category: G.D.B., R.D.C., J.M.D., M.E., F.C.G., R.W.H., E.H.M., R.O., O.P.,[14] R.M.S., J.T.T., F.W., and J.W. In addition, F.T. served as a volunteer Republican poll watcher.[15] Each of these voters' ballots showed votes for Woodward.
Hale admits in his brief that the trial judge erred by including some people in this category that should not have been included. In fact, 2 of the 13 people identified by the trial judge had actually filed regular, as opposed to on-site, absentee ballots. Accordingly, the trial court erred in excluding the votes of R.O. and R.W.H.[16] Accordingly, Hale's vote total remains 106,297; Woodward's vote total remains 106,311; and Woodward's lead remains 14 votes.
F.C.G., one of the 11 remaining persons identified by the trial judge as being Republican Party poll watchers who were in the county on the day of the election, testified that he voted by on-site absentee ballot because, at the time he filled out his affidavit and ballot, he intended to be outside Jefferson County on the day of the election working as a poll watcher in Hale County.[17] He further testified, however, that because of job-related responsibilities, he was unable to leave Jefferson County until approximately 3:00 p.m. on election day.
The trial judge excluded F.C.G.'s vote on the basis that he was actually in Jefferson County on the day of the election. We are thus faced with the task of clarifying under what circumstances a person is entitled to have a vote submitted by on-site absentee ballot counted. With regard to this particular voter, the question may be phrased: When a person submits an on-site absentee ballot, and when he or she did so under the good faith belief that he or she would be outside the county on the day of the election, but when he or she in fact is inside the county for any portion of the election day, is his or her vote automatically excluded? In other words, does a voter lose his or her right to have his vote counted because his or her schedule changed? No.
Hale argues that the trial court correctly excluded F.C.G.'s vote: "The problem with allowing a voter to say that he or she `expected' to be out of town is that any voter can make that statement in order to justify his illegal vote." (Reply brief of appellee, filed September 20, 1999, at 2.) We are not unmindful of the problem Hale points out. However, we cannot agree that this problem requires the conclusion that the votes of persons who find themselves in situations such as this voter did must be excluded.
As this Court has said:

*1150 "It is the established law in this state that:
"`... a person be not disfranchised as to his right as an elector' ... when he has made an honest effort to comply with the law and in that effort has substantially complied with the statutory mandates.'"
Woodall v. City of Gadsden, 278 Ala. 634, 636, 179 So.2d 759, 761 (1965). Further, as we stated in our August 20, 1999, remand order:
"[T]he requirement that there be substantial compliance with the election laws, as articulated in Williams v. Lide, 628 So.2d 531 (Ala.1993), was not rejected in the aftermath of Roe v. Alabama, 43 F.3d 574 (11th Cir.1995), cert. denied, Davis v. Alabama, 516 U.S. 908, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995) It seems clear to us that, so long as any irregularities in the voting process do not `adversely affect the sanctity of the ballot and the integrity of the election,' substantial compliance `with the essential requirements of the absentee voting law' is sufficient. Williams, supra, at 536."
752 So.2d at 1128. Finally, we note that the right of citizens to vote is perhaps the most basic and cherished right of our democratic system,[18] and we must construe the voting laws "in order to effectuate the legislative purpose of protecting and furthering a citizen's right to vote," Wells v. Ellis, 551 So.2d 382, 383 (Ala.1989), so long as the sanctity of the election process is preserved.
In light of the above, we cannot agree that the votes of persons who submitted on-site absentee ballots would automatically be excluded if they were shown to have been inside the county on the day of the election. Under § 17-10-3(c), a person
"who will be unable to vote at his or her regular polling place because of [his or her] absence from the county of his or her residence on the day of any ... election may obtain and cast an absentee ballot by appearing in person at an on-site absentee balloting location within said county on the Saturday ten days prior to the date of said election or on the Tuesday of the week immediately preceding the date of the election."
(Emphasis added.) That Code section is not as clear as it could be as it relates to the facts of this case, but, given the fundamental nature of the right to vote, we will not infer a restriction on that right that is not explicitly stated by the Legislature. The Legislature could have provided that persons who voted by on-site absentee ballots *1151 but were subsequently in the county on the day of the election could not have their votes counted. It did not do so, however.
In § 17-10-3(c), the Legislature did not address the effect of an on-site absentee voter's being in the county on the day of the election; it merely provided that one who "will be" out of the county on that date may vote in advance by on-site absentee ballot. Because the affidavit is made and the on-site ballot is cast several days before the date of the election, we conclude that the Legislature's intent in passing the statute was to allow a person to vote by on-site absentee ballot if he thought at the time he filled out his affidavit and cast his ballot that, on the day of the election, he would be outside the county. Thus, the condition that must be met to vote by on-site absentee ballot is not being outside the county on the day of the election but having the belief when one actually casts his on-site absentee ballot that he "will be" outside the county on election day.
The bright-line rule applied by the trial court to exclude the ballots of those voters who were, in fact, in the county on election day is appealing because of its simplicity, but the application of that rule would deprive a person of his right to have his vote counted, simply because his plans changed after he voted by absentee ballot. In adopting the rule that we do today, we believe that we are meeting our responsibility under the law to defend the right of the people to vote and to have their votes counted. We see no indication here that the sanctity of the election process is threatened.
With regard to F.C.G., who had planned to be in Hale County but who was not able to leave Jefferson County until 3:00 p.m. on the day of the election, there is no evidence that his testimony about his plans was untruthful. There is no indication in the record that he did not, in good faith, believe at the time he submitted his on-site ballot that he would be out of the county on the date of the election. The trial court, therefore, erred in excluding F.C.G.'s ballot.[19] Accordingly, Hale's vote total remains 106,297; Woodward's vote total remains 106,311; and Woodward's lead remains 14 votes.
We next consider the votes of F.T. and the 10 remaining persons identified by the trial judge as being in the county on election day acting as poll watchers. These 11 voters all voted for Woodward by on-site absentee ballots. It appears undisputed that these voters were not authorized by § 17-10-3(c) to do so because, when they cast their ballots, they were not planning to be out of the county on the day of the election. It is equally clear, however, that all of these voters would have been entitled to vote by regular absentee ballot under the provisions of § 17-10-3(a)(6). The question, then, is: Where one is authorized by law to vote by absentee ballot, must his vote be excluded because he submits his ballot with the wrong affidavit form?
Ten years ago, in Wells v. Ellis, 551 So.2d 382 (Ala.1989), this Court first grappled with the difficult issues sometimes raised in cases involving the determination whether certain absentee ballots are due to be counted or to be excluded. Justice Jones, writing for the Court, stated:
"Alabama courts have not yet addressed the construction of the statute that authorizes absentee voting and sets out the manner in which that voting must be done (Ala.Code 1975, § 17-10-1 et seq.). Our research, however, has revealed two primary methods of construction *1152 developed and adopted by other jurisdictions that have addressed similar statutes.
"A number of jurisdictions subscribe to the view that absentee voting laws should be strictly construed because the absentee voting statutes grant a privilege and do not confer an absolute right; and because these statutes are in derogation of the common law. This `strict compliance' construction is based on the premise that statutory requirements for applying for an absentee ballot, marking an absentee ballot, taking the prescribed affidavit, and returning the ballot and affidavit are mandatory and, therefore, that strict compliance with the terms of the statute is required. By that construction, incomplete compliance, or lack of compliance, with any requirement of the statute, technical though it may be, invalidates the ballot. See, e.g., Garza v. Salinas, 434 S.W.2d 153 (Tex.Civ.App. 1968).
"The majority of jurisdictions, however, has held that absentee voting laws should be liberally construed in order to effectuate the legislative purpose of protecting and furthering a citizen's right to vote. `Substantial compliance' with the statutory requirements is required under this interpretation. See, e.g., Mittelstadt v. Bender, 210 N.W.2d 89 (N.D. 1973).
"In Boardman v. Esteva, 323 So.2d 259 (Fla.1975), cert. denied, 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976), the dispute concerned the validity of 3,389 absentee ballots cast in a judicial election. Boardman, declared the winner, received the majority of the overall votes because he received the majority of the absentee votes cast. Esteva sought to have himself declared the winner of the election based on the votes cast via the voting machines only, and sought to have the election declared illegal with respect to the absentee ballots. The trial court granted Boardman's motion for summary judgment, but the intermediate appellate court reversed and declared Esteva the winner, holding that the law in Florida required strict compliance with the mandatory requirements of the absentee voting statute.
"On appeal to the Florida Supreme Court, that court stated that the issue was whether the Florida absentee voting statute required strict compliance or substantial compliance with the provisions of the statute in order to have valid absentee ballots. The Court went on to explain the guiding principles in construing election statutes:
"`We first take note that the real parties in interest here, not in the legal sense but in realistic terms, are the voters. They are possessed of the ultimate interest and it is they whom we must give primary consideration. The contestants have direct interests certainly, but the office they seek is one of high public service and of utmost importance to the people, thus subordinating their interests to that of the people. Ours is a government of, by, and for the people. Our federal and state constitutions guarantee the right of the people to take an active part in the process of that government, which for most of our citizens means participation via the election process. The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard. We must tread carefully on that right or risk the unnecessary and unjustified muting of the public voice. By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right.'
"Boardman v. Esteva, 323 So.2d at 263.
"Having so stated, the Boardman Court held that, because the obvious will of the people was a preference for Boardman over contestant Esteva, and because of the notable absence of any allegation of fraud with respect to the conduct of the voters or the election *1153 officials, it could `countenance a different result, one contrary to the apparent will of the people, ... [only if] the sanctity of the ballot and the integrity of the election [had not been] maintained, and not merely on the theory that the absentee ballots cast were in technical violation of the law.' 323 So.2d at 263.
"In 1984, the Florida Supreme Court, again faced with an election dispute, reaffirmed the Boardman decision and summarized the `Boardman factors' to be considered in determining whether an election should be set aside:
"`(a) the presence or absence of fraud, gross negligence, or intentional wrongdoing;
"`(b) whether there has been substantial compliance with the essential requirements of the absentee voting law; and
"`(c) whether the irregularities complained of adversely affect the sanctity of the ballot and the integrity of the election.'

Bolden v. Potter, 452 So.2d 564, 566 (Fla.1984). See, also, Brown v. Grzeskowiak, 230 Ind. 110, 101 N.E.2d 639 (1951).
"We find the Boardman rationale to be the correct one for resolving absentee voting statute disputes and, therefore, we adopt the law set out in that decision as it relates to the construction of Ala. Code 1975, § 17-10-1 et seq."
551 So.2d at 383-84. In Williams v. Lide, 628 So.2d 531 (Ala.1993), this Court reaffirmed its adherence to the "substantial-compliance rule" as set forth in Boardman. In its 1996 amendments to the absentee voting laws, the Legislature modified § 17-10-7, the Code section setting forth the form of the affidavits to accompany absentee ballots, to make the requirements for the absentee-voting affidavits somewhat more exacting. However, as we held in our August 20, 1999, remand order, the "substantial-compliance rule" remains the law. Thus, as we wrote, "so long as any irregularities in the voting process do not `adversely affect the sanctity of the ballot and the integrity of the election,' substantial compliance `with the essential requirements of the absentee voting law' is sufficient." 752 So.2d at 1128, quoting Williams, supra, at 536.[20]
Applying the law as described above, we must ask, with regard to each of the voters discussed below: (1) Whether the voter committed "fraud, gross negligence, or intentional wrongdoing"; (2) Whether the voter "substantial[ly] compli[ed] with the essential requirements of the absentee voting law"; and (3) whether the submission of the absentee ballot with the affidavit form for an on-site ballot rather than a "regular" ballot "adversely affect[ed] the sanctity of the ballot and the integrity of the election."
Six of the remaining 11 voters testified that they discussed with election officials their reasons for wishing to vote by on-site absentee ballots and that the election officials told them that they could vote by on-site absentee ballots, or, at least, that the officials did not tell these voters that there would be any problem in their voting by on-site absentee ballots. They are: R.D.C., J.M.D., M.E., E.H.M., O.P., and J.W.
We are almost persuaded by the contestants' argument that these voters should have their votes counted, even though they were not authorized by law to vote by on-site absentee ballots. There is no dispute that these citizens were, in fact, authorized to vote by absentee ballot under the provisions of § 17-10-3(a), which authorized them to vote by regular absentee ballot. As the contestants point out, no evidence was admitted calling into question the authenticity of any of the above-listed voters' ballots. That is, there was no evidence *1154 admitted that tended to prove that the absentee affidavits bearing the names of the above-listed voters were not actually those voters' affidavits. There was no evidence tending to prove that the ballots contained in those affidavit envelopes did not reflect votes for the candidates of the voters' preference.
As this Court has held, "A legal voter has the right to express his free choice and wish in the premises, and will not be deprived thereof by reason of the fraud or neglect of election officers." Campbell v. Jefferson County, 216 Ala. 251, 252, 113 So. 230, 230-31 (1927). Further, "a legal voter has the right to express his free choice and wish at an election and within the statutes, and will not be deprived [thereof] by reason of mistake of judgment, and of the law by election officials, or by the neglect or fraud of election or canvassing officials." Pope v. Howle, 227 Ala. 154, 157, 149 So. 222, 225 (1933).
Pope and Campbell, however, do not replace the test described above from Williams v. Lide, supra. Regardless of the reliance that these voters may have placed on the election officials who were present when these voters cast their on-site absentee ballots, we cannot ignore the fact that these voters signed affidavits that were not accurate.[21] As we stated in our opinion of August 20, 1999:
"For `regular' absentee ballots, that is, those that are mailed in or that are hand delivered, § 17-10-7(b) provides that paragraph (5) of the affidavit shall read as follows:
"`(5) I am entitled to vote an absentee ballot because:
"`Check only one:
"`______ I will be out of the county or the state on all of the following days: election day, Saturday ten (10) days prior to election day, and Tuesday of the week immediately preceding election day.
"`______ I am physically incapacitated and will not be able to vote in person on election day.
"`______ I work a required workplace shift which has at least ten hours which coincide with the polling hours at my regular polling place.
"`______ I am a student at an educational institution located outside the county of my permanent residence and am therefore unable to vote at my usual polling place on election day.
"`______ I am a member of or a spouse/dependent of a member of the armed forces of the United States.
"`______ I have been appointed as an election officer at a polling place which is not my regular polling place.'
"For `on-site' absentee voters' affidavits, Subsection 17-10-7(c) provides that paragraph (5) of the affidavit shall read as follows:
"`(5) I am entitled to vote an absentee ballot because I will be out of the county or state on election day.'
"It is apparent from the words used by the Legislature in this statute that the Legislature required that the voter check the appropriate reason for voting a `regular' absentee ballot, but made no provision for the inclusion of a box or space after the `(5)' because there is only one reason listed in the statute and on the form, viz.: `I am entitled to vote an absentee ballot because I will be out of the county or state on election day.' Stated differently, a comparison of the language the Legislature used in subsection (b) of § 17-10-7 for `regular' absentee affidavits with the language the Legislature prescribed for `on-site' absentee affidavits in subsection (c) reveals that the Legislature specified spaces in front of the reasons for voting absentee for *1155 `regular' absentee affidavits, with instructions to `Check only one,' but that the Legislature did not require that there be a space or a box on the `on-site' absentee form and that there are no instructions to check any such box on that form.
"It is readily apparent why the Legislature wrote the statute as it did. Subparagraph (5) in § 17-10-7(b) lists the six different reasons for authorizing a person to vote absentee, but in § 17-10-7(c) there is only one reason for voting absentee permitted; thus, there are no alternatives to mark when a voter is voting absentee `on site.' The signature of the affiant is sufficient to identify the reason for voting absenteethat the voter states that he or she will be `out of the county or state on election day.' By contrast, for `regular' absentee ballots, there are six possible reasons for casting an absentee ballot by mail or by hand delivery, only one of which includes the reason that the voter will be out of the county or state on election day. Thus, there is a need for the absentee voter to identify which reason is being claimed. Compare Ala.Code 1975, § 17-10-3(a), with Ala.Code 1975, § 17-10-3(c).
"The last sentence of the affidavitin both forms of the affidavitreads as follows:
"`Moreover, I further swear (or affirm) that all of the information given above is true and correct to the best of my knowledge and that I understand that by knowingly giving false information so as to vote illegally by absentee ballot that I shall be guilty of a misdemeanor which is punishable by a fine not to exceed one thousand dollars ($1,000) or confinement in the county jail for not more than six months, or both.'
"Thus, in the case of an absentee ballot cast by mail or by hand delivery, the voter, by checking one of the six possible reasons for casting an absentee ballot and then signing the affidavit, is swearing or affirming that the indicated reason is true and correct. In the case of an absentee ballot cast on site, however, there is only one reason entitling the voter to vote an absentee ballot; therefore, there is no need to indicate which reason the voter has for voting absentee. Simply by signing the affidavit, the voter is swearing or affirming that the single reason stated in paragraph (5) is true and correct, and the voter could be prosecuted for falsely swearing or affirming false information."
752 So.2d at 1126-27 (footnote omitted).
Although absolutely no evidence presented by the contestee indicates that any of these voters intended to defraud anyone when they cast their absentee ballots, and although the contestants presented evidence indicating that each of these voters was entitled to vote by regular absentee ballot, the fact remains that the statement in their affidavits indicating that they would be out of the county on election day was not accurate. In fact, the record shows that several of these voters followed advice given to them by absentee-ballot election officials. Because of that fact, we were almost persuaded to conclude that many of these voters cast their on-site absentee ballots because of neglect of election officials in failing to present them with the proper affidavit, in failing to direct them to the place where one could be obtained, or by incorrectly advising them that they could cast an on-site absentee ballot. But, applying the test of Wells v. Ellis, and despite remaining mindful of the rule quoted above from Campbell v. Jefferson County, supra, that "[a] legal voter has the right to express his free choice and wish in the premises, and will not be deprived thereof by reason of the fraud or neglect of election officials," we have finally concluded that the contestee met his burden of showing that the statements made by the voters in their affidavits were not correct. Consequently, they were not entitled to cast on-site absentee ballots. In reaching this conclusion, we would be remiss if we failed to point out that election officials who manage the casting of absentee ballots should present to voters, *1156 who are acting in good faith, the proper forms for casting absentee ballots and should properly advise them, when requested, about the procedure to cast a proper absentee ballot.[22] In light of these facts, we conclude, but somewhat reluctantly, that the trial judge did not err in excluding the votes of R.D.C., J.M.D., M.E.,[23] E.H.M.,[24] O.P., and J.W. Accordingly, Hale's vote total remains 106,297; Woodward's vote total is reduced to 106,305; and Woodward's lead is reduced to 8 votes.
The last five voters in the poll-watcher group did not rely on the representations of voting officials that they were entitled to vote by on-site ballot. They are: G.D.B., R.M.S.,[25] F.T.,[26] *1157 J.T.,[27] and F.W. It appears undisputed that they would have been authorized to vote by regular absentee ballot under the provisions of § 17-10-3(a). However, it is also undisputed that they were not authorized by law, specifically under § 17-10-3(c), to cast on-site absentee ballots.
This group of voters is distinguishable from the group of six voters discussed immediately above, because these five voters did not rely on the representations of voting officials in voting by on-site absentee ballot. Nonetheless, bearing in mind our responsibility under Wells v. Ellis, and in light of the discussion immediately above, we cannot conclude that the trial judge erred in excluding these votes. Accordingly, Hale's vote total remains 106,297; Woodward's vote total is reduced to 106,300; and Woodward's lead is reduced to 3 votes.
The trial judge next identified persons whose votes he excluded because their ballots failed to meet the signature and/or witnessing requirements imposed by the statutes. We will address each of them, in turn.
G.J.T. testified that she signed the names of her husband, R.T., her two sons, K.C.T. and T.T., and her daughter, M.T., to on-site absentee affidavits. Her two sons and her daughter were not home when she did so. She marked the ballots for herself, her husband, and her daughter. However, G.J.T. testified, Mildred Cook, who appears to have been active in obtaining on-site absentee ballots for Hale from a number of persons who live in the Bessemer Division of the county, marked the ballots of G.J.T.'s two sons. The ballots of all five members of G.J.T.'s family (including her own) showed votes for Hale.
The trial judge excluded the votes of G.J.T's children, K.C.T., T.T., and M.T., because they did not sign the affidavits that purported to be theirs. The trial judge did not exclude G.J.T.'s ballot or that of her husband, R.T. Although her husband did not sign his own affidavit, he was present when his wife did so.
As discussed above, we held, in our August 20, 1999, opinion:
"[S]o long as any irregularities in the voting process do not `adversely affect the sanctity of the ballot and the integrity of the election,' substantial compliance `with the essential requirements of the absentee voting law' is sufficient. Williams, supra, at 536."
752 So.2d at 1150. In determining whether the signature requirement is among the "essential requirements of the absentee voting law," id., we are not without legislative guidance. Section 17-10-4 provides:
"Any applicant may receive assistance in filling out the application [for an absentee ballot] as he or she desires, but each application shall be manually signed by the applicant and, if he or she signs by mark, the name of the witness to his or her signature shall be signed thereon."
Section 17-10-5(b) provides:
"[T]he signing of a poll list by an absentee voter casting his ballot at an on-site absentee balloting location shall constitute an `application' for an absentee ballot."
Section 17-10-7 provides that the affidavit form accompanying an absentee ballot, which form a voter must fill out, whether the absentee ballot is a regular ballot or an on-site ballot, must contain the following statement, in all capital letters, immediately below the line designated for the voter's signature:
"IF YOUR AFFIDAVIT IS NOT SIGNED (OR MARKED), OR IF YOUR AFFIDAVIT IS NOT WITNESSED BY TWO WITNESSES 18 YEARS OF AGE OR OLDER OR A NOTARY PUBLIC OR OTHER OFFICER AUTHORIZED TO ACKNOWLEDGE OATHS, PRIOR TO BEING *1158 DELIVERED OR MAILED TO THE ABSENTEE ELECTION MANAGER, YOUR BALLOT WILL NOT BE COUNTED."
Finally, we note that § 17-10-10 provides that "[t]he provision for witnessing of the voter's affidavit signature (or mark) in Section 17-10-7 goes to the integrity and sanctity of the ballot and election." (Emphasis added.) Thus, the Legislature has specifically stated that the requirement that a voter physically sign or mark the affidavit is one that "goes to the integrity and sanctity of the ballot and election." An irregularity with regard to that requirement, therefore, would require that the ballot be excluded. The Legislature's express statement that the witnessing of the signature or mark "goes to the integrity and sanctity of the ballot and election" supports our conclusion that the signature itself is similarly important.[28] Further, our conclusion that the voter must physically mark the absentee affidavit is consistent with the Legislature's express provision that he or she must do so on the application for an absentee ballot.[29] See Taylor v. Cox, 710 So.2d 406 (Ala.1998).
In light of the above, we affirm that portion of the trial court's order excluding the ballots purporting to be the ballots of K.C.T., T.T., and M.T. Those ballots showed votes for Hale. Accordingly, Hale's vote total is reduced to 106,294; Woodward's vote total remains 106,300; and Woodward's lead extends to 6 votes.
Based on the above, we conclude that the trial judge erred in failing to exclude the ballot of R.T.[30] That ballot showed a vote for Hale. Accordingly, Hale's vote total is reduced to 106,293; Woodward's vote total remains 106,300; and Woodward's lead extends to 7 votes.
S.B.H. testified that she is not a registered voter. Therefore, the trial judge correctly excluded her ballot.[31] She also testified that she signed the absentee-ballot application and affidavit of her father, C.H., and the absentee-ballot application of her sister, K.H. The trial judge excluded the ballot purporting to be C.H.'s, and we affirm that exclusion.[32] *1159 However, the trial judge erred in failing to exclude the ballot of K.H.[33] All three of those ballots showed votes for Hale. Accordingly, Hale's vote total is reduced to 106,290; Woodward's vote total remains 106,300; and Woodward's lead extends to 10 votes.
C.M.L. testified that she did not sign or mark her on-site absentee affidavit and that she did not mark her own ballot. She testified that she had given permission for Louise Chandler to do so. Despite the fact that C.M.L. had given Chandler that permission, the trial court correctly excluded C.M.L.'s ballot for the reasons discussed above. That ballot showed a vote for Hale. Accordingly, Hale's vote total is reduced to 106,289; Woodward's vote total remains 106,300; and Woodward's lead extends to 11 votes.
R.L.W. testified that she signed the names of her husband, A.B.W., and her son, J.A.W., on their purported affidavits. She also testified that she marked their purported ballots.[34] The trial judge correctly excluded the ballot of J.A.W., but he erred in failing to exclude the ballot of A.B.W. Those two ballots showed votes for Hale. Accordingly, Hale's vote total is reduced to 106,287; Woodward's vote total remains 106,300; and Woodward's lead extends to 13 votes.
C.H. testified that she signed the absentee affidavit of the ballot purporting to be that of her son, El. H. She testified that Mildred Cook and Johnnye Lassiter watched her sign her son's name. C.H. testified that she had her son's permission to vote for him. Nonetheless, the trial judge correctly excluded the vote purporting to be that of El. H., for the reasons discussed above. That ballot showed a vote for Hale. Accordingly, Hale's vote total is reduced to 106,286; Woodward's vote total remains 106,300; and Woodward's lead extends to 14 votes.
D.H. testified that her signature does not appear on the document purporting to be her absentee affidavit. Although she did mark her own ballot, she testified that she did not sign the affidavit. Accordingly, the trial judge erred in failing to exclude her ballot. That ballot shows a vote for Hale. Accordingly, Hale's vote total is reduced to 106,285; Woodward's vote total remains 106,300; and Woodward's lead extends to 15 votes.
M.H. testified that he is not a registered voter. Further, he testified that the signatures purporting to be his on an absentee-ballot application and affidavit are not, in fact, his signatures. The affidavit indicates that Mildred Cook and Johnnye Lassiter were the witnesses. M.H. also testified that he was familiar with the signature of his brother, Mi. H. He testified that the signature on what purports to be Mi. H.'s absentee affidavit was not, actually, his brother's signature. That affidavit also appears to have been witnessed by Mildred Cook and Johnnye Lassiter. The trial judge correctly excluded the ballots purporting to be those of M.H. and Mi. H. Those ballots show votes for Hale. Accordingly, Hale's vote total is reduced to 106,283; Woodward's vote total remains 106,300; and Woodward's lead extends to 17 votes.
Ea. H. testified that she did not vote in the November 3 General Election and that the signature on what purports to be her absentee affidavit is not, in fact her signature. The trial judge correctly excluded the ballot purporting to be hers. That ballot showed a vote for Hale. Accordingly, Hale's vote total is reduced to 106,282; Woodward's vote total remains 106,300; and Woodward's lead extends to 18 votes.
Ma. H. testified that she signed her mother's name, A.H., on an application for an absentee ballot and on an absentee-ballot affidavit. She also testified that she signed her brother's name, P.H., on an application for an absentee ballot and on *1160 an absentee-ballot affidavit. She testified that Mildred Cook and Johnnye Lassiter, who are shown as witnesses on both affidavits, were not present when she signed the affidavits. The trial court correctly excluded the ballots purporting to be those of A.H. and P.H. Those ballots show votes for Hale. Accordingly, Hale's vote total is reduced to 106,280; Woodward's vote total remains 106,300; and Woodward's lead extends to 20 votes.
T.L.M. testified that she was living in Washington, D.C., at the time of the November General Election. She testified that she did not sign an absentee-ballot application or affidavit and that she did not vote in the November General Election. Mildred Cook and Johnnye Lassiter are shown as the witnesses on what purports to be her absentee-ballot affidavit. The trial court correctly excluded the ballot that purports to be T.L.M.'s. That ballot shows a vote for Hale. Accordingly, Hale's vote total is reduced to 106,279; Woodward's vote total remains 106,300; and Woodward's lead extends to 21 votes.
The trial judge next identified a group of voters that he held had improperly voted by on-site absentee ballots; he concluded that they had voted improperly because, he said, they did not use the ballots for the only available reason, that is, that they would be outside the county on the day of the election. He identified these 23 voters as: L.B., J.C.B., B.C., P.A.C., E.R.F., J.G., D.K., J.K., E.K., R.G.L., R.L., C.L., L.M., S.M., K.A.M., B.P., T.F.R., H.R., J.S., A.S., F.T.,[35] G.W., and S.W. The trial judge excluded these ballots, all of which showed votes for Woodward except for that of B.P., which showed a vote for Hale.
Three of these 23 voters, L.B., S.M., and A.S., testified that they could not recall whether they were in Jefferson County on the day of the election. There was no evidence offered to show that these three voters were not, in fact, outside the county on the date of the elections, and there was no evidence offered to prove that they acted in anything other than good faith when they cast their on-site ballots. When the evidence does not make a prima facie showing that a vote was illegally cast, the vote cannot be excluded. Shepherd v. Sartain, supra; Black v. Pate, supra. As a consequence, in the absence of any evidence tending to prove that these voters cast their on-site ballots in bad faith or that they were actually in the county on the day of the election, it was error for the trial judge to exclude their votes. Because we conclude that they were not due to be excluded, the vote totals remain unchanged. Hale's vote total remains 106,279; Woodward's vote total remains 106,300; and Woodward's lead remains 21 votes.
Four of these 23 voters testified that they voted by on-site absentee ballots because they had planned to be out of the county on the day of the election but that their plans changed and that, therefore, they were actually in the county on the day of the election. These voters are J.C.B., D.K., R.G.L., and R.L. There was no evidence calling into question the veracity of these four witnesses, and a review of the trial court's order (see Appendix A) shows that the trial judge made no finding as to the credibility of these witnesses, finding only that they did not "meet the requirement" to vote by on-site absentee ballot. Appendix A, 752 So.2d at 1183.[36] Accordingly, for the same reasons that it was error for the trial court to exclude the vote of F.C.G., see supra, it was error for the trial judge to exclude these four votes. Accordingly, the vote totals remain unchanged. Hale's vote total remains 106,279; Woodward's vote total remains 106,300; and Woodward's lead remains 21 votes.
*1161 B.C. and S.W. testified that they voted by on-site absentee ballots because their wives were scheduled to be in the hospital for surgery, or recovering from surgery, on the day of the election. B.C. and S.W. were not authorized by law to vote by regular or on-site absentee ballots. Although S.W. testified that he relied on the instructions of election officials in filling out his affidavit, S.W., like B.C., signed an inaccurate affidavit. Accordingly, for the reasons discussed above, the trial judge did not err in excluding these two voters' ballots. Both ballots showed votes for Woodward. Accordingly, Hale's vote total remains 106,279; Woodward's vote total is reduced to 106,298; and Woodward's lead is reduced to 19 votes.
P.A.C. and G.W. testified that they voted by on-site absentee ballots because they were scheduled to be in the hospital for surgery, or recovering from surgery, on election day. Neither of these voters testified that she relied on the instructions of election officials in filling out her ballot and affidavit. The contestants do not argue that these two votes were improperly excluded, and, while one might argue that these two voters were entitled to vote by regular absentee ballot or by "emergency absentee ballot,"[37] we do not address that question at this time because it is not essential to the resolution of this case. Accordingly, we do not conclude that the trial judge erred in excluding these two voters' ballots, which showed votes for Woodward. Accordingly, Hale's vote total remains 106,279; Woodward's vote total is reduced to 106,296; and Woodward's lead is reduced to 17 votes.
Eight of these 23 voters testified that they voted by on-site absentee ballot because they were scheduled to work as poll workers, as distinguished from volunteer poll watchers, on the day of the election. They are: E.R.F., J.G., J.K., K.A.M., L.M., B.P., T.F.R., and J.S. As poll workers, each of these voters was authorized by § 17-10-3(a)(6) to vote by regular absentee ballot. The parties presented no evidence casting any doubt on the authenticity of these voters' ballots and no evidence suggesting that any of these voters did not cast their ballots in good faith. Nevertheless, these voters signed inaccurate affidavits. Therefore, for the reasons discussed above, we conclude that the trial judge did not err in excluding their ballots.[38] Seven of these 8 voters' ballots showed votes for Woodward, and 1 of their ballots showed a vote for Hale. Therefore, we subtract 7 votes from Woodward's vote total and 1 vote from Hale's vote total. Accordingly, Hale's vote total is reduced to 106,278; Woodward's vote total is reduced to 106,289; and Woodward's lead is reduced to 11 votes.
E.T.K. testified that she voted by on-site absentee ballot because she was scheduled to be at work on the day of the election for a 12-hour shift and that she therefore could not go to the polls. Because of her work schedule, she was authorized under § 17-10-3(a)(3) to vote by regular absentee ballot. Further, she testified that she discussed her reason for wishing to vote by absentee ballot with election officials and that they told her to vote by on-site absentee ballot. Nevertheless, she signed an inaccurate affidavit, and her vote is therefore due to be excluded. The trial judge, accordingly, did not err in excluding her ballot. Her ballot showed a vote for Woodward. Accordingly, Hale's vote total remains 106,278; Woodward's vote total is reduced to 106,288; and Woodward's lead is reduced to 10 votes.
C.L.'s testimony as to why she voted on-site is unclear, although it appears that she believed that she was entitled to vote by on-site absentee ballot because she was scheduled to be on a jury. Without the *1162 benefit of clearer testimony, we cannot conclude that the trial judge erred in excluding her ballot. C.L.'s ballot showed a vote for Woodward. Accordingly, Hale's vote total remains 106,278; Woodward's vote total is reduced to 106,287; and Woodward's lead is reduced to 9 votes.
R.H.R. testified that he was in Peru on the date of the November General Election. Because of his planned trip, he voted with an on-site absentee ballot before leaving the country. When he went to cast his on-site ballot, he took his father, H.L.R., to vote on-site at the same time.
Charlotte Ann Hooten, an employee of a Jefferson County nursing home, testified that H.L.R. was a patient there on the day of the November election. Her records indicated that he received medicine throughout the day and that he was not signed out that day. The trial judge excluded H.L.R.'s ballot, which showed a vote for Woodward. The contestants argue that the vote should not be excluded on the basis of Hooten's testimony, because she did not testify that she saw him in the county on the day of the election, only that her records showed that he was in the county.[39] They point out that the nursing home's sign-in/sign-out sheet did not show H.L.R. leaving the facility on the day that he filled out his on-site absentee ballot and cast his vote, although it is undisputed that he did leave on that day. So, the contestants argue that it was possible that H.L.R. was outside the county on the day of the election. Based on the evidence available, however, we cannot conclude that the trial judge erred in excluding H.L.R.'s vote for Woodward. Accordingly, Hale's vote total remains 106,278; Woodward's vote total is reduced to 106,286; and Woodward's lead is reduced to 8 votes.
The trial judge next considered two individual ballots. C.P. testified that he had lived in Shelby County for approximately 12 years and that he had continued to vote in Jefferson County throughout that period. The trial judge excluded C.P.'s vote for Woodward, and we cannot conclude that he erred in doing so. Accordingly, Hale's vote total remains 106,278; Woodward's vote total is reduced to 106,285; and Woodward's lead is reduced to 7 votes.
G.R.N. testified that he was recruited a couple of days before the election to serve as a Republican poll watcher. The day before the election, he told election officials about his situation and told them that he wanted to vote by an absentee ballot. He relied on their instructions in voting by on-site absentee ballot. For the reasons discussed above, however, the trial court did not err in excluding G.R.N.'s ballot, which showed a vote for Woodward. Accordingly, Hale's vote total remains 106,278; Woodward's vote total is reduced to 106,284; and Woodward's lead is reduced to 6 votes.

V.
In our August 20, 1999, opinion, we discussed the authority of this Court to render a judgment contrary to the judgment on review:
"We could, accordingly, upon our conclusion that the judgment of the trial court is due to be reversed, proceed to render a judgment in Woodward's favor and declare him the winner of the election, as the contestants request and as the law permits, it being well settled that this Court has the authority to render a judgment contrary to a judgment entered by the trial court, provided that all the facts bearing on the issue in question are before this Court and establish that the party is entitled to a judgment as a matter of law. Indeed, § 12-22-70, Ala.Code 1975, provides:
"`The appellate court may, upon the reversal of any judgment or decree, remand the same for further proceedings or enter such judgment or decree as the court below should have entered or rendered, when the record enables it to do so.'

*1163 "Although we have held that § 12-22-70 is simply a codification of an appellate court's inherent powers, Barnes v. Dale, 530 So.2d 770 (Ala.1988); see also Jefferson County v. Busby, 25 Ala.App. 449, 148 So. 415 (1933), it is nonetheless an accurate statement of the law."
752 So.2d at 1134.
We did not on August 20, 1999, however, render a judgment for the contestants, because of our concern that the due-process rights of the contestee could be violated if we did so. At that point, all the evidence bearing on the question which candidateHale or Woodwardhad received the most legal votes for sheriff was not before this Court, because the trial judge had dismissed the election contest before the parties had been given the opportunity to introduce whatever evidence they could on the question of the legality of challenged votes. Accordingly, we remanded for further proceedings. On this return to the remand, the record and the briefs of the parties show that on remand the parties introduced a great deal of evidence, both by submitting documents and by presenting oral testimony, on the question which of the two candidates received the most votes for sheriff of Jefferson County in the November 1998 General Election.

Conclusion
We conclude that the trial judge erred in holding that Hale received the most legal votes for sheriff of Jefferson County. Based on our review of the evidence and upon our application of the law to the evidence, we conclude that Woodward received 106,284 legal votes and that Hale received 106,278 legal votes. Woodward was elected by the people of Jefferson County to be their sheriff, receiving 6 more legal votes than Hale. Accordingly, we reverse the trial judge's judgment, and we render a judgment for the contestants.
REVERSED AND JUDGMENT RENDERED.
SEE and LYONS, JJ., concur.
HOOPER, C.J., concurs specially.
HOUSTON, J., concurs (writing to follow).[*]
COOK and JOHNSTONE, JJ., dissent.
ENGLAND, J., dissents (written dissent accompanies this opinion; modified dissent to follow).[*]
BROWN, J., recuses herself.
HOOPER, Chief Justice (concurring specially).
Justice Cook's dissent was distributed the day before the majority opinion was being released. I had not intended to write, but when I read Justice Cook's insult to the majority of this Court and the opinion that majority has conscientiously prepared, I felt I had no choice.
If anything about this case suggests partisan politics, it is Justice Cook's dissent. The people of Jefferson County duly elected a sheriff, and they are entitled to have that duly elected sheriff take office. For most of this year, the county has been paying the sheriffs salary to the wrong person. It is time the winner took office and time this dispute ended.
COOK, Justice (dissenting).
The majority concludes that Alabama's absentee-ballot law requires only substantial compliance, and at the same time, strict compliance. This conclusion, which I will address in some detail, is internally inconsistent as it relates to this case and externally inconsistent based on the precedent of this Court. Applying these rules, this Court declares Jim Woodward the winner of the 1998 election to the office of sheriff of Jefferson County. In doing so, *1164 it violates well-established legal rules and principles of the State of Alabama, as well as the Voting Rights Act of 1965, § 208 (codified, as amended, at 42 U.S.C. § 1973aa-6); the Americans with Disabilities Act, 42 U.S.C. § 12132; U.S. Const. art. IV, § 4 (guaranteeing "a republican form of government"); and U.S. Const., amend. XIV (prohibiting the denial of due process). For these reasons, I dissent.
This Court is being inconsistent in concluding that Alabama's absentee-ballot law requires only substantial compliance as it relates to on-site balloting, and, at the same time, declaring that regular absentee ballots are subject to the scrutiny of strict compliance. Where there is a lack of consistency in an opinion involving a highly charged partisan election, such as in this case, the absence of consistency can subject this Court's opinion to being questioned as being influenced by partisan politics. Last, I frankly do not know, and I doubt that the reader will know, how the next absentee-ballot case will be addressed and decided by this Court.
My dissent in this case is not without personal difficulty. That difficulty is manifested in my criticism of the use, by this Court, of the doctrine of substantial compliance regarding the on-site absentee-ballot statute. While I personally favor the substantial-compliance doctrine, this Court, in Taylor v. Cox, 710 So.2d 406 (Ala.1998), the only case it has considered on that subject since the 1996 amendment to the regular-absentee-ballot statute, applied the plain-meaning/strict-construction rule of statutory construction. I agree in principle with the statement in the majority opinion "that the right of citizens to vote is perhaps the most basic and cherished right of our democratic system". 752 So.2d at 1150. While the right to vote is a basic and cherished right, the process of absentee voting is a privilege. Scheer v. City of Miami, 15 F.Supp.2d 1338 (S.D.Fla.1998); Raetzel v. Parks/Bellemont Absentee Election Bd., 762 F.Supp. 1354 (D.Ariz.1990). The Legislature thus has the authority under both the Alabama and the United States Constitutions to impose a constitutional procedure to implement a process for absentee voting.
I recognize that I can be accused of taking a position in this case that is different from the position I took in Taylor. In Taylor, which I will discuss in some detail, I dissented on the basis that a regular absentee ballot properly executed, that is, one that is either witnessed by two witnesses, or notarized, should be counted, although the signature on the application for the absentee ballot, though authorized by the voter, was not personally signed by the voter. Taylor, however, emphasizes the point that I make here. My position in Taylor was rejected, i.e., I lost. The majority in Taylor determined that the plain words of the statute should be strictly construed. I thus had every reason to believe, and was quite willing to accept, that the absentee-ballot law of Alabama was subject to the plain and unambiguous meaning of the statute and would be strictly construed.
The majority in this case utilizes the reasoning it rejected in Taylor. In Taylor, I stated that the Legislature did not amend the portion of the regular-absentee-ballot statute in 1996 relating to requiring the voter to sign the application, and therefore, a failure of the voter to sign the application should not result in rejection of an otherwise legal ballot. In this case, the majority declares that the substantial-compliance rule can be applied to the on-site absentee-ballot statute because the Legislature has not specifically stated that failure to comply with the on-site statute will result in the vote's not being counted.
Part I of my dissent will address my disagreements with Part IV of the majority opinion. The discussion will include the majority's holdingwith which I disagreethat the trial court erred in excluding the testimony of Dr. Roper. It will also include a discussion of three blocks of voters with which the majority deals in Part IV of its opinion. Part II of my dissent sets out my disagreements with *1165 Part I of the majority opinion, dealing with the necessity of a new election.

I. Legal and Illegal Votes[40]
My calculation begins, as does that of the majority, with the tally contained in this Court's opinion in this case dated August 20, 1999, as to which I concurred only in part, and that in the result. In that case, we reversed the trial court's judgment dismissing the contest and remanded the action for the introduction of evidence of illegal voting. According to this Court's tally at that time, Woodward had 106,311 votes and Hale had 106,298 votesa difference of 13 votes in favor of Woodward ("the Remand Tally").
The majority concedes that, on remand, the trial court made findings of fact based on "a great deal of oral testimony." 752 So.2d at 1144. Therefore, those findings are to be reviewed pursuant to the ore tenus rule. "`It is axiomatic that where the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court's conclusions on issues of fact, and this Court will not disturb the trial court's conclusion unless it is clearly erroneous and against the great weight of the evidence....'" Ex parte Monroe, 727 So.2d 104, 106 (Ala.1999) (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala.1977)). Otherwise stated, the trial court's findings of fact are not to be "`disturbed on appeal unless they are palpably wrong, manifestly unjust, or without supporting evidence.'" Anderson v. Lee, 621 So.2d 1305, 1307 (Ala.1993).
The majority acknowledges these principles but does not apply them consistently. For example, it correctly defers to the trial court as to the credibility of Jessie Burrell, whose testimony was offered to show that certain votes were cast illegally. However, it fails to apply these established rules of procedure to the trial court's decision to exclude the testimony of Dr. Roper as an expert witness.

A. The Excluded Testimony of Dr. Roper
The majority fails to identify the problem with Dr. Roper's testimony. Indeed, it focuses on a nonissue. Specifically, it identifies the "question" as: "Who may testify as a handwriting expert?" 752 So.2d at 1146. It then states:
"[Hale] introduced no evidence tending to call into question Dr. Roper's qualifications to testify as an expert witness in the field of handwriting analysis. The trial judge, nonetheless, ruled that Dr. Roper could not testify as an expert, apparently because he did not use a microscope in his examination of certain handwriting samples."
752 So.2d at 1146 (emphasis added). With all due respect to the majority, the issue was not whether Dr. Roper was qualified to "testify as a handwriting expert." In fact, the trial court did not hold that Dr. Roper was not a qualified "handwriting expert." The dispute was over the reliability of the methodology on which Dr. Roper proposed to base his testimony.
In this connection, Hale did not contend that handwriting analysis has not "gained general acceptance in the ... field," as required by Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923), for admissibility. He did rely, however, on the well-established rule that, in addition to "meeting the requirements of the Frye doctrine," the proponent of evidence must also "lay[] a foundation that [the] specific test was administered reliably." Charles W. Gamble, McElroy's Alabama Evidence § 490.01(1) (4th ed.1991). "Additionally, it must be shown that the test was conducted under conditions that render its results reliable." Id. This was the aspect of Dr. Roper's testimony that was at issue, and as to which the proponent, Woodward, failed to meet his burden of production.
*1166 Specifically, Dr. Roper testified that, just prior to testifying, he had obtained, in the "hallway" of the courthouse, a number of the signatures about which he proposed to testify. Apparently, the challenged voters had offered their exemplar signatures in his presence. He admitted that it was "not his normal practice to ... examine signatures at the courtroom and to take handwriting exemplars himself." (Reporter's Transcript, at 220.) (Emphasis added.) He stated: "I rarely take writings myself. But atthey were done this way on my recommendation, based upon the circumstances and time constraints available." (Reporter's Transcript, at 216.)
During a colloquy between the parties before the trial judge, Woodward's counsel conceded that no evidence had been offered as to the reliability of Dr. Roper's methodology. Id. at 223-24. At that point, the trial judge began to speak of a possible means by which Dr. Roper's methodology might be examined. Woodward's counsel immediately and strenuously objected to the trial judge's comments, in a manner that the trial judge considered personal and accusatory. Id. at 224-25. In the rather pointed colloquy that followed between Woodward's counsel and the trial judge, the objection was not withdrawn. Consequently, the trial court ruled that Dr. Roper's testimony would not be admitted.
The proponent of expert testimony must "lay[] a foundation that [the] specific test was administered reliably." C. Gamble, supra, at § 490.01(1). Moreover, "[a] ruling on the admissibility of expert testimony is largely within the discretion of the trial court and will not be overturned unless there has been an abuse of discretion." Tidwell v. Upjohn Co., 626 So.2d 1297, 1300 (Ala.1993). I cannot hold that, under these circumstances, the trial judge abused his discretion in disallowing Dr. Roper's testimony.
Here, the expert witness admitted that the method on which he proposed to base his testimony was not his customary method. The proponent neither proposednor offeredevidence as a foundation for the admissibility of the testimony. Finally, the proponent strenuously objected to the trial court's own attempts to examine the witness's methodology.
Thus, I dissent from that portion of the majority opinion holding that the trial court erred in disallowing Dr. Roper's testimony. The majority's logic and fidelity to legal principles fall apart even further, however, in the disposition of the following blocks of absentee ballots.

B. Individual Voter Blocks
The first block of voters consists of 12 persons who failed strictly to comply with formalities attendant upon the signature or witness requirements for regular absentee-ballot affidavits. The second block consists of 19 persons who cast on-site absentee ballots, but who were, nevertheless, in Jefferson County on election day serving as poll workers. The third block of voters consists of 12 persons who cast on-site absentee ballots, but who had no plans to be out of Jefferson County on election day. The majority holds that the votes of those in the first blockwho voted for Hale are invalid for failure of the voters strictly to comply with the absentee ballot law. It then simultaneously holds that some of the voters in the third blockwho voted for Woodwarddid not need to comply strictly with the absentee ballot law, and, therefore, that their votes are valid. I shall address each of these blocks in separate sections.

(1) Procurement Formalities
The majority excludes from its tally of legal votes those of 12 persons who failed in some respect strictly to comply with provisions of the regular absentee ballot law. Specifically, it excludes the votes of R.T., K.C.T., T.T., M.T., C.H., K.H., C.M.L., A.B.W., J.A.W., E.H., A.H., and P.H. These persons all voted for Hale. The majority excludes their votes because the voters did not personally sign the affidavit accompanying their ballot. However, with some of these voters, the affidavit was *1167 signed by a family member with the permissionor at the requestof the voter. Moreover, the trial court found that two of these voters, namely, R.T. and A.B.W., were physically disabled. Thus, from the voters in this block, the majority requires strict compliance as it did in Taylor. Following the precedent of Taylor, I agree that the votes of all but R.T. and A.B.W. were invalid.
Taylor involved an election contest initiated by Regina Taylor, the unsuccessful candidate for a position on the Bay Minette city council. 710 So.2d at 407. Taylor challenged the validity of four absentee ballots cast for John Cox, her opponent, on the ground that "the four absentee voters had not themselves signed the application form for the absentee ballots." Id. (emphasis in original). In doing so, she relied on Ala.Code 1975, § 17-10-4, which provides in pertinent part:
"The application required in Section 17-10-3(a) shall be filed with the person designated to serve as the absentee election manager. The application shall be in a form prescribed and designed by the Secretary of State and shall be used throughout the state. Notwithstanding the foregoing, handwritten applications can also be accepted at any time prior to the five day deadline to receive absentee ballot applications as provided in Section 17-10-3(a). The application shall contain sufficient information to identify the applicant and shall include the applicant's name, residence address, or such other information necessary to verify that the applicant is a registered voter. Any applicant may receive assistance in filling out the application as he or she desires, but each application shall be manually signed by the applicant and, if he or she signs by mark, the name of the witness to his or her signature shall be signed thereon."
710 So.2d at 409-10 (Cook, J., dissenting) (emphasis in Taylor).
The applicants in Taylor were "a 99-year-old man [and] his 90-year-old wife, who [was] bedridden; a long-distance truck driver; and a full-time college student." 710 So.2d at 408 n. 4. The applicants "had ... designated agent[s] sign the application form[s] for them." Id. at 407. There was no dispute that the challenged ballots were "properly notarized or witnessed," and the trial court held that the they were valid. Id.
Nevertheless, this Court reversed the judgment of the trial court, reasoning that the "language and meaning" of the phrase "manually signed by the applicant" were "clear." Id. at 408. The holding and rationale of Cox, therefore, mandate that ballots accompanied by affidavits that have not been "manually signed" by the voter are invalid. Following the precedent of Cox, I subtract 10 votes from Hale's total. The tally thus becomes 106,288 votes for Hale; 106,311 votes for Woodward. Woodward leads by 23 votes.
Taylor does not, however, require the exclusion of the votes of R.T. and A.B.W., the two disabled voters in this block. The trial court expressly found these voters to be so physically disabled as to require assistance in voting. The majority, nevertheless, disqualifies their votes because they solicited the aid of their wives in signing their affidavits and in marking their ballots. In other words, the majority excludes their votes, simply because they did not "manually sign" their own affidavits. Indeed, the majority hypothetically suggests "that a question may arise as to how a person who is completely paralyzed or otherwise disabled can comply with this rule." 752 So.2d at 1158 n. 29 (emphasis added). Thus the majority hints that it "might" view more sympathetically the attempts of R.T. and A.B.W. to exercise their elective franchiseif only they were "completely paralyzed." Because they were not "completely paralyzed," however, the majority defers any further consideration of this matter.
This Court need not await a case involving a literal quadriplegic. Federal law requires that the votes of R.T. and A.B.W. be counted. Specifically, 42 U.S.C. *1168 § 1973aa-6, of the Voting Rights Act of 1965, provides: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." (Emphasis added.) Similarly, 42 U.S.C. § 12132, a part of the Americans with Disabilities Act ("ADA"), provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[41]
Congress passed the ADA in 1990 on the basis of the following findings:
"The Congress finds that
"(1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;
"(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
"(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;
"(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;
"(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, over-protective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;
"(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;
"(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society;
"(8) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

*1169 "(9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity."
42 U.S.C. § 12101(a) (emphasis added). Congress further declared:
"It is the purpose of this chapter
"(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
"(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
". . . .
"(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."
42 U.S.C. § 12101(b) (emphasis added).
"The United States Supreme Court has repeatedly held that `[i]t is basic to [the] constitutional command [of the Supremacy Clause] that all conflicting state [laws] be without effect.'" Cantley v. Lorillard Tobacco Co., 681 So.2d 1057, 1059 (Ala.1996) (quoting Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). "Therefore, when federal and state laws conflict, the federal law triumphs and preempts the conflicting state law." Id. It does so in this case.
In implementing the laudable and legitimate purposes expressed in § 12101(b), Congress has, through the ADA and the Voting Rights Act, modified and superseded the state law upon which the majority relies to invalidate the votes of R.T. and A.B.W., namely, § 17-10-4, and Taylor, which construed it. Thus, 42 U.S.C. § 1973aa-6, which authorizes "[a]ny voter who requires assistance to vote by reason of ... disability" to solicit and receive assistance from "a person of the voter's choice," modifies and supersedes § 17-10-4, to the extent it requires the voter "manually [to] sign" the absentee-ballot affidavit. See Dipietrae v. City of Philadelphia, 666 A.2d 1132, 1135 (Pa.Commw.Ct.1995) (on the basis of 42 U.S.C. §§ 1973aa-6 and 12132, the "trial court properly allowed a disabled voter to appoint a person of his... choice to obtain an absentee ballot application, to deliver it to the Election Board, to obtain an absentee ballot from the Board and to deliver the completed ballot ... to the mail box or to the Board"), aff'd, 543 Pa. 591, 673 A.2d 905 (1996).
The trial court's finding that these voters needed physical assistance in voting is subject to the presumptions that attach to evidence presented ore tenus.[42] It is undisputed that R.T. and A.B.W. solicited the aid of their wives in signing their affidavits and in marking their ballots. It is further undisputed that these acts were done in their presence. Under these circumstances, this Court cannot, consistent with the Voting Rights Act and the ADA, exclude the votes of R.T. and A.B.W. In *1170 doing so, the majority violates the fundamental guarantees of the statutes and the Constitution of the United States.
R.T. and A.B.W. voted for Hale and those votes are due to be counted. Consequently, Woodward's total remains 106,311 and Hale's total is reduced by 10 to 106,288. Woodward's lead extends to 23 votes.

(2) False Affiant-Poll Workers
This block consists of 19 persons who cast on-site absentee ballots, but who were, nevertheless, in Jefferson County on election day serving as poll workers. This group is composed of E.R.F., J.G., J.K., K.A.M., L.M., B.P., T.F.R., J.S., F.T., G.D.B. R.M.S., J.T., F.W., R.D.C., J.M.D., M.E., E.H.M., O.P., and J.W. Every voter in this block swore on the accompanying affidavit: "I am entitled to vote an [on-site] absentee ballot because I will be out of the county or state on election day." Ala.Code 1975, § 17-10-7(c)(5) (emphasis added). However, none of these persons had, at the time they executed their on-site affidavits, plans to be out of the county on election day. With one exception, these persons voted for Woodward.
Due process and fidelity to precedent mandate that, where affidavits accompanying on-site absentee ballots cast for Woodward fail to comply with the "plain meaning" of the absentee-voter law, the Court apply an approach parallel to the one it applied in its disposition of the regular absentee ballots cast for Hale. As I shall explain in more detail later in this dissent, compliance with the "plain meaning" of the absentee-voter law, that is, "strict compliance," does not require the impossible or the absurd. It does, however, require that at the time of the signing of the on-site affidavit the voter planned in good faith to be out of the county on election day. There is no dispute that the voters in this block did not comply with that principle and, therefore, that their votes must be excluded. Woodward's total is reduced by 18, becoming 106,293. Hale's total is reduced by 1, becoming 106,287. Woodward leads by 6 votes.
The majority agrees with mebut most reluctantlyas to this block of voters. It states: "There is no dispute that these citizens were, in fact, authorized to vote by absentee ballot under the provisions of § 17-10-3(a), which authorized them to vote by regular absentee ballot." 752 So.2d at 1153. (Emphasis added.) It concedes: "We [were] almost persuaded by the contestants' argument that these voters should have their votes counted, even though they were not authorized by law to vote by on-site absentee ballots." Id. (emphasis added). Furthermore, it states: "[W]e conclude, but somewhat reluctantly, that the trial judge did not err ..."; id. at 1156 (emphasis added); and "we have finally concluded that the contestee met his burden." Id. at 1155 (emphasis added). The significance of the majority's ambivalence is strikingly illustrated by its disposition of five ballots cast by voters in the next block.

(3) Miscellaneous False Affiants
This block consists of 12 persons who, like those discussed in the last section, falsely swore on their on-site affidavits that they planned to be out of the county on election day. These persons, all of whom voted for Woodward, had no certain plans, at the time they executed their on-site affidavits, to be out of Jefferson County on election day, and, thus, did not execute the affidavit in good faith. These persons were: L.B., B.C., P.A.C., D.K., E.K., R.L., C.L., S.M., H.R., A.S., G.W., and S.W.
The majority concedes, as it must, that these persons were "not authorized by law, specifically under § 17-10-3(c), to cast on-site absentee ballots." 752 So.2d at 1157. Nevertheless, it excuses the illegality of five of these votes, namely, those of L.B., S.M., A.S., D.K., and R.L. Its stated rationale is that "there was no evidence offered to prove that they acted in anything other than good faith when they cast their on-site ballots." 752 So.2d at 1160.
However, these five voters all testified as to their plansor the absence thereof at the time they executed their on-site *1171 affidavits. Neither L.B., S.M., nor A.S. could testify unequivocally that at the time they executed their affidavits they planned to be out of the county. In fact, L.B. did not even suggest that he intended to be out of the county, so as to be able to use an on-site absentee ballot. The testimony of S.M. and that of A.S. indicated, at best, that they were aware of a possibility that they might be out of the county. But ambiguity does not satisfy the statute.
In an election contest, such as the one presented in this case, where the voter's response is ambiguous, and there is a lack of objective evidence, even when it has been requested from the voter, to establish that the voter did in good faith plan to be out of the county on election day, the voter cannot escape the statutory "out-of-the-county" requirement of the statute through ambiguity. Additionally, the absentee-ballot process provides a remedy in an emergency situation, when a voter learns of unforeseen employment circumstances that require the voter to be out of the county on election day. If a voter learns, not more than five days before an election, that an out-of-county employment requirement will exist on election day, the voter can vote an emergency absentee ballot.[43] The trial court's findings as to the testimony of L.B., S.M., and A.S. are subject to the ore tenus rule, and, in view of the evidence, they were not plainly and palpably wrong.
The ore tenus presumptions are especially pertinent in respect to the testimony of D.K. and the testimony of R.L., whose names and positions are well known in Jefferson County. Because the need for anonymity outweighs the need to present the most candid and detailed analysis of their testimony, I will discuss the evidence they presented in relatively general terms. As to his election-day plans, D.K. testified as follows:
"Q. [By Hale's counsel] And were you in Jefferson County on November 3, 1998?
"A. [By D.K.] Yes, sir.
"Q. And were you on duty that day?
"A. Yes, sir.
"Q. Okay. Did you work all day?
"A. I hadn't planned on it, but I did, yes, sir.
"Q. Okay. You said that you hadn't planned on it. What had you planned to do?
"A. I had planned to go play some golf out of the county that day and come back at seven-thirty that night for the [election] returns.
"Q. Okay. Where were you going to play golf?
"A. Far away from Jefferson County, sir.

"Q. Well, there are a lot of places `far away from Jefferson County.'
"A. I play in Blount County. I have gone to Cullman, different places.
"Q. So you were going to go play golf somewhere, but you don't know where, is that what you are saying?
"A. That's correct. I hadn't finalized my plans.

"Q. And who were you going to go with?
"A. I hadn't finalized my plans, sir."
(Reporter's Transcript, at 497-98.) (Emphasis added.) Considering D.K.'s identity and his employment position, the trial judge could have found this testimony entirely incredible. At a minimum, the testimony suggests that at the time D.K. executed his on-site affidavit, he had no definite plans to be out of the county on election day.
Because of the identity and position of R.L., his testimony was subject to the same analysis. A finding, therefore, that R.L. did not intend to be unable to vote on *1172 election day because of an anticipated absence from the county is entirely consistent with the presumptions attending ore tenus evidence.
Indeed, I am convinced that the real rationale for the majority's disposition of these five votes is the same rationale that "almost persuaded" it to excuse the poll workers who falsified their affidavits. In other words, the actual rationale is that these voters could have voted a regular absentee ballot; ipso facto, they can vote an on-site absentee ballot. Under this inexplicable rationale, any voter who could vote under some provision of the absentee-ballot law is automatically entitled to vote under any provision of the absentee-ballot law. Under this rationale, the votes of L.B., S.M., A.S., D.K., and R.L. should not be excluded because they did not vote by a regular absentee ballot.
Inasmuch as the majority concedes that the votes were not cast in accordance with the on-site election statute, the votes are due to be excluded for failure to strictly comply with statutory requirements, in the absence of a procedure or rule to recognize the votes as being legal. The procedure that is applied by the majority in this case is the "substantial-compliance" rule as set forth in Williams v. Lide, 628 So.2d 531 (Ala.1993).[44] That rule was, of course, at the center of the dispute over the 1994 race for Chief Justice.
In response to loud and strident objections from various nonjudicial quarters to the substantial-compliance rule, the Legislature in 1996 made extensive revisions of the absentee-ballot law. The implications of these revisions were illustrated in Taylor v. Cox, supra, where this Court construed the absentee-ballot law in a manner that can only be understood as "strict compliance." As if to emphasize that point, Justice See called attention to "the history that gave rise to the [1996 amendment of Ala.Code 1975,] § 17-10-7." 710 So.2d at 409, n. 6 (See, J., concurring specially). He asserted that Roe v. Mobile County Appt. Bd., 676 So.2d 1206, 1226 (Ala.1995), had held "absentee ballots could be counted even if they failed to comply with the two-witnesses-or-notarization requirement of § 17-10-7." Id. Finally, he stated: "In my view, far from approving this Court's holding in Roe, [the 1996 amendment] was an express disapproval of judicial departures from the plain meaning of election statutes." 710 So.2d at 409, n. 6 (emphasis added). In this class of case, "plain meaning" is simply shorthand for "strict compliance." In other words, the Court required strict compliance with the absentee-voter law.
This Court cannot have it both ways. Either the absentee-voter law requires strict compliance, consistent with Taylor, or it requires substantial compliance, in line with Roe. As I pointed out in Part I.B.(1), which deals with the regular absentee voters, the majority required of the individuals who voted for Hale strict compliance.
The majority attempts to circumvent the obvious implications of its inconsistency by avoiding the explicit use of the term, "strict compliance" and by describing the conduct it wishes to excuse as not implicating "`essential requirements of the absentee-voting law.'" 752 So.2d at 1153. Apparently, the prevention of voter fraud specifically, the execution of the on-site affidavit by a voter who does not in good faith plan to be out of the county on election daydoes not strike the majority as one of the "`essential requirements of the absentee-voting law.'"
When I voted on this Court's August 20, 1999, remand order, see 752 So.2d at 1136, I could not have foreseen that the majority *1173 would take this approach with regard to some of the 115 on-site ballots at issue before this Court at that time. One of the issues before us at that time was whether there was any significance in the fact that 115 voters had not checked the "box" that appeared on the on-site affidavits to indicate the reason they were voting under that provision of the absentee-ballot law. Hale had argued that the failureor refusalof the voters to check the box was significant. He argued in effect (1) that there is a difference between saying something and saying nothing; (2) that if affiants mark the "box" on the on-site affidavit forms corresponding to § 17-10-7(c)(5), they affirmatively say something, thus bringing them squarely and incontrovertibly within the imprecations of the oath; (3) that if they do not mark the "box," they have not "given" the information contained therein, and, therefore, will not beor will not feelbound by the oath or threatened by its maledictions; and (4) that as a result, the oath will fail of its essential purpose.
Indeed, Eubanks's own witness, Charles Grainger, general counsel for the secretary of state, testified:
"And there are people who walk in thinking they can vote for any reason whatsoever. And they come there and they find out you can only vote if you are going to be out of the county on election day. And it's possible that some of these people would look at that affidavit and say well if I don't check that box, I'm not committing perjury."
(Emphasis added.)
This Court rejected those arguments. Specifically, it said:
"In the case of an absentee ballot cast on site, however, there is only one reason entitling the voter to vote an absentee ballot; therefore, there is no need to indicate which reason the voter has for voting absentee. Simply by signing the affidavit, the voter is swearing or affirming that the single reason stated in paragraph (5) is true and correct, and the voter could be prosecuted for falsely swearing or affirming false information."
752 So.2d at 1127 (emphasis added) (footnote omitted).
When I voted on the August 20, 1999, opinion, I fully believed that the Court was committed to that proposition, namely, that "a voter could be prosecuted for falsely swearing or affirming false information," simply by signing his or her name to the affidavit. In other words, I was convinced that voters with false intentions who did not check the boxes were just as liable to prosecution as if they had checked the boxes with false intentions. I was convinced that the Legislature deemed it unnecessary to compel a voter to "check the box."
To my dismay, the majority has now shifted its position, and holds, in effect, that "falsely swearing or affirming false information" is not a serious offense. Indeed, holds the majority, a truthful affidavit is not one of the "`essential requirements of the absentee voting law.'" 752 So.2d at 1128.
I hasten to point out that strict compliance does not require the impossible or the absurd. A voter need not be a prophet to vote by on-site absentee ballot. The voter must, however, at the time he or she executes the affidavit, have a definite plan to be out of the county on election day. For example, R.G.L., who voted by on-site absentee ballot, but nevertheless was in the county on election day, testified as follows:
"A. [R.G.L.] I had a business trip planned leaving that Monday the 2nd, that afternoon, and returning Tuesday night after the polls closed. So there wasn't anything sinister. It was just that my plans changed. My father was put in the hospital and had emergency surgery on the 3rd, that Tuesday, on election day. So, I cancelled my business trip and stayed with him.

*1174 "Q. [Counsel for Woodward] So, on Saturday, ten days before the election, you expected to be ...
"A. Yes, sir.
"Q .... out of the county on election day?
"A. Yes, sir."
(Reporter's Transcript, at 783-84.) J.C.B., who also voted by on-site absentee ballot, but who was in the county on election day, testified in a similar fashion. Consequently, I would hold that the votes of R.G.L. and J.C.B. are due to be counted.
As I pointed out in my special writing of August 20, 1999, on-site absentee voting in Alabama is new. 752 So.2d at 1137 (Cook, J., concurring in the result). It was authorized by Act No. 96-885, 1996 Ala. Act 1699, in connection with various other revisions of the absentee-ballot law. I assume that the Legislature had valid and considered reasons for restricting the right to use an on-site absentee ballot to those whose sole reason for voting absentee is that they would be out of the county on election day.
In that connection, the Legislature has this year again amended the on-site absentee-ballot law. Specifically, Act No. 99-388, 1999 Ala. Acts 615, adds, among other things, the following provision:
"(j) Election officers appointed to an on-site absentee balloting location shall:
"(1) Post a sign at the entrance of the on-site absentee voting place notifying prospective voters that they may only vote absentee at the on-site absentee balloting location if the voter will be out of the county on election day."
(Emphasis added.) Act No. 99-388 reinforces my view that the Legislature "meant what it said" in creating the special method of voting absentee and making it available only to those who have definite plans to be "out of the county on election day."
In any case, "[a]ll questions of propriety, wisdom, necessity, utility, and expediency of legislation are exclusively for the Legislature and are questions with which this Court has no concern." Johnson v. Price, 743 So.2d 436, 438 (Ala.1999); see Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 18 So.2d 810 (1944). In reasoning that voters who might have voted by regular absentee ballot are ipso facto authorized to vote by on-site absentee ballot, the majority abrogates in toto the legislative scheme authorizing on-site absentee voting.
For these reasons, Woodward is not entitled to any of the 12 votes included in this block. Woodward's total is reduced by 12, yielding 106,281 votes. Hale's total remains at 106,287. Hale leads by 6 votes.

(4) Miscellaneous Votes to be Subtracted from Woodward
In addition to the votes in blocks two and three, the votes of G.R.N. and C.P. are due to be subtracted from Woodward's total. G.R.N. was another poll worker. G.R.N. testified that he was requested to serve as a poll watcher a couple of days before the election. The day before the election he discussed his circumstances with election officials and told them that he wanted to vote absentee. He attempted to vote by emergency ballot, pursuant to Ala. Code 1975, § 17-10-12(c). His attempt was ineffective, however, because the only valid reason for voting pursuant to § 17-10-12(c) is "if he or she is required by his or her employer under unforeseen circumstances to be out of the county on an emergency business trip on election day." (Emphasis added.) The section further provides:
"The applicant shall complete and file an application form designed by the Secretary of State for emergency absentee voters. The form shall contain an affidavit which the applicant shall sign or swear acknowledging that he or she was not aware of the out of county business requirement prior to five days before the election. An applicant who meets the requirements of this subsection may vote by an emergency absentee ballot."
(Emphasis added.) G.R.N.'s testimony on its facereveals that he was not entitled *1175 to vote under these provisions. Woodward's total is reduced to 106,280. Hale leads by seven votes.
The vote of C.P. is, likewise, due to be subtracted from Woodward's total. This is so, because Shelby County is the site of C.P.'s residence and domicile. Woodward's total is thus reduced to 106,279. Hale's total remains 106,287. Hale leads by eight votes.

(5) Miscellaneous Votes to be Subtracted from Hale
The following seven votes, however, are due to be subtracted from Hale's total, namely, those of S.B.H., D.H., M.H., Mi. H., E.H., T.L.M., and R.C. Neither S.B.H. nor M.H. is registered to vote. Both E.H. and T.L.M. testified that they did not vote in the election. R.C. has been convicted of a felony. Neither D.H. nor Mi. H. signed the affidavits purporting to be theirs. Finally, B.P., like those voters in block two, voted for Hale by on-site absentee ballot without the intention to be out of the county on election day.
With the exclusion of these seven votes, Hale's total is reduced to 106,280. Woodward's total is 106,279. Thus, my final calculations place Hale ahead by one vote. For the following reasons, however, I conclude that this election is void and that the voters of Jefferson County are entitled to a new election.

II. New Election
In Part I of the main opinion, the majority asserts that there is no provision for this court to call a new election. I agree that there is no express, statutory authority. I disagree, however, with the assertion that this Court is without authority to require a new election. Where circumstances are truly extraordinary, courts will declare an election void, even without express statutory authority. Foulkes v. Hays, 85 Wash.2d 629, 632-33, 537 P.2d 777, 780 (1975) (necessary and proper powers would include the power to order a new election where no other remedy would adequately correct distortions in election results caused by fraud or neglect); cf. Terry v. Sencindiver, 153 W.Va. 651, 171 S.E.2d 480 (1969). Indeed, this Court has the inherent authorityand the dutyto enforce the Constitution of the United States and the Constitution of Alabama.
This election contest implicates a number of guarantees afforded by the Constitution of the United States, including those contained in U.S. Const. art. IV, § 4, which provides: "The United States shall guarantee to every state in this Union a republican form of government...." "[T]he right to vote is inherent in the republican form of government envisaged by Article IV, Section 4 of the Constitution." Baker v. Carr, 369 U.S. 186, 242, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Indeed, "[e]mphasis on this basic right to vote is essential to the fair workings of the democratic process under our republican form of government." Kessler v. Grand Cent. Dist. Management Ass'n, Inc., 158 F.3d 92, 118 (2d Cir.1998). "`Governmental interference with the right to vote ... calls for active judicial protection of the background conditions for political deliberation, political equality, and citizenship.'" Id. (quoting Cass R. Sunstein, The Partial Constitution 142-44 (1993)) (emphasis added). Also, the voters of Alabama enjoy specific due-process guarantees under both the Fourteenth Amendment and the Constitution of Alabama. This Court is charged with enforcing these guarantees.
Moreover, it is expressly invested with the supervisory power of the judiciary of Alabama. Ala. Const.1901, amend. 328, § 6.02 ("[t]he supreme court shall have original jurisdiction ... to issue such ... orders as may be necessary to give it general supervision and control of courts of inferior jurisdiction"); Ala.Code 1975, § 12-2-7 ("The Supreme Court shall have authority ... (3)[t]o issue ... such ... writs as are necessary to give to it a general superintendence and control of courts of inferior jurisdiction.")
Thus, this Court has the constitutional, statutory, and inherent authority to abstainand to compel the courts of inferior jurisdiction to abstainwhere judicial action *1176 would violate fundamental guarantees of due process and the right to participate in our republican form of government. When the electoral process has become so tainted that the judiciary of Alabama cannot, consistent with the Constitutions of the United States and of Alabama, determine and declare the winner of an election, this Court has both the power and the duty to abstain and to enjoin further judicial action in the matter. In other words, the judiciary of Alabama cannot be compelled to participate in the violation of voters' constitutional rights. Such abstention is required in this case for a number or reasons.
First, an enormous amount of confusion and controversy has been generated by the recent revisions of the absentee-ballot laws, which authorized the on-site ballots central to this case. Like the majority, I am deeply troubled by the fact that a large number of voters were encouraged to falsify their affidavits by election officials themselves. My concern is amplified by the fact that this Court cannot speak with one voice as to how to resolve the matter of on-site, absentee voting. But it is worse than useless to castigate and chastise election officials for failing to understand a new law on which this Court cannot agree.
Second, there is still the matter of the 23 ballots from the Bessemer Division that have allegedly "disappeared," of which I spoke in my special writing directed to our August 20, 1999, remand. As I stated there: "As for those `23 "on-site" absentee affidavit envelopes from the Bessemer Division that contained no ballots when the parties examined them on July 7-8,' 752 So.2d at 1124, there is a factual issue regarding the disposition of the ballots those envelopes once contained." 752 So.2d at 1137. This issue has yet to be resolved to my satisfaction.
Third, there is no "cushion"no margin of errorin this case. The margin of victory is razor-thin, regardless of whether one prefers my view of the evidence or that of the majority. Thus, every vote counts. Although conducting a new election would not resolve all the matters of law over which this Court cannot agree, it would, in all probability, change the margin of victory and render those legal issues academic.
Fourth, this case has now been in the trial court repeatedly and in this Court a number of times. However, neither the trial court nor this Court has arrived at the same tally twice. Because of the unresolved controversy over the on-site absentee ballotsand missing ballotsthis Court can, simply by placing a particular "interpretation" on the testimony of A.B.W., L.B., S.M., A.S., D.K., and R.L., produce any result it wants. In other words, applying rules of law to this case does not remove it from the posture it is in, an unfortunate posture that will allow the decision in it to be seen as a conscious partisan decision.[45] Any such result is, therefore, fundamentally unfair, and "fundamental fairness [is] the touchstone of due process." Armstrong v. State, 294 Ala. 100, 103 n. 1, 312 So.2d 620, 623 n. 1 (1975). Moreover, any such result is inconsistent with the democratic process and with the principles of a republican form of government.
Thus, though I have no difficulty in "deciding a case" and although I have done my best to apply what I deem to be established principles of law in reaching my final tally in this case, I am not comfortable with the result. It is not my place to choose the sheriff of Jefferson County. Indeed, both of the former candidates, Mike Hale and Jim Woodward, are personally known to me. They are, as stated in an earlier order by Judge Wynn, both fine men. I knew and worked with them during the 17½ years that I served as a trial judge in Jefferson County, and I have a high regard and respect for each of them. *1177 Obviously, they are both well regarded by the voters of Jefferson County. The voters, not I and not the majority, must ultimately decide this case.
As it stands now, doubt and suspicion will forever cloud this election. The voters of Jefferson County will never feel confident that the "system worked." Under the peculiar and extraordinary circumstances of this case, this Court has the power and the duty to abstain from rendering a decision on the merits. In other words, it has the power and the duty to abstain from "[g]overnmental interference with the right to vote." Kessler, 158 F.3d at 118.
Thus, consistent with its power under the laws of the United States and the laws of Alabama, this Court should declare the November 1998 election for sheriff of Jefferson County void. Such a declaration would automatically invoke the political processes of this state, setting the stage for "`political deliberation, political equality, and citizenship,'" id., through a new election.
By forging ahead to enter a judgment on the merits, the majority violates the constitutional and statutory law of the United States and that of Alabama. For these reasons, I dissent.
JOHNSTONE, Justice (dissenting).
I respectfully dissent from the majority's treatment of seven particular on-site absentee ballots and two particular "regular," or mail-in, absentee ballots. More specifically, I respectfully dissent from the majority's counting in favor of Woodward the on-site absentee ballots cast by L.B., R.L., J.C.B., D.K., S.M., A.G.S., and R.G.L. and from the majority's discounting from Hale's vote the "regular," or mail-in, absentee ballots cast by R.T. and A.B.W.
On the basis of the materials before us, the vote of L.B. in favor of Woodward should be discounted, and the votes of R.T. and A.B.W. in favor of Hale should be counted. Further, obedience to the ore tenus rule requires that we remand the case to the trial court for its determination of the bona fides of R.L., J.C.B., D.K., S.M., A.G.S., and R.G.L. in swearing that they would be outside Jefferson County on election day in order to obtain and to vote on-site absentee ballots. The fact findings of the trial court on the bona fides of these six on-site absentee voters would then determine the outcome of this election, because the majority finds only a six-vote lead for Woodward even with his receiving the benefit of the majority's treatment of all nine of these on-site and "regular" mail-in absentee ballots. This dissent will now discuss these nine votes with particularity.
In order to obtain and to vote an on-site absentee ballot, each one of the seven on-site absentee ballot voters discussed in this dissent swore under oath that he or she would be outside Jefferson County on election day. The majority correctly holds that such a voter's ballot is valid if the voter so swore with a "good faith belief" that he or she would, in fact, be outside of Jefferson County on election day.
L.B., who voted an on-site absentee ballot in favor of Woodward, first testified that he was in Jefferson County on election day but then testified that he could not recall whether or not he was in Jefferson County on election day. He offered no explanation of why he obtained and voted an on-site absentee ballot. This voter's initial testimony that he was in Jefferson County on election day is sufficient to support a fact-finding by the trial court to this effect. Moreover, the combination of evidence that L.B. was in Jefferson County on election day and the absence of any explanation or excuse for his having voted an on-site absentee ballot constitutes a prima facie case that the absentee ballot is invalid, as the trial court concluded. "We will not disturb the trial court's findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence." Williams v. Lide, 628 So.2d 531, 534 (Ala.1993), citing Mitchell v. Kinney, 242 Ala. 196, 200, 5 So.2d 788, 797 (1942).
*1178 R.L., who obtained and voted an on-site absentee ballot in favor of Woodward, admitted that he was in Jefferson County most of election day but claimed that he was outside Jefferson County for several hours on election day. He testified that, even though he, himself, was a candidate seeking election by the voters of Jefferson County in this same election, he had agreed and planned to do campaign work for another candidate in Walker County on election day. He testified further that, when he went to Walker County on election day, the other candidate did not need his help.
The trial court erroneously discounted R.L.'s vote and those of J.C.B., D.K., S.M., A.G.S., and R.G.L. categorically upon a finding that they were not outside Jefferson County on election day. The trial court should instead have applied, and must now apply, the good-faith-belief test to the oath sworn by each of these voters in applying for an on-site absentee ballot, in order for the trial court validly to decide the validity or invalidity of each such voter's vote. The implausibility of R.L.'s testimony presents the trial court with the factual issue of whether R.L. did, in fact, entertain a good faith belief that he would be outside of Jefferson County on election day. Because R.L.'s testimony was ore tenus, the trial court observed the delivery of the testimony and the demeanor of the witness himself and now can best judge the weight and credibility of the testimony. Charles Israel Chevrolet, Inc. v. Walter E. Heller & Co., 476 So.2d 71, 74 (Ala.1985). If the trial court finds that R.L. swore his oath and obtained his on-site absentee ballot in good faith, then R.L.'s vote for Woodward is valid; and, if the trial court finds that R.L. did not swear his oath and obtain his ballot in good faith, then his vote is not valid. The Supreme Court cannot, at this stage of the proceedings, count R.L.'s vote in favor of Woodward without usurping the function the ore tenus rule assigns exclusively to the trial judge.
The rationale for remanding for the trial court to judge the bona fides of R.L.'s on-site absentee ballot application oath applies equally to the issue of the validity of the votes of the remaining five on-site absentee ballot voters to be discussed in this dissent. I will summarize the operative facts pertaining to each of these remaining five.
J.C.B., who obtained and voted an on-site absentee ballot in favor of Woodward, presented inconsistent testimony about the election day plans he entertained when he swore his oath. Specifically, he testified that he planned to vacation at Gulf Shores but also to work as a deputy sheriff in Jefferson County on election day. He testified further that, on occasion, his work took him outside Jefferson County. He testified, however, that he was not outside Jefferson County on election day. This testimony presents the trial court with the question of whether, when this voter swore his oath, he did, in fact, entertain a good faith belief that he would be outside Jefferson County on election day.
D.K., who voted an on-site absentee ballot in favor of Woodward, testified that, even though he remained in Jefferson County on election day, he "had planned to go play some golf out of county that day, and come back at seven thirty that night for the returns." When asked where he was going to play golf, he testified, "Far away from Jefferson County, sir." (Emphasis added.) He further testified that he "hadn't finalized" his plans where or with whom he would play golf. This testimony presents the trial court with the fact question of whether this voter swore his oath for an on-site absentee ballot in good faith.
S.M., who obtained and voted an on-site absentee ballot for Woodward, testified, "Since I would be working, I would not know if I was going to be in county or out of county.... I didn't plan for myself. But as far as my work, yes, there was a very good possibility I would be out of the county." She then testified to varying degrees of likelihood that her work would take her out of the county. Harboring this *1179 state of mind, she swore that she would be out of Jefferson County on election day, in order to obtain and to vote an on-site absentee ballot. She further testified that she could have been in Jefferson County all day on election day or could have been outside the county for part or all of election day. S.M.'s testimony presents the trial court with the fact question of whether S.M. swore her oath to obtain an on-site absentee ballot in good faith.
A.G.S. likewise voted an on-site absentee ballot for Woodward. The essence of her testimony regarding her plans for election day when she swore her oath to obtain her absentee ballot is, "II would not have voted absentee had I not had plans to be out of town that day, or out of state." She also testified, "My calendar does not show me being out of town [on election day]." Noteworthily, plans to be merely "out of town" would not satisfy the on-site absentee ballot requirement that the voter plan to be out of the county and would not justify an oath that the voter would be out of the county. A.G.S.'s testimony, too, presents the trial court with the fact question of whether she swore her oath for an on-site absentee ballot in good faith.
The sixth in this series of on-site absentee voters who cast votes for Woodward and whose testimony presents further fact questions for the trial court, is R.G.L. He testified that, although he had obtained and voted his absentee ballot because he planned to be out of Jefferson County on a business trip on election day, his plans had changed and he had remained in Jefferson County. The credibility of this ore tenus testimony, like the credibility of the ore tenus testimony of the other on-site absentee ballot voters discussed in this dissent, is for the trial court, not the Supreme Court, to decide.
Finally, two disabled voters, R.T. and A.B.W., voted for Hale by "regular" mail-in absentee ballots. While the majority discounts their votes from Hale's total, I think their votes should be counted for the reasons stated by Justice Cook in his scholarly dissent.
I agree with the majority that the facts and the law do not require or allow us to order or to approve a new election. The winner of this election can be validly determined. The only way for this Court to effect such a determination, however, is to remand this case to the trial court with instructions to apply the good-faith-belief test to the testimony of R.L., J.C.B., D.K., S.M., A.G.S., and R.G.L., to count or to discount each of the nine votes addressed by this dissent as explained in this dissent, and to count or to discount each of the other contested votes addressed by the very thorough majority opinion as directed by the majority opinion.
ENGLAND, Justice (dissenting).
I respectfully dissent from the majority's opinion. I agree with that part of Justice Cook's dissent that states that a new election should be held.

Appendix A to Opinion of November 5, 1999
[NOTE: This appendix reproduces the trial court's order of September 10, 1999, without emendation or other alteration, except to substitute initials for the names of the voters and to indicate the judge's signature at the end.]

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
IN RE: CONTEST OF ELECTION
FOR OFFICE OF SHERIFF OF
JEFFERSON COUNTY, ALABAMA,
HELD ON NOVEMBER 3, 1998.
CONTESTANTS: DELLA F. EUBANKS,
 DANIEL
 J. NICHOLS, and
 JIM WOODWARD,
vs.
CONTESTEE: MIKE HALE
CIVIL ACTION NO. CV 98-7033 WJW

*1180 ORDER

This case solely consists of an election contest, the statutory procedure whereby the contestant not certified as the winner of a popular election may demand and receive an examination of electors and ballots in order to demonstrate that said election was, in some part, typified by fraud, malconduct or corruption, on the part of election officials or others; or the counting of illegal votes; or, the rejection of legal votes; or the certified winner is ineligible to serve; or bribery, offers to bribe, intimidation or malconduct calculated to prevent a fair, free and full exercise of the elective franchise (emphasis added). Code of Alabama, § 17-15-1.
"Election" is variously defined as, "The formal choice of a person or persons for any position or dignity, usually by ballot"; "A popular vote upon any question officially proposed"; "The act of choosing." Funk and Wagnal's Standard College Dictionary, 1996, Pleasantville, New York.
The decision hereinbelow will address the dual entitlements of the voters of Jefferson County as well as those standing for election, Woodward and Hale.
Section 33 of the Constitution of Alabama of 1901, provides that, "The privilege of suffrage shall be protected by laws regulating elections and prohibiting, under adequate penalties, all undue influences from power, bribery, tumult or other improper conduct."
Further, in Garrett v. Cunningham[Cuninghame], 211 Ala. 430, 100 So. 845 (1924), the rights of citizen voters (each and every qualified elector in Jefferson County) [emphasis added] are protected as follows: "Nor shall any ballot be rejected for any technical error which does not make it impossible to determine the voter's choice ..." Code, 1907 § 414.
Thus, in a "perfect world," the undersigned need only recognize and enforce the aforementioned and similar precedents, thus bestowing each qualified voter and each Sheriff's Candidate with its respective entitlement.
Counsel for Woodward postulate a clear and correct majority of 106,307 votes for Woodward versus 106,266 votes for Hale. This comprises a difference (or majority) of 41 votes.
Counsel for Hale espouse a correspondingly clear and correct majority of 106,282 votes for Hale, versus 106,276 votes for Woodward. This yields a majority of votes for Contestee Hale amounting to 6 votes.
The inevitable issue then becomes how can this judge determine, from previous orders of our Supreme Court herein, applicable pertinent statutes under Title 17, Code of Alabama and the caselaw, the most salient application of the law to the facts. As strong public policy is primordially at stake, it is deemed imperative that the declaration of the rightful winner of the election be unerringly reflective of the mandate of the people.
The citizens of Jefferson County as well as these sheriff's candidates are entitled to have a duly elected sheriff, whose position and tenure is unencumbered by doubt, suspicion or the perception of disenfranchisement.
However, damages lurk along this path. The decision (or decisions) reached by not only this writer, but the Supreme Court as well, conceivably could have the unintended, yet unavoidable effect of casting doubt about various other political races decided by the November 3, 1998, General Election.
Because this writer was well pleased with the results of the November 3, 1988, races listed below, it is most hopefully believed that nothing stated below be misconstrued as any lack of respect for distinguished *1181 friends and revered office-holders. The illustration is propounded for purposes of public confidence in the electoral process.
The election results of the November 3, 1998, General Election (computer-run on November 3, 1998) show that the vote totals for three different places as "Associate Justice of the Supreme Court" received only 2, 3 and 4 thousand more votes respectively than the loser. Though no contest was filed, the interpretation of only the rather newly enacted law providing for on-site absentee voting, Code of Alabama, § 17-10-7(c) might cause speculation that the allowance or rejection of these on-site ballots in each of the 67 counties indicate a fanciful winner who had previously been presumed to have lost.
To continue the sequential illustration of the effect of judicial treatment of on-site ballots (without further present discussion on the effect of treatment of other statutes and authorities) the vote difference in the race for one Public Service Commission was only 213 ballots. One so inclined might easily conclude that the "true winner" would have been the losing candidate if the legal and decisive way of applying the effect of on-site ballots cast was carried out in the Public Service Commission race along with the same lines it was treated in the Woodward versus Hale contest.
Of the races for public office which might allow or encourage mistrust and lack of confidence, depending on the judicial treatment of the on-site ballot issue are the Secretary of State race as well as some Jefferson County Circuit Judgeships and Commissioner of Agriculture.
Another matter demanding the attention of the Supreme Court must be addressed. In reviewing the applicable law during this election contest, this court has come upon a perceived oversight contained in Alabama Law which should be considered and dealt with by the Supreme Court during its deliberations. As early as 1901, the Alabama Legislature, through ratification of Article V, Section 122, Constitution of Alabama, recognized the office of sheriff to be part of the executive department of this State. Article V, Section 112 states: "The executive department shall consist of a governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and a sheriff for each county." (Article V, Section 112, is later repealed in part by Amendment No. 284, as it pertains to the state superintendent of education.)
This Court, along with various other courts including the United States Court of Appeals, Eleventh Circuit, and the Supreme Court of the United States, has consistently and unequivocally held that the sheriff is an executive officer of the state. See Turquitt v. Jefferson County, Alabama, 137 F.3d 1285 (11th Cir.1998), McMillian v. Monroe County, Alabama, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), Stark v. Madison County, Alabama, 678 So.2d 787 (Ala.[Civ.App.]1996), Whitten v. Lowe, 677 So.2d 778 (Ala.[Civ. App.]1995), Oliver v. Townsend, 534 So.2d 1038 (Ala.1988), King v. Colbert County, 620 So.2d 623 (Ala.1993), and Parker v. Amerson, 519 So.2d 442 (Ala.1987). That the sheriff is an Alabama State Officer as a member of the executive department is well established in Alabama case law and the Alabama Constitution.
Sections 17-15-50 through 17-15-63, Code of Alabama 1975, proscribe the manner of contesting elections for State Officers. In particular, § 17-15-50 lists all officers which must follow the above listed code sections in order to perfect an election contest. Specifically, § 17-15-50 applies to the "... election for the officer of Governor, Secretary of State, Auditor, Treasurer, Attorney General, Commissioner of Agriculture and Industries, justices of the Supreme Court or judges of the courts of appeals, ..." Missing from this *1182 list of offices is the office of sheriff. Sheriff is the only executive department office which is not encompassed by §§ 17-15-50 through 17-15-63.
In consideration of this oversight, (Undoubtedly caused by years of popular belief that the sheriff was a county official. See Turquitt supra) this court concludes that a contest of the election for sheriff is governed by §§ 17-15-20 through 17-15-35. However, the list of offices covered by these sections does not include any executive department office. Further, the list of offices covered by these sections seems to only provide for sheriff by default in the catch-all phrase "any office which is filled by the vote of a single county". § 17-15-20, Code of Alabama.
In an effort to follow the obvious intent of our Legislature, Alabama courts, and United States courts, to treat sheriff as an executive department office, this court urges the Supreme Court to mandate that a contest for an election of sheriff should follow the Alabama Code sections which correctly pertain to all other executive department offices. By treating the contest of an election for sheriff as all other executive offices are treated, the Supreme Court would be following both the intent of the Legislature authoring the Alabama Constitution and previous holdings in Alabama and United States courts.
The Supreme Court's Order On Return to Remand, dated August 2, 1999, requires a calculation of the total number of votes legally cast for Contestant and for Contestee. A detailed statement of findings of fact considered in support of judgment is to accompany the judgment, which is stayed by this trial court pending review of the Supreme Court.
Pursuant to the directions of the Supreme Court, this writer calculates the total number of votes legally cast for the Contestant, Jim Woodward, to be 106,276 and the total number of votes legally cast for the Contestee, Mike Hale, to be 106,282. These calculations clearly indicate that Contestee received 6 of legally cast votes more than Contestee Woodward.
This court heard evidentiary matters over a period of seven full non-consecutive days, from August 24 through September 2, 1999.
Considerable and certain testimony in this case was surprisingly susceptible of belief, based on the age, judicial experience and God-given gift of some measure of discernment of this writer. Correspondingly, certain minimal testimony was patently ludicrous or biased.
Dr. Roper, called as an expert witness, had not too long prior trained literally at the knee of a qualified expert. Providing a recently-revised curriculum vitae, Dr. Roper took the stand.
Contestee's voir dire revealed that Roper intended to do hand writing analyses with a magnifying glass from his pocket. Counsel for Contestee objected on grounds of "junk science" as set out in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579[, 113 S.Ct. 2786, 125 L.Ed.2d 469] (1993).
As an attorney, and later as a trial judge, this writer has had extensive experience with hand writing experts. It is believed that no qualified expert would compromise his credentials, expertise or ethics by purporting to forego traditional, microscopic laboratory tests and conduct a "shoot from the hip" type of alchemy, thereafter giving sworn testimony to substantiate the exercise. This purported expert is the heart and soul of the necessity for the decision in Daubert. Contestant had sought to challenge the votes of 6 persons who had cast ballots for Hale. These persons were R.L.F., M.T., R.R., R.L.T., H.T. and L.H. By excluding the portrayal contemplated by Dr. Roper, these 6 votes for Hale are declared legally cast.
*1183 This writer had previously become familiar with the identity of Jesse Burrell, through an examination of the Sheriff's investigative file. No report she had made of wrongdoing had persuaded deputies to file charges or to deepen the investigation.
On the stand, she could never be "stumped". She knew the exact, sound physical condition, the activities, location and potential of her neighbors on election day. With no medical training, she testified staunchly on the diagnosis, prognosis and progress report on each of her targets. To be concise, her testimony was unworthy of any credibility whatsoever.
As a disgruntled office-seeker, her motives were clear. The voters she tried to discredit are L.B., A.D., L.C., C.R., W.M.C., F.S., R.G. and M.M. These were votes cast for Hale, and should be allowed.
This court is satisfied from evidence presented by Contestant that the vote for R.C. is due to be excluded. R.C.'s vote is due to be excluded due to his being convicted of a felony. Therefore, R.C.'s vote for Hale is not counted.
The next category of voters which this court considers is the on-site absentee ballots which were cast by poll watchers. Numerous Republican poll watchers were instructed by the Jefferson County Republican Executive Committee that they could vote either by regular or on-site absentee ballot. These poll watchers were obviously in Jefferson County on election day since they were serving as poll watchers. As stated by the Supreme Court in its previous order, the only reason a voter may vote by on-site absentee ballot is that the voter will be out of town on election day. Therefore, the votes of R.O., J.T.T., O.P., R.M.S., F.W., G.D.B., R.D.C., F.C.G., E.H.M., R.W.H., J.M.D., J.W., and M.E., all of whom fall into this category, should not be counted. All of these voters who served as poll watchers voted for Woodward.
A second group of voters whose votes should be excluded are voters whose signatures are illegal. This court was disturbed to hear testimony of numerous witnesses who attested to the fact that the signatures of the absentee ballots were not their own or persons who saw the ballots signed by someone other than the person whose name appeared on the ballot. These ballots were illegally cast. Therefore, the votes of T.T., M.T., K.C.T., S.B.H., C.H., C.M.L., J.A.W., El. H., M.H., Mi. H., A.H., P.H., T.L.M., and Ea. H. are excluded. All of these voters cast votes for Hale. Included in this category of persons whose ballot was signed by someone other than the voter are R.T. and A.B.W. However, through the court's observation of these two voters, this court is satisfied that these two voters were in need of assistance in completing the ballot. Therefore, this court accepts that the ballots cast in the name of A.B.W. and R.T. are legal and the votes are not excluded from the final counts.
A third group of voters whose votes should be excluded are the voters which testified as to their reason for voting by on-site absentee ballot, which did not meet the requirement, as stated before, that the voter be out of the county on election day. These voters include several persons who voted on-site so that they could work at their normal jobs, all in Jefferson County. These voters also include some who voted on-site due to the hospitalization of a family member on the day of the election. These voters whose votes are excluded are: A.S., B.C., R.L., E.R.F., L.M., P.A.C., D.K., F.T., R.G.L., K.A.M., C.L., J.K., E.K., J.G., L.B., H.R., B.P., T.F.R., J.C.B., S.W., S.M., G.W., and J.S. Phillips' vote for Hale is excluded. The remaining voters listed in this category of voters all voted for Woodward and their vote is excluded.
An individual vote, the vote cast by C.P. for Woodward, is excluded on the basis that C.P. testified in court that at the time *1184 of the election, and for the ten years prior to the election, he was a resident of Shelby County, Alabama. C.P. testified that although he was a resident of Shelby County at the time of the election, he voted in the Jefferson County election. Therefore, his vote is excluded by this court.
Another individual vote, the vote cast by G.R.N. for Woodward, is excluded on the basis that he did not meet the statutory requirement of an emergency absentee voter under § 17-10-12(c), Code of Alabama. G.R.N. voted on November 2, 1998, as an emergency absentee ballot because he had agreed on that late date to serve as a Republican poll watcher.
It should be noted that this court did not consider the validity of votes cast by Ca. H., Ja. D., and Fa. W. These three voters were not called to testify. Instead, the Contestee offered the affidavits of these on-site absentee ballots to show that these voters wrote in reasons for voting on the affidavits. The court did not consider the validity of these three ballots in reaching its decision.
This writer has advised the attorneys and parties, back on August 24, 1999, that this court has been deceived or its requests largely ignored, in its requests for certain evidence. That is, this writer ordered the delivery from the Sheriff's office, in November of 1998, of the complete sheriff's investigative file.
What was sent was a folder of less than 100 pages, consisting of investigations, incident reports and some information on voters retrieved, apparently, from an N.C.I.C. computer search.
In contrast, two weeks ago, the same file was requested by this court and it was received, consisting of several hundred pages of additional matters, reports and information.
Along similar lines is the apparent use of the Sheriff's department to aid counsel for the contestant in its attempt to gather material for use in contesting the election. Should the offices of state (actually, The State of Alabama) be so gracious in assisting contestants in their endeavors to unseat an opponent, perhaps the Legislature should be delivered a request for funding, in order that costs of a contest be paid for by the state. What is ridiculous in the preceding example, is wholly improper in the above-described incident.
As regards on-site ballots, there is little caselaw available, owing to the August 1996 effective date for such method of voting. Our Supreme Court has ruled, in the subject case, that the "block" on an on-site ballot need not have been checked, as no alternative reason for so voting is printed thereon.
Section 17-10-7(c) Code of Alabama, cites a case in the case notes entitled Roe v. Mobile Co. Appointment Bd., 676 So.2d 1206 (Ala.1995). This case holds that, "Absent a showing of fraud, gross negligence, or intentional wrongdoing, Alabama law requires the counting of all absentee ballots cast in a general election which contain: (1) the place of residence of the person casting the ballot; (2) the reason for voting by absentee ballot; and (3) the signature of the voter. The appropriate place to make any such showing would be in the legislature if an election contest is filed. Thus, any such absentee ballots at issue are to be opened, over challenges if made, and counted." To further develop this, the Court stated in Garrett v. Cunningham[Cuninghame], Infra., "A voter should not be disenfranchised by rejection of his ballot in whole or in part, when it is clear that he made an honest effort to comply with the law and has substantially complied with its mandatory requirements..."
In sharp contrast with the cases cited above is the holding of our Supreme Court that one reason, and one reason only, exists for a voter to be allowed the privilege of voting by absentee, on-site ballot. This *1185 is the reason and the requirement that the voter "will be out of the county or state on election day".
In addition, the statute [§ 17-10-7(c)] states that the on-site absentee voter must swear an oath stating, "Moreover, I further swear (or affirm) that all of the information given above is true and correct to the best of my knowledge and that I understand that by knowingly giving false information so as to vote illegally by absentee ballot that I shall be guilty of a misdemeanor which is punishable by a fine not to exceed one thousand dollars ($1,000) or confinement in the county jail for not more than six months, or both."
Is it the duty or the prerogative of this writer, to disregard a body of common law, Title 17 statutory law (enacted by representatives of the people of Alabama) and the sworn oaths of persons competent to make a decision to be bound by their own pledge of individual honor, truth and responsibility in order to enforce a counter-vailing set of laws and statutes chosen by onethough that one be a duly elected judge.
This Circuit Court cannot substitute its decision or opinion for the mandate of a majority of the voters of Alabama. And the choice to be made by one judicial officer, depending on which set of law it chooses to disregard, will determine which voters will be a majority and which will be a minority.
It is not within the realm of principle or intent of this trial court to deprive either half of the population of Jefferson County of their right to vote for their Sheriff.
To mandate by the judicial fiat of this one would be to deprive the many of their right to a county sheriff of their choosing.
Despite the apparent majority attributable to Mike Hale, in light of all the evidence and the well-intentioned but conflicting or irreconcilable occurrence of statutory and constitutional law as cited hereinabove, a judgment under § 17-15-2 and § 17-15-32, Code of Alabama, are the only proper statutes which can be followed in order to attain the legality necessary to state of the law and evidence as adduced. Thus, each candidate is declared ineligible to be sheriff insofar as the November 3, 1998, election only.
The election of November 3, 1998, insofar as the election of Sheriff of Jefferson County is hereby annulled. This judgment of Annulment shall, if allowed to stand, allow the voters of Jefferson County to determine and thereby have unerring confidence in their entitlement to elect the Sheriff of Jefferson County without substantial mistrust or suspicion that they have been disenfranchised by the election process and thereafter the fiat of the courts.
It is incumbent upon the Governor, under § 17-18-2 and § 17-18-3, to hold a special election on or after October 12, 1999.
DONE AND ORDERED this 10th day of September, 1999.
 /s/ William J. Wynn
 William J. Wynn
 Circuit Judge
cc: Albert L. Jordan, Esq.
 Algert S. Agricola, Jr., Esq.
 J. Scott Langner, Esq.
 Russell Jackson Drake, Esq.
NOTES
[1] At its conference on August 10, 1999, this Court systematically examined each of the exhibits for relevant evidence. Exhibit 7, a manila envelope alleged by the parties to contain files compiled by the Jefferson County Sheriff's department in the course of a voterfraud investigation, was not unsealed.

Coincidentally, on that same day Hale filed with this Court a motion to supplement the record, attaching to the motion what appears to be a copy of an indictment of Woodward. Subsequently, the contestants filed a response to that motion. The motion to supplement the record is due to be denied because we have not examined Exhibit 7 and because the fact that Woodward may or may not have been indicted does not in any way alter the vote count that is the subject of this appeal.
[2] The contestee Hale insisted that these 25 Bessemer Division absentee ballots be examined at the July 8, 1999, hearing before the trial court; however, at oral argument, the contestee contended that we should not consider these 25 ballots.
[3] See note 11, infra.
[4] The following statement made by Hale's counsel appears in the record, at page 54 of the transcript of Carter's deposition:

"Mr. Carter, some of the lawyers involved in this election contest went over to the vault on Wednesday and we obtained 48 on-site absentee voting envelopes which, of course, contain the affidavit and contain this box that we have been talking about. In that process, we discovered the affidavits of Edna Mae Walker and William H. Walker, Sr. And it appears that they did not check the box, but since the envelope had been opened, we lawyers assume that the ballot was counted."
(Emphasis added.)
Mr. Carter did not testify to any specific recollection as to whether the Walkers' ballots had been counted. However, we note that, at least at the time of Mr. Carter's deposition, counsel for the contestee had reached the same conclusion regarding the Walkers' "on-site" affidavit envelopes that counsel for the contestants argue before this Court regarding the 23 "on-site" affidavit envelopes at issue here, which, like the Walkers'"on-site" affidavit envelopes, were discovered by the attorneys opened and with their ballots removed that is, the conclusion that the ballots were counted.
[5] Although the statute makes no provision for the inclusion of a box or space for a voter to check or mark on an "on-site" absentee ballot, it is plain that the ballots in Jefferson County included such a box. Why was the box included? There is some evidence in the record on this issue, but we find it is unnecessary to determine why and under what circumstances this occurred, because the Legislature did not require a box or space for the absentee voter to indicate the obvious, that each was stating that he or she would "be out of the county or state on election day."
[6] Ala. Acts 1996, 2d Ex.Sess., Act No. 96-885, p. 1699, § 6.
[7] See, also, Roe v. Mobile County Appointment Bd., 676 So.2d 1206, 1253 (Ala.1995) (Maddox, J., dissenting).
[8] Similarly, poll workers in the Bessemer Division, except as to two ballots we find did comply, followed the requirements of the law when they did not count ballots contained in affidavit envelopes that did not comply with the provisions of § 17-10-10. See section II, supra. "On-site" absentee ballots included in envelopes that did not have a check in the box by the only reason for voting absentee, however, were properly counted. See, section III, supra.
[9] We counted those 25 absentee ballots from the Bessemer Division. Hale received 18 votes and Woodward received 7. As we have discussed in this opinion, 23 of these 25 absentee ballots should not have been counted, but even if the trial judge counted each of these ballots, Woodward would have been the winner. We reach this conclusion, as follows: Before the contest was filed, the vote totals were 106,269 for Hale and 106,232 for Woodward, a 37-vote margin. If one adds 79 of the 115 ballots in the Birmingham Division to Woodward's total, and 27 of those to Hale's total, the result would have been 106,311 for Woodward and 106,296 for Hale, or a 15-vote difference in Woodward's favor.

Adding the Bessemer Division ballots to these totals does not alter the result. Of the 25 Bessemer Division ballots, 7 showed votes for Woodward and 18 showed votes for Hale. (Of these 25 ballots, however, as we have stated, only 2, both of which showed votes for Hale, were actually due to be counted. The remainder of the ballots for Hale and all of the ballots for Woodward were not due to be counted, because of noncompliance of the affidavits associated with those ballots.) Adding those votes to the totals given above would result in a vote of 106,318 for Woodward and 106,314 for Hale, yielding a 4-vote difference in Woodward's favor.
[10] See section III, supra, of this opinion for further discussion of this issue.
[11] At oral argument, the following exchange took place:

"MADDOX, J.: [Addressing contestants' counsel]
You may have covered this, but I am interested in the record of the hearing that was held on July 8, the most recent hearing after remandthere's some mention in the record about some lost ballots, lost affidavits. Do these seven exhibits here contain all the records that the trial judge reviewed in making his January 4 order?
"MR. JORDAN: Yes.
"MADDOX, J.: They do?
"MR. JORDAN: Absolutely. In fact, the proceedingsthe proceedings before the judge involved the judge helping to have the materials brought to the courtroom. He said, and we asked himare these all the materials that you reviewed? And I believe that'sit occurred both on and off the record. It's definitely on the record, but I'm saying it occurred additional times off the record. And, there were additional checks made. In the transcript of proceedings, it doesn't include testimony from the judge, in that sense, but it includes statements from the people, with everybody assembled that not only is this everything, but we did a check and we went to the vault.
"MADDOX, J.: OK, so we can conclude from that that the trial judge used these records in order to make the determination and finding that he made in the January 4th order that he had counted all the uncounted ballots and that Hale still won?
"MR. JORDAN: He said in his order that he had counted all the on-site ballots.
"MADDOX, J.: All right.
"LYONS, J.: Mr. Jordan, let me probe this a little further. There are clearly some absentee ballots that are not in that box. Now, you maintain that these ballots were not there because they were voted and counted. Is that correct?
"HOOPER, C.J.: The Bessemer box.
"LYONS, J.: The Bessemer box.
"MR. JORDAN: Right, right.
"LYONS, J.: The absence is explained by the fact that they apparently had to be counted.
"MR. JORDAN: That's the only way they could get in the box.
"LYONS, J.: Right. Now, is there a contrary contention from your adversaries to the effect that these boxesthese votes were there when the judge looked at things and they're somehow now missing? Are we going to hear that from the other side?
"MR. JORDAN: I don't believe so with respect to the inference to be drawn by the emptiness of an affidavit envelope the unsealing of an affidavit envelope. For instance, there are notwe didn't see any affidavit envelopes in this material that is unsealed that does not contain a ballot in it. And the reason is that when the chief inspector of the absentee voting placeand this is not in the record, but it's common sensethey open them, they pull them out, they separate them, and then after they separate them they take the ballots and feed them through the counter machine. And so you're left with the empty affidavit envelope.
"SEE, J.: In fact, by statute aren't they required to do that?
"MR. JORDAN: Absolutely.
"SEE, J.: And if they were to have removed those ballots and not counted them, they would havethat is if they had determined that these ballots were not to be counted and nonetheless opened them and removed them from the affidavit envelopes, they would have been violating the law?
"MR. JORDAN: [Section] 17-10-10 says exactly that in the first sentence in the second paragraph."
Mr. Drake, counsel for the contestee, responded to this discussion when he presented his argument:
"MR. DRAKE: Mr. Jordan and Mr. Agricola found 23 [on-site absentee affidavits with the box unchecked] that were opened. And, the ballots were missing. It is logical to me to concludehe concluded that they must have been counted on election nightit's just as logical to me to conclude that Judge Wynn opened them and counted them. We had pointed out to him
"LYONS, J.: And then lost them?
"MR. DRAKE: Yeah. And lost them.
"HOOPER, C.J.: How'd that happen?
"MR. DRAKE: I don't know. I think that makes as much sense as saying that they were opened on election night and counted. Because we've got the testimony the emphatic testimonythat they were not counted.
"HOOPER, C.J.: How does a judge lose those things? That would puzzle me. I've been one of those.
"MR. DRAKE: Well he took things home with him. I don't know. I don't know what happened.
"HOOPER, C.J.: He took evidence home?
"MR. DRAKE: Yes. He took all of this stuff home with him, over the Christmas holidays and over the New Year's holidays.
"HOOPER, C.J.: I see.
"MR. DRAKE: And, I don't know if he lost it. But they don't know if the ballots were counted or not, either. And, I'm just saying that that speculation is offset by another speculation that's just as reasonable for two reasons. One is, you've got Earl Carter's testimony that's unrefuted that the ballots were not counted. And, second, if you take those 23 ballots and assume that 21 of them were for Mike Hale, you come up with a difference of 4. And that's what Judge Wynn said was the difference. And that makes as much sense as anything.
"LYONS, J.: So he made a mathematical mistake with 4 votes and he lost the other ballots?
"MR. DRAKE: No. I'm not saying he made a mathematical mistake. I'm not sayingI'm not assuming that all 23 of those votes went to Hale. They may have.
"LYONS, J.: OK. What you're saying is when he counted them, that's how he came to his math.
"MR. DRAKE: I'm saying if you assume 21 of them were for Hale
"LYONS, J.: I see.
"MR. DRAKE:and then you subtract or give those two votes, that difference, to Woodward, you come up with a difference of 4, with Hale winning, which is exactly what Judge Wynn's count was.
". . . .
"MADDOX, J.: So, the record does not reflect who in fact opened those ballots?
"MR. DRAKE: There is nothing in the record to indicate who opened them.
"MADDOX, J.: What inferences were drawn by the trial judge as to who opened them?
"MR. DRAKE: I beg your pardon?
"MADDOX, J.: What inference did the trial judge make in making his determination about the vote totals?
"MR. DRAKE: We don't know. There's nothing in his order about that. There's nothing in his order saying who opened them or whether he opened them. I think we assume that he openedI mean I assume that he opened the 23.
"HOOPER, C.J.: Where is the testimony in here aboutEarl Carter testifying that they were not counted?
"MR. DRAKE: His deposition is in the record. We took his deposition and it's in the record, and in my original briefs I would have cited to that page.
"HOOPER, C.J.: OK.
"LYONS, J.: When Earl Carter testified, I assume he testified that there were 23 on-site ballots that did not have the box checked and for that reason they were not counted. Is that the essence of his testimony?
"MR. DRAKE: No. My recollection is that he didn't know how many weren't counted. He just simply said we didn't count any of them.
"LYONS, J.: OK. He said we didn't count any.
"MR. DRAKE: Right.
"LYONS, J.: And you thenin order to where does the number 23 come into the picture?
"MR. DRAKE: Twenty-three is the number that they found in looking at the absentee ballot envelopes from Bessemer that did not have the box checked and the ballots were missing.
"LYONS, J.: OK, so we've got the 23 affidavits without the box checked, but they don't have the ballots with them.
"MR. DRAKE: Right.
"LYONS, J.: So the big mystery is where are the ballots?
"MR. DRAKE: Right.
". . . .
"MADDOX, J.: I have before me a photocopy of plaintiff's exhibit number 4, and it's marked plaintiff's 4Carter. Would that be an exhibit to his deposition?
"MR. DRAKE: Yes.
"MADDOX, J.: It appears to be a copya photocopyof the affidavit envelope.
"MR. DRAKE: Yes.
"MADDOX, J.: Do you know whether or not that exhibit at the time that deposition was taken was opened or unopened?
"MR. DRAKE: I don't recall. It may have been not a form, but one that wasn't used. You know? I don't know. I don't know. But, I offer that explanation as one way that Judge Wynn got to his 4."
[12] The Legislature provided for the first multiple-reason affidavit in 1980. See Act No. 80-732, 1980 Ala. Acts 1478. Before 1980, the affidavit provided in pertinent part:

"`Before me, the undersigned authority, personally appeared ______, who is known (or made known) to me and who, being first duly sworn, deposes and says: I am a bona fide resident and qualified elector of ______ precinct or district in ______ County, Alabama or that I was a bona fide resident and qualified elector of ______ precinct or district until my removal therefrom on the ___ day of ___ 19,__ [sic], a date not more than thirty days before the election day, and but for such removal I still satisfy the Alabama registration requirements. I have not heretofore voted in the election to be held on ____, 19__, and I am entitled to vote therein; but, I will be away from the county of my residence (or former residence) or unable to go to the polls on such day. Therefore I have marked the foregoing absentee ballot and hereby declare the same to be my ballot in said election. ______ (Signature or mark of voter.)'"
Act No. 1147, § 5, 1975 Ala. Acts 2251 (emphasis added).
[1] In our August 20, 1999, remand order, we specifically retained jurisdiction of this case, and we directed that any judgment entered by the trial judge be stayed pending our review. Accordingly, the trial judge's order entered on September 10 was stayed.
[2] To protect the privacy of the voters whose ballots are involved in this case, the voters' names appearing in the trial court's order, a copy of which is attached as Appendix A, are replaced by the voters' initials, both in the appendix and in this opinion.
[3] The trial judge wrote:

"Another matter demanding the attention of the Supreme Court must be addressed. In reviewing the applicable law during this election contest, this court has come upon a perceived oversight contained in Alabama Law which should be considered and dealt with by the Supreme Court during its deliberations. As early as 1901, the Alabama Legislature, through ratification of Article V, Section 112, Constitution of Alabama, recognized the office of sheriff to be part of the executive department of this State. Article V, Section 112 states: `The executive department shall consist of a governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and a sheriff for each county.' (Article V, Section 112, [was] later repealed in part by Amendment No. 284, as it pertains to the state superintendent of education.)
"This Court, along with various other courts including the United States Court of Appeals, Eleventh Circuit, and the Supreme Court of the United States, has consistently and unequivocally held that the sheriff is an executive officer of the state. See Turquitt v. Jefferson County, 137 F.3d 1285 (11th Cir.1998), McMillian v. Monroe County, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), Stark v. Madison County, Alabama, 678 So.2d 787 (Ala.Civ.App.1996), Whitten v. Lowe, 677 So.2d 778 (Ala.Civ.App.1995), Oliver v. Townsend, 534 So.2d 1038 (Ala. 1988), King v. Colbert County, 620 So.2d 623 (Ala.1993), and Parker v. Amerson, 519 So.2d 442 (Ala.1987). That the sheriff is an Alabama State Officer as a member of the executive department is well established in Alabama case law and the Alabama Constitution.
"Sections 17-15-50 through 17-15-63, [Ala.Code 1975], [prescribe] the manner of contesting elections for State Officers. In particular, § 17-15-50 lists all officers which must follow the above listed code sections in order to perfect an election contest. Specifically, § 17-15-50 applies to the `... election for the office of Governor, Secretary of State, Auditor, Treasurer, Attorney General, Commissioner of Agriculture and Industries, justices of the Supreme Court or judges of the courts of appeals....' Missing from this list of offices is the office of sheriff. Sheriff is the only executive department office which is not encompassed by §§ 17-15-50 through 17-15-63.
"In consideration of this oversight (Undoubtedly caused by years of popular belief that the sheriff was a county official. See Turquitt, supra), this court concludes that a contest of the election for sheriff is governed by §§ 17-15-20 through 17-15-35. However, the list of offices covered by these sections does not include any executive department office. Further, the list of offices covered by these sections seems to only provide for sheriff by default in the catch-all phrase `any office which is filled by the vote of a single county.' § 17-15-20, [Ala.Code 1975].
"In an effort to follow the obvious intent of our Legislature, Alabama courts, and United States courts, to treat sheriff as an executive department office, this court urges the Supreme Court to mandate that a contest for an election of sheriff should follow the Alabama Code sections which correctly pertain to all other executive department offices. By treating the contest of an election for sheriff as all other executive offices are treated, the Supreme Court would be following both the intent of the Legislature authoring the Alabama Constitution [sic] and previous holdings in Alabama and United States courts."
Appendix A, 752 So.2d at 1181-82.
[4] See Parker v. Amerson, 519 So.2d 442 (Ala. 1987).
[5] Section 17-15-20 provides that one contesting the election of another to "any office which is filled by the vote of a single county" must make a written statement meeting specified requirements. An election for sheriff is clearly one "filled by the vote of a single county." Further, § 17-15-29 provides that the contest of an election for "judge of the probate court, sheriff, tax assessor, tax collector, county treasurer, clerk of the circuit court or any other office filled by the vote of a single county" is triable in the circuit court. (Emphasis added.) Similarly, § 17-15-34 specifically provides that the contest of an election for sheriff may be appealed from the circuit court to this Court. Thus, a plain reading of the statutes in question demonstrates that the Legislature intended that elections for sheriff be governed by §§ 17-15-20 through 17-15-35.
[6] The trial judge declared both candidates "ineligible," but he did so with respect to the November 3 election only. In other words, the trial judge sought to create a circumstance where the November 3 election could, in effect, be held anew.
[7] Hale, in his brief, invites this Court to order a new election:

"In his ending portion of his order, Circuit Judge William Wynn, in effect, declared the office of Sheriff to be vacant and called for a special election or new election to fill the office. Contestee Mike Hale stated in open Court that he was willing to run for election again and to allow the people to decide this issue. Should the Court reach the conclusion that it cannot decide who won the election, then ordering a new election would be appropriate."
(Brief of Contestee, filed September 16, 1999, at 40.)
[8] The course of proceedings in this case has been unusual. The trial judge dismissed the election contest before the trial had even begun, and he did so based on an erroneous analysis of the evidence. When this Court concluded that the trial court had erred in dismissing the case, it remanded the case for further proceedings at which the parties could introduce their evidence of alleged illegal votes. In doing so, this Court ordered that the trial court proceedings be completed within 14 days. Because of the unusual course of proceedings in this case, and because of the time limit imposed by this Court in its remand order, and out of an abundance of caution, we conclude that the contestants' constitutional due-process rights require that we consider all of the evidence admitted below.
[9] For the convenience of the reader, we will keep a running count of the votes as we discuss them and reach our conclusions as to whether they are to be excluded. Our starting points are the totals we found in our August 20, 1999, order. As we understand the evidence, there are no additional votes to be added. Thus, with regard to each of the votes discussed below, the only question is whether they are to be excluded and, therefore, subtracted from our previously established totals.
[10] See also Moon's Adm'r v. Crowder, 72 Ala. 79, 88 (1882), which defined a handwriting expert as one "accustomed to, and skilled in the matter of handwritings, genuine and spurious"; Charles W. Gamble, McElroy's Alabama Evidence, § 111.01(3) (5th ed.1996); and Joseph A. Colquitt, Alabama Law of Evidence, § 9.1(b) (1996).
[11] The trial judge asked Dr. Roper whether he had looked at the signatures and other handwriting samples through a "telescope." From the context of the proceedings, however, it seems that the trial judge intended to say "microscope."
[12] The following chart details which of the 21 votes about which Dr. Roper would have testified the trial court excluded based on the testimony of other witnesses.

 Voters Dispositions
 Trial Court This Court
C.H. Excluded Excluded
D.H. Not Excluded Excluded
Ea.H. Excluded Excluded
M.H. Excluded Excluded
Mi.H. Excluded Excluded
A.H. Excluded Excluded
P.H. Excluded Excluded
C.M.L. Excluded Excluded
T.L.M. Excluded Excluded
K.C.T. Excluded Excluded
M.T. Excluded Excluded
R.T. Not Excluded Excluded
T.T. Excluded Excluded
A.B.W. Not Excluded Excluded
J.A.W. Excluded Excluded
R.L.F. Not Discussed Not Excluded
L.H. Not Discussed Not Excluded
R.R. Not Discussed Not Excluded
M.T. Not Discussed Not Excluded
H.T. Not Discussed Not Excluded
R.L.T. Not Discussed Not Excluded

(For clarity's sake, the above chart lists the result of this Court's decision, rather than the action we take. Thus, for example, where we affirm the trial judge's exclusion of a vote, the chart lists "Excluded" rather than "Affirmed.")
R.L.F., L.H., R.R., M.T., H.T., and R.L.T. are the voters about whose votes Dr. Roper was prepared to testify and about which there was no other evidence introduced tending to show that they should have been excluded.
[13] We will address the remaining votes later in this opinion.
[14] O.P. testified that she was not a Republican party poll watcher. She was a poll worker, as distinguished from a volunteer poll watcher for a political party. It appears that the trial judge erred in placing his discussion of this witness's vote in this section of his order.
[15] For some reason, the trial judge did not include F.T. in the portion of his order in which he discussed the other poll watchers. Nevertheless, for clarity's sake, we address F.T.'s vote in this portion of this opinion.
[16] In his brief, Hale identified three such persons. In their brief, the contestants note that there were, in fact, three Republican Party poll watchers who voted with regular absentee ballots. For some reason, the trial judge included only two of those three in the list of names of persons whose votes he concluded were due to be excluded. In fact, all three votes should be counted. Because the trial judge listed only two of those voters in his order, his order is reversed as to only two of those three.
[17] The trial judge's order is not clear as to whether he believed that the 13 people he identified as poll watchers were working as poll watchers in Jefferson County. The testimony of this witness is clear that was a poll watcher in Hale County, not Jefferson County.
[18] In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court of the United States discussed the importance of the right to vote in a democratic society:

"Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 [(1884)], and to have their votes counted, United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 [(1915)]. In Mosley the Court stated that it is `as equally unquestionable that the right to have one's vote counted is as open to protection ... as the right to put a ballot in a box.' 238 U.S. at 386, 35 S.Ct. 904. The right to vote can neither be denied outright, Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 [(1915)], Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 [(1939)], nor destroyed by alteration of ballots, see United States v. Classic, 313 U.S. 299, 315, 61 S.Ct. 1031, 85 L.Ed. 1368 [(1941)], nor diluted by ballot-box stuffing, Ex parte Siebold, 100 U.S. (10 Otto) 371, 25 L.Ed. 717 [(1879)], United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 [(1944)]. As the Court stated in Classic, `Obviously included within the right to chose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted....' 313 U.S., at 315, 61 S.Ct. 1031.... The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."
377 U.S. at 554-55, 84 S.Ct. 1362.
[19] We note that another witness, C.G., who, like F.C.G., is an attorney, also testified that he had voted by an on-site absentee ballot because of his belief that he would be out of the county on the day of the election. Like F.C.G., C.G. actually did leave the county on the day of the election, but he was absent from the county for only a short time. The essential points of these witnesses' testimony were nearly identical. Yet, for some unknown reason, the trial judge held only the vote of F.C.G. to be excluded. His order makes no reference to C.G.
[20] As will be discussed below, the signature and witnessing requirements of the absentee-voting laws are of such integral importance that irregularities with respect to those requirements will be deemed to go to the "sanctity of the ballot and the integrity of the election."
[21] But see note 22.
[22] It is apparent from this record that several of the voters whose votes were excluded by the trial judge, an exclusion we reluctantly affirm, explained to election officials their reasons for applying to vote by absentee ballot and that election officials either did not supply them with the proper forms or failed to direct them to the proper place to obtain those forms. Further, it is apparent from this record that a number of these voters attempted to file accurate affidavits by writing in on their affidavit forms, for example, "work," or some similar statement in attempts to explain their true reasons for voting absentee. R.D.C. testified that election officials told him how to fill out his affidavit and that he wrote on his affidavit that he would be working as a poll watcher. M.E. did the same. J.M.D. testified that he did not mark the box beside the paragraph labeled "5" because he knew he would be in the county working as a poll watcher. E.H.M. testified that election workers told her to leave that box blank, and that she did so.

One might argue that those voters who were authorized to vote by regular absentee ballot, but who nonetheless voted by on-site absentee ballot and who attempted to correct the on-site affidavit form by writing in on it their reason for voting absentee, should have their ballots counted. We do not address that issue, however, because it is not essential to the outcome of this case.
Those charged with managing the casting of absentee ballots should be trained in the laws regulating the casting of absentee ballots, so that any voter who, in good faith, desires to vote absentee, and who is entitled to do so, can vote absentee and have his or her vote counted.
[23] M.E. also wrote on his affidavit that he was not sure whether he would be out of the county on election day. He had volunteered to be a poll watcher in a number of counties, and he had not yet been assigned a polling location at which he was to serve. One could make a compelling argument that M.E. was, in fact, authorized by § 17-10-3(c) to vote by on-site absentee ballot, given his belief, at the time he cast his ballot, that he might be outside the county on the day of the election. We need not address that issue, however, because determining that M.E.'s ballot, and the

ballots of other similarly situated voters, should be counted would not alter the result in this case.
[24] During her direct-examination, E.H.M. stated:

"And I wantedlet me tell you this: My kids and my grand-kids were watching my performance this past year in regard to government. And I wanted to show them that one person could make a difference in the dirty politics that we've encountered. So please, please, don't let me have to tell them that my vote didn't count."
Although her statement does not bear on the legal issue here, it is a reminder of the importance that many citizens attach to their right to vote. We regret that we are forced to conclude that, under the law, E.H.M.'s vote must be excluded. We reiterate that, because of the fundamental nature of a citizen's right to vote, and because, like E.H.M., many citizens attach great value to their right to vote, it is incumbent on election officials to provide citizens requesting to vote by absentee ballot the proper affidavit form and to provide those citizens with accurate and complete information. With regard to a number of voters in the November 3 General Election, it is apparent that Jefferson County election officials did not do all they should have done to provide accurate and complete information on the procedures for voting by absentee ballot to voters attempting to cast absentee ballots.
[25] However, R.M.S. testified that he had not yet received his poll-watching assignment and that he knew when he cast his on-site ballot that he might be assigned outside the county. See note 23.
[26] F.T.'s testimony also implies that he had volunteered to serve as a poll watcher outside Jefferson County. In response to a question asking whether he might have been assigned to be a poll watcher in another county, F.T. testified: "Yes. They said they needed people all over. I told them I would do what I had to do." (5th Supp. R. at 1013.) F.T. also testified that he had not yet received his assignment when he cast his ballot. See note 23.
[27] J.T. also testified:

"I had volunteered to be a poll watcher in any county that I was needed in, and expected to be out of Jefferson County."
(5th Supp. R. at 1095.) See note 23.
[28] We do not view this conclusion as an abandonment of the substantial-compliance rule of Williams v. Lide, and we do not view this conclusion and that rule as inconsistent. As we wrote in our August 20, 1999, order, "so long as any irregularities in the voting process do not `adversely affect the sanctity of the ballot and the integrity of the election,' substantial compliance `with the essential requirements of the absentee voting law' is sufficient." 752 So.2d at 1150, quoting Williams v. Lide, supra. With regard to the witnessing and signature requirements of the statute, we conclude that we are not free to ignore the Legislature's statement that those requirements go "to the integrity and sanctity of the ballot and election." The language the Legislature used regarding the witnessing requirement is completely consistent with Williams v. Lide and in no way implies that the substantial-compliance rule has been reversed, overturned, or in any way superseded.
[29] We note that a question may arise as to how a person who is completely paralyzed or otherwise disabled can comply with this rule. We are not faced with that question today, however, because neither of the parties raises that argument as to any voter, and we therefore do not address it. Further, if we have reached a conclusion that is contrary to the intent of the Legislature, then we invite that body to correct our error. See also Taylor v. Cox, 710 So.2d 406, 408 (Ala.1998), in which a majority of this Court "suggest[ed] that the legislature reconsider the wording of this statute."
[30] The trial judge discussed R.T.'s vote in conjunction with his discussion of the vote of A.B.W., see infra. He stated: "[T]hrough the Court's observation of these two voters, this court is satisfied that these two voters were in need of assistance in completing the ballot." However, we note that R.T. did not testify, and, based on our review of the transcript, it does not appear that he was ever present in the courtroom.
[31] S.B.H.'s ballot would also be properly excluded for another reason. Her affidavit bears the signatures of Johnnye Lassiter and Mildred Cook as witnesses. S.B.H. testified that she does not know either of them and that they were not present when she signed her affidavit.
[32] S.B.H. also testified that Cook and Lassiter, who are shown as witnesses on C.H.'s ballot, were not present when S.B.H. signed C.H.'s name on his affidavit.
[33] The trial judge's order never mentions K.H.
[34] A.B.W. also testified. The record suggests that he has difficulty hearing. Although his testimony is somewhat confusing, it appears to be consistent with his wife's testimony.
[35] F.T.'s vote is discussed above. Therefore, we will not discuss it again here.
[36] Furthermore, the trial judge made no specific statement that he made a credibility choice regarding his exclusion of these votes, as he did in the case of the witness Jessie Burrell.
[37] See § 17-10-12(b), Ala.Code 1975.
[38] J.G., L.M., and J.S. testified that they relied on the assistance of election officials in filling out their on-site absentee affidavits or on the representation of election officials that they could vote by on-site absentee ballots. That argument, however, does not alter our conclusion that their ballots are due to be excluded. See our discussion above.
[39] H.L.R. has since died.
[*] Note from the reporter of decisions: When the Court released this opinion on November 5, 1999, Justice Houston and Justice England indicated they would file further writings. Both Justice Houston and Justice England later informed the reporter that they would not write further.
[40] I do not discuss every voter addressed in the majority opinion. The voters not discussed are thereby not contested in this writing. The only votes contested by the majority and by this writing are two votes in Part I.B.(1) and five votes in Part I.B.(3) of this writing.
[41] "Public entity" is defined as "any State or local government; ... department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A) and (B). The term "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).
[42] In this connection, the majority says: "[The trial court] stated: `[T]hrough the court's observation of these two voters, this court is satisfied that these two voters were in need of assistance in completing the ballot.'" 752 So.2d at 1158 n. 30. It then states: "However, we note that R.T. did not testify and, based on our review of the transcript, it does not appear that he was ever present in the courtroom." Id. I do not believe, on the basis of this record, that this court can make a specific finding that the trial judge did not observe R.T. I note that the contestants appear careful not to state affirmatively that R.T. was never in the courtroom. Obviously, an individual need not actually testify to be observed by the trial judge, and the record nowhere demonstrates that R.T. was never in the courtroom to be observed. In addition, this issue was not raised in the trial court after the trial judge entered his finding and prior to the filing of briefs on appeal.
[43] See Ala.Code 1975, § 17-10-12(c), and the discussion of this statute in Part I.B.(4) of this dissent.
[44] I concede that if I were at liberty to apply a rule according to my personal taste, I would apply the "substantial-compliance" rule. However, I cannot ignore the developments in the absentee-ballot law since 1996, which includes action by both the Legislature and this Court. Therefore, I am not at liberty to apply the rule that I personally prefer, and I am certainly not at liberty to apply one rule to the contestant and another rule to the contestee in this case.
[45] I do not suggest or imply that the majority in reaching its decision is making a conscious partisan decision. I simply point out that the evidence is such, and this case is so postured, that a clear and decisive result cannot be achieved.